## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OPP LIQUIDATING COMPANY, INC. (f/k/a Orchids Paper Products Company), et al.,<br><br>          Debtors. | Chapter 11<br><br>Case No. 19-10729 (MFW)<br><br>Jointly Administered |
| BUCHWALD CAPITAL ADVISORS LLC, as Liquidating Trustee of the Orchids Paper Products Liquidating Trust,<br><br>          Plaintiff,<br><br>    v.<br><br>JEFFREY S. SCHOEN, et al.,<br><br>          Defendants. | Adv. Proc. No. 21-50431 (MFW) |

## <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT</u>

**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan (DE Bar No. 4057)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, 6th Floor
Wilmington, DE  19801
(302) 984-6108
    jryan@potteranderson.com
    rslaugh@potteranderson.com

**JENNER & BLOCK LLP**
Vincent E. Lazar (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
Monika N. Kothari (admitted *pro hac vice*)
353 North Clark Street
Chicago, IL 60654-3456
(312) 222-9350
vlazar@jenner.com
wwilliams@jenner.com
mkothari@jenner.com

*Counsel to Defendants Jeffrey Schoen, Steven Berlin, John Guttilla, Douglas Hailey, Elaine MacDonald, and Mark Ravich*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ........................................................................ iv

PRELIMINARY STATEMENT ....................................................................1

SUMMARY OF ALLEGATIONS ................................................................2

APPLICABLE STANDARDS ......................................................................4

    I.   **Rule 12(b)(6) Standards.** ...............................................................4

ARGUMENT ................................................................................................5

    I.   **The Count I, Count II, and Count III Claims Based on the 2014-15 Business Expansions Are Time-Barred.** ...............5

   II.   **The Facts Pled in Count I Are Insufficient to Give Rise to a Claim for Breach of Fiduciary Duty Against the Officers.** ............................................7

        A.  **The Allegations Concerning the Fabrica Transaction Are Insufficient to Support Any Claims.** ................9

        B.  **The Allegations Concerning the Selection of the QRT Machine Are Insufficient to Support Any Claims.** ............10

        C.  **The Allegations Concerning the Barnwell Planning & Construction Are Insufficient to Support Any Claims.** ............11

        D.  **The Cost Overrun Allegations Are Insufficient to Support Any Claims.** .............14

        E.  **The Allegations Concerning Management's Oversight of Maintenance and Training at Barnwell Are Insufficient to Support Any Claims.** ............15

        F.  **The Allegations Concerning Orchids' Raw Material Costs Are Insufficient to Support Any Claims.** ............16

        G.  **The Allegations Concerning the Debtor's Financial Statements and Projections Neither Give Rise to Any Claims, Nor Resulted in Any Damages.** ............18

        H.  **The Allegations Concerning Orchids' Pre-Petition Restructuring Efforts Are Insufficient to Support Any Claims.** ............20

  III. **Count II Fails to State a Non-Exculpated Claim for Breach of Fiduciary Duty Against the Director Defendants.** ............21

**IV. Count III Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty.** ........................................................................................................**26**

**V.  Count IV Fails to State a Claim for Avoidance and Recovery of Fraudulent Transfers.** ........................................................................................................**28**

**CONCLUSION** ........................................................................................................**30**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Alex. Brown Management Services, Inc.*,
2005 WL 2130607 (Del. Ch. Aug. 26, 2005) .......................................................................8

*Aldy v. Valmet Paper Machinery*,
74 F.3d 72 (5th Cir. 2005) ...............................................................................................10

*In re Allpoints Warehousing in Liquidation, Inc.*,
259 B.R. 824 (D. Del. 2001) ...............................................................................................6

*Asbestos Workers Local 42 Pension Fund v. Bammann*,
2015 WL 2455469 (Del. Ch. May 22, 2015) ...................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................................4

*Matter of Beach*,
731 Fed. Appx. 322 (5th Cir. 2018)..................................................................................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................................4

*Boeing By Levit v. Shrontz*,
1992 WL 81228 (Del. Ch. Apr. 20, 1992) ..........................................................................6

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) .............................................................................................9, 10

*In re Bridgeport Holdings, Inc.*,
388 B.R. 548 (Bankr. D. Del. 2008) ..............................................................................6, 13

*Chen v. Howard Anderson*,
87 A.3d 648 (Del. Ch. 2014)..............................................................................................21

*Citron v. Merritt-Chapman & Scott Corp.*,
409 A.2d 607 (Del. Ch. 1977)............................................................................................30

*CMS Investment Holdings, LLC v. Castle*,
2015 WL 3894021 (Del. Ch. June 23, 2015)..............................................................26, 27

*In re Columbia Pipeline Group, Inc.*,
2021 WL 772562 (Del. Ch. March 21, 2021).....................................................................8

*Corporate Risk Holdings LLC v. Rowlands*,
  2018 WL 9517195 (S.D.N.Y. Sept. 28, 2018).........................................................24

*Crescent/Mach I Partnership, L.P. v. Turner*,
  2005 WL 3618279 (Del. Ch. Dec. 23, 2005)..........................................................28

*In re Crude Oil Commodity Futures Litig.*,
  913 F.Supp.2d 41 (S.D.N.Y. 2012) .......................................................................17

*In re Cyan, Inc. Stockholders Litig.*,
  2017 WL 1956955 (Del. Ch. May 11, 2017)..........................................................22

*Dohmen v. Goodman*,
  234 A.3d 1161 (Del. 2020) ......................................................................................7

*In re Dow Chem. Co. Derivative Litig.*,
  2010 WL 66769 (Del. Ch. Jan. 11, 2010)................................................................9

*In re DSI Holdings, LLC*,
  2020 WL 7054390 (Bankr. D. Del. Dec. 2, 2020)..................................................28

*In re Essar Steel Minnesota LLC*,
  2019 WL 2246712 (Bankr. D. Del. May 23, 2019).................................................22

*In re Fedders North America, Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) .......................................................................21

*Gantler v. Stephens*,
  965 A.2d 695 (Del. 2009) ........................................................................................7

*In re Goldman Sachs Group, Inc. Shareholder Litig.*,
  2011 WL 4826104 ............................................................................................. *passim*

*Halpern v. Barran*,
  313 A.2d 139 (Del. Ch. 1973)..................................................................................6

*Hamilton Partners, L.P. v. Highland Capital Management, L.P.*,
  2014 WL 1813340 (Del. Ch. May 7, 2014).......................................................26, 27

*Re IMO Restated Revocable Tr. of Lawrence F. Conlin*,
  2014 WL 242655 (Del. Ch. Jan. 21, 2014)..............................................................6

*Kravitz as Trustee of Aegean Litig. Trust v. Tavlarios*,
  2020 WL 3871340 (S.D.N.Y. July 8, 2020) .........................................................7, 8

*In re Lexington Health Group, Inc.*,
  339 B.R. 570 (Bankr. D. Del. 2006) .......................................................................29

*In re LMI Legacy Holdings, Inc.*,
  625 B.R. 268 (D. Del. 2020) ........................................................................5, 17

*Lyondell Chemical Co. v. Ryan*,
  970 A.2d 235 (Del. 2009) ................................................................................21

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ..............................................................................27

*In re Midway Games Inc.*,
  428 B.R. 303 (Bankr. D. Del. 2010) ...............................................................29

*In re ML/EQ Real Estate Partnership Litig.*,
  1999 WL 1271885, (Del. Ch. Dec. 21, 1999) ...................................................6

*In re NewStarcom Holdings, Inc.*,
  547 B.R. 106 (Bankr. D. Del. 2016) ................................................................28

*In re NYMEX Shareholder Litig.*,
  2009 WL 3206051 (Del. Ch. Sept. 30, 2009) ....................................................9

*Oklahoma Firefighters Pension & Retirement Sys. v. Corbat*,
  2017 WL 6452240 (Del. Ch. Dec. 18, 2017).....................................................24

*In re Our Alchemy, LLC*,
  2019 WL 4447541 (Bankr. D. Del. Sept. 16, 2019) ..........................................20

*Quadrant Structured Prod. Co., Ltd. v. Vertin*,
  115 A.3d 535 (Del. Ch. 2015).........................................................................20

*In re Qualcomm Inc. FCPA Stockholder Deriv. Litig.*,
  2017 WL 2608723 (Del. Ch. June 16, 2017).....................................................19

*Reiter v. Fairbank*,
  2016 WL 6081823 (Del. Ch. Oct. 18, 2016) .....................................................25

*Rosenblatt v. Getty Oil Co.*,
  493 A.2d 929 (Del. 1985) .........................................................................12, 13

*Sheridan v. NGK Metals Corp.*,
  609 F.3d 239 (3d Cir. 2010)..............................................................................4

*In re Signature Apparel Group LLC*,
  577 B.R. 54 (Bankr. S.D.N.Y. 2017)..................................................................8

*Southeastern Pennsylvania Trans. Auth. v. Facebook, Inc.*,
  2019 WL 5579488 (Del. Ch. Oct. 29, 2019) ......................................................7

*In re SRC Liquidation, LLC*,
    581 B.R. 78 (Bankr. D. Del. 2017) ..................................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................4

*Tilden v. Cunningham*,
    2018 WL 5307706 (Del. Ch. Oct. 26, 2018) ...............................................24, 25

*In re Tribune Company Fraudulent Conveyance Litig.*,
    2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018) ..................................................30

*Twin Bridges LP v. Drager*,
    2007 WL 2744609 (Del. Ch. Sept. 14, 2007) ...................................................27

*VWP of Am., Inc. v. United States*,
    163 F.Supp.2d 645 (Ct. Intl. Trade 2001) .......................................................17

*In re W.J. Bradley Mortgage Capital, LLC*,
    598 B.R. 150 (Bankr. D. Del. 2019) .................................................................5

*In re Walt Disney Co. Deriv. Litig.*,
    907 A.2d 693 (Del. Ch. 2005) ......................................................................7, 8

*In re Washington Mutual, Inc.*,
    2013 WL 3757330 (Bankr. D. Del. July 16, 2013) ...........................................18

*Weekapaug Groove LLC v. Charles Gallanti, Inc.*,
    2019 WL 1643945 (Del. Ch. April 15, 2019) ...................................................14

*In re Wonderwork, Inc.*,
    611 B.R. 169 (Bankr. S.D.N.Y. 2020) .........................................................27, 28

*In re Xtreme Power Inc.*,
    563 B.R. 614 (Bankr. W.D. Tex. 2016) ............................................................20

*In re Xura, Inc., Stockholder Litig.*,
    2018 WL 6498677 (Del. Ch. Dec. 10, 2018) ....................................................28

*Zucker v. Hassell*,
    2016 WL 7011351 (Del. Ch. Nov. 30, 2016) ...............................................12, 13

**Statutes**

8 Del. C. § 141(e)......................................................................................23, 24

10 Del. C. § 8106 ...........................................................................................5

8 Del. C. § 102(b)(7)..................................................................................21, 26

Defendants Jeffrey Schoen, Steven Berlin, John Guttilla, Douglas Hailey, Elaine MacDonald, and Mark Ravich (the "**Defendants**") hereby submit this memorandum ("**Memorandum**") in support of their motion to dismiss the *Complaint for Breach of Fiduciary Duty* (Adv. Dkt. 1) (the "**Complaint**") filed by Buchwald Capital Advisors LLC, as Liquidating Trustee of the Orchids Paper Products Liquidating Trust (the "**Trustee**").

## PRELIMINARY STATEMENT

The Trustee seeks to impose liability upon the board and management of Orchids Paper Products Company ("**Orchids**" or the "**Debtor**") for a laundry list of business challenges the company faced from 2014 to 2019. Without any factual support or reasonable basis for inference, the Trustee conclusorily asserts that each issue resulted from a breach of fiduciary duty by one or more of the defendants.

Cutting through the hyperbole, conclusions, and characterizations that the Court should disregard in evaluating a motion to dismiss, the gravamen of the Complaint is that: (1) Orchids' management supposedly made the wrong decisions to expand Orchids' business during 2014 and 2015 (Compl. ¶¶ 27-39, 74-93, 137-138), (2) Orchids' management should have better predicted and controlled the company's costs (*id.* ¶¶ 40-42, 61-62, 71-73, 95-102, 111-122, 134), and (3) Orchids' directors relied too heavily upon and should have replaced Orchids' management (*id.* ¶¶ 123-135, 151). These allegations are near-textbook examples of the types of business decisions and conduct that are protected by the business judgment rule, and in the case of the director defendants constitute at worst exculpated "duty of care" claims. Absent a showing of disloyalty, recklessness, or intentional misconduct, these backwards-looking factual allegations—even if true (which they are not)—are insufficient to sustain a claim for breach of fiduciary duty. In addition, most of the claims are time-barred, and the "aiding and abetting" and fraudulent transfer counts of the Complaint fail to state viable causes of action.

The Complaint does not allege facts plausibly capable of overcoming the high bar for imposing fiduciary liability under Delaware law. Allowing this litigation to proceed would set terrible precedent for future cases in which a plaintiff might seek to impose liability upon officers and directors simply because a business failed, and in this case would impose unwarranted defense costs and burdens on the Debtor's former officers and directors. The Complaint should therefore be dismissed with prejudice in its entirety.

## SUMMARY OF ALLEGATIONS[1]

Prior to 2014, Orchids manufactured value tissue products at a single facility in Pryor, Oklahoma. (Compl. ¶¶ 21-22). In 2014, in response to market trends, the company sought to reposition itself as a national supplier of both value and premium tissue products by securing manufacturing presences on the East and West Coasts. (*Id.* ¶ 24.)

To effectuate its West Coast expansion, in mid-2014 Orchids entered into agreements with Mexican tissue manufacturer Fabrica de Papel San Francisco, S.A. ("**Fabrica**") pursuant to which Orchids acquired the machinery, customer contracts and other principal assets underlying Fabrica's sales to U.S. customers. (*Id.* ¶ 83, 88-89). Orchids then leased certain machinery back to Fabrica, and entered into a supply agreement with Fabrica under which Orchids received an option to buy up to 18,000 tons of product per year from Fabrica at cost for the next 20 years. (*Id.* ¶¶ 83, 85). Fabrica's president and chairman, Mario Armando Garcia, joined Orchids' board of directors after the transaction. (*Id.* ¶ 83.)

To effectuate its East Coast expansion, in November 2014, the company decided to open a new facility located in Barnwell, South Carolina to take advantage of tax incentives offered by local officials. (*Id.* ¶¶ 25-26, 75). At a January 2015 board meeting, management presented a

---

[1] While well-pled allegations are accepted as true for the purposes of the Defendants' motion to dismiss, the Defendants do not concede the truth, accuracy, or completeness of the allegations in the Complaint.

5-year financial plan to the board which incorporated a preliminary cost estimate of $127 million for the Barnwell buildout, and which contemplated using a Voith-manufactured ATMOS paper machine (*Id.* ¶ 27). However, Orchids' management continued to evaluate paper machine options, and after meeting with Valmet Oy ("**Valmet**") in March and April 2015 regarding Valmet's newest hybrid paper machine—the Advantage QRT (the "**QRT**")—Orchids' management decided to recommend the QRT machine rather than Voith's ATMOS or Valmet's NTT paper machines. (*Id.* ¶¶ 32-33). At a May 2015 board meeting, management presented the pros and cons of the QRT, ATMOS, and NTT machines, ultimately recommending the QRT machine. (*Id.* ¶ 33).  At the conclusion of that meeting, the board approved the purchase of the QRT machine. (*Id.* ¶ 35).

After buying the QRT machine, Orchids separately contracted with Valmet to also engineer and design the Barnwell paper mill and related de-inking plant. (*Id.* ¶ 36). Orchids also hired a general contractor, who was responsible for implementing design changes. (*Id.* ¶ 43). All of these decisions were made prior to April 1, 2016 (*Id.* ¶¶ 24-43, 83-89).

A range of issues arose during the Barnwell facility design, engineering and construction phases, such that the ultimate cost of the paper mill, converting lines, and de-inking plant (plus the addition of offices, a boiler room, a maintenance shop, and storage areas) resulted in a project cost of approximately $157 million by the time the paper mill came online in June 2017, which the Trustee alleges was approximately 10 weeks behind schedule (even though it was within the original 25-month timeline). (*Id.* ¶¶ 34, 42-43, 54). Throughout construction, management pressed the general contractor and Valmet to keep the project on schedule, and took numerous steps to contain costs, including seeking concessions from Valmet. (*Id.* ¶¶ 42, 50-51). Valmet ultimately agreed to price concessions and extended payment terms, along with three months of on-site technical assistance. (*Id.* ¶¶ 51, 66).

After coming online in June 2017, Barnwell did not reach its ultimate productivity targets as several issues plagued the plant's operations during the startup period. (*Id.* ¶ 66). Among other things, due to a Valmet design failure, the QRT machine was unable to properly process "broke" (a recyclable byproduct of the conversion process), even though Orchids had specifically contracted for a machine capable of doing so, and Valmet conducted additional engineering on the QRT machine to address the issue. (*Id.* ¶¶ 56-57).   The unavailability of spare parts and labor and material shortages are also alleged to have contributed to inefficiencies at Barnwell. (*Id.* ¶¶ 64-81).

By 2017, Orchids' financial condition had begun to significantly deteriorate, and this deterioration accelerated in 2018. (*Id.* 119-121). Over the course of 16 months, Orchids spent approximately $10 million on outside professionals as part of an effort to either sell the company or obtain replacement financing for the company. (*Id.* ¶ 119). On April 1, 2019 (the "**Petition Date**"), Orchids filed a voluntary chapter 11 petition. (*Id.* ¶ 122).

## APPLICABLE STANDARDS

### I.    Rule 12(b)(6) Standards.

Under Federal Rule of Civil Procedure 12(b)(6), a complaint can survive a motion to dismiss "only if, taking all well-pleaded factual allegations as true, it contains enough facts to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n. 27 (3d Cir. 2010). In deciding a motion to dismiss, "courts must consider the complaint in its entirety, as well as . . .  documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

4

322 (2007). While "all well-pleaded facts are accepted as true, the trial court need not accept as true conclusory statements, statements of law, or unwarranted inferences cast as factual allegations." *In re LMI Legacy Holdings, Inc.*, 625 B.R. 268, 278-79 (D. Del. 2020).

## ARGUMENT

I.    **The Count I, Count II, and Count III Claims Based on the 2014-15 Business Expansions Are Time-Barred.**

The Complaint's core allegations are that Orchids' management and directors breached their fiduciary duties by: (a) entering into the Fabrica transactions in June 2014 (Compl. ¶ 83); (b) selecting Barnwell, South Carolina as the site of the East Coast facility in November 2014 (*id.* ¶ 26); (c) selecting the QRT machine over the ATMOS or NTT machines in May 2015 (*id.* ¶¶ 27-35); (d) improperly planning and designing the Barnwell buildout from November 2014 – November 2015 (*id.* ¶¶ 26-40); and (e) failing to conduct sufficient due diligence as to these matters.  (*Id.* ¶¶ 32-33, 37-39, 41(d), 45, 52, 57, 59, 70, 80, 89, 93, 126-32). All of these claims are time-barred.

The breach of fiduciary claims relating to the 2014-2015 business expansion transactions are time-barred because the underlying events occurred more than three years before the Petition Date. Under Delaware law, "a breach of fiduciary duty claim is subject to a three-year statute of limitations." *In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R. 150, 167-68 (Bankr. D. Del. 2019); 10 Del. C. § 8106. "The limitations period begins from the date of the alleged harm" which occurs "[at] the moment the wrongful act accrues—not when the harmful effects of the act are felt—even if the plaintiff is unaware of the wrong." *Id*. As each of the Trustee's principal allegations related to events that occurred before April 1, 2016 (three years before the April 1, 2019 petition date), they are time-barred.

The Trustee's allegations do not support any of the three tolling doctrines recognized under Delaware law: (1) equitable tolling; (2) fraudulent concealment; or (3) the "inherently unknowable injury" doctrine.  *See In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 561 (Bankr. D. Del. 2008). The Trustee does not allege any act of fraudulent concealment, nor any act of fraudulent self-dealing necessary to trigger equitable tolling. *See Halpern v. Barran*, 313 A.2d 139, 142 (Del. Ch. 1973) ("Our courts have refused to suspend the statute where there was no allegation that the directors personally profited from self-dealing. Furthermore, mere allegation of fiduciary self-dealing by itself is not sufficient to invoke the rule. There must be some charge that the self-dealing was fraudulent."); *accord Bridgeport Holdings*, 388 B.R. at 563; *In re Allpoints Warehousing in Liquidation, Inc.*, 259 B.R. 824, 829 (D. Del. 2001); *Boeing By Levit v. Shrontz*, 1992 WL 81228, at *2 (Del. Ch. Apr. 20, 1992).  Thus, these two tolling theories are inapplicable.

With respect to third tolling theory, the "inherently unknowable injury" doctrine, numerous courts have pointed out that it is inapplicable in the corporate fiduciary duty context because the knowledge of directors and officers is imputed to the company. *See, e.g., Bridgeport Holdings*, 388 B.R. at 563 (rejecting applicability of the "inherently unknowable injury" doctrine to a breach of fiduciary duty claim asserted by a bankruptcy trustee because "the [debtor] was necessarily on notice of the D&O Defendants' actions."); *accord In re ML/EQ Real Estate Partnership Litig.*, 1999 WL 1271885, at *2 n. 12. (Del. Ch. Dec. 21, 1999) (noting that the inherently unknowable injury doctrine should "rarely, if ever, apply in the entity law context"); *Re IMO Restated Revocable Tr. of Lawrence F. Conlin*, 2014 WL 242655, at *4  (Del. Ch. Jan. 21, 2014) (same).

All of the breach of fiduciary duty claims relating the 2014-2015 plant expansion transactions are time-barred, and therefore must be dismissed.

**II.    The Facts Pled in Count I Are Insufficient to Give Rise to a Claim for Breach of Fiduciary Duty Against the Officers.**

The remaining facts pled in Count I (and any pre-April 1, 2016 facts, to the extent not time-barred) fail to support a claim for breach of fiduciary duty against Orchids' management because none of the underlying factual allegations come close to meeting the high bar under Delaware law needed to establish disloyalty, bad faith, or gross negligence.

"Directors of Delaware corporations owe duties of care and loyalty to the corporation and its stockholders." *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020). The "fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

The duty of loyalty prohibits corporate fiduciaries from "us[ing] their position of trust and confidence to further their private interests" and "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by the shareholders generally." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005) (internal quotations omitted). "To prove a breach of the duty of loyalty, the plaintiff must establish that the fiduciary either consciously disregarded his duties to stockholders or acted in his own interest to the detriment of stockholders." *Southeastern Pennsylvania Trans. Auth. v. Facebook, Inc.*, 2019 WL 5579488, at *7 (Del. Ch. Oct. 29, 2019).

A breach of the duty of loyalty based on a fiduciary's conscious disregard of oversight obligations, also known as a *Caremark* claim, is widely regarded as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Kravitz as Trustee of Aegean Litig. Trust v. Tavlarios*, 2020 WL 3871340, at *8 (S.D.N.Y. July 8, 2020) (applying Delaware law) (internal quotations omitted). "Pleadings, even specific pleadings, indicating that [fiduciaries] did a poor job of overseeing risk in a poorly-managed corporation do not imply . . .

7

bad faith." *Id.* (quoting *In re Gen. Motors Co., Deriv. Litig.*, 2015 WL 3958724, at *17 (Del. Ch. June 26, 2015)). Rather, "[t]o state a *Caremark* claim, a plaintiff must plead that (a) the [fiduciary] utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system of controls, [the fiduciary] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Id.* (internal quotations omitted).

Turning to the duty of care, "[a] plaintiff can recover monetary damages for a breach of the duty of care only by establishing that the fiduciary was grossly negligent." *In re Columbia Pipeline Group, Inc.*, 2021 WL 772562, at *50 (Del. Ch. March 21, 2021). "Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one 'which involves a devil-may-care attitude or indifference to duty amounting to recklessness.'" *Albert v. Alex. Brown Management Services, Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005). "Liability arising from the duty of care arises in two distinct contexts:" (a) a conscious, yet ill-advised decision; or (b) an unconsidered failure to act in circumstances in which due attention would have prevented the loss. *In re Signature Apparel Group LLC*, 577 B.R. 54, 99 (Bankr. S.D.N.Y. 2017) (applying Delaware law).

When evaluating decision-based duty of care claims, absent "fraud, bad faith, or self-dealing," courts apply the business judgment rule, which presumes that disinterested fiduciaries "in making a business decision . . . act on an informed basis . . . and in the honest belief that the action taken was in the best interests of the company and its shareholders." *Disney*, 907 A.2d at 746-47. When applicable, the business judgment rule precludes liability so long as the defendant's conduct can be "attributed to any rational business purpose." *Id.* at 747. Thus, to survive a motion to dismiss, a plaintiff must rebut the business judgment rule by "plead[ing] particularized facts

sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the [fiduciary] was adequately informed in making the decision." *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *9 (Del. Ch. Jan. 11, 2010). The reasonableness of a fiduciary's efforts to inform themself in connection with a decision is itself "measured by concepts of gross negligence." *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000).

Under these standards, none of the allegations against Orchids' management support an actionable claim for breach of fiduciary duty.

### A.    The Allegations Concerning the Fabrica Transaction Are Insufficient to Support Any Claims.

The Trustee first alleges that the company overpaid for the Fabrica assets in 2014 (Compl. ¶¶ 87-89) and calls the fact that the Fabrica supply agreement was not assignable without Fabrica's consent "problematic" in the "grand plans for a sale of the company." (*Id.* ¶ 90). These gripes amount to nothing more than second-guesses that management might have been able to negotiate a better price or better contract terms. Even if timely, these claims would have been barred by the business judgment rule. The Trustee does not identify any bad faith or conflict of interest with respect to the Fabrica transactions, and does not allege that the purchase negotiations were not arms' length or less than vigorous. The Complaint also lacks any basis to infer that a lower price or better contract terms were even obtainable.  And even if they had been obtainable, "the mere failure to secure deal protections that, in hindsight, would have been beneficial to shareholders does not amount to a breach of the duty of care." *In re NYMEX Shareholder Litig.*, 2009 WL 3206051, at *8 (Del. Ch. Sept. 30, 2009). The Trustee's allegations concerning the supposed shortcomings of the Fabrica acquisition transaction therefore constitute precisely the sort of disinterested decision-making that is shielded by the business judgment rule.

**B.**    ***The Allegations Concerning the Selection of the QRT Machine Are Insufficient to Support Any Claims.***

The Trustee next asserts that management underestimated the potential risks associated with the QRT machine's pilot status and Valmet's purported lack of experience in the U.S. when recommending Valmet's QRT equipment over Voith's ATMOS or Valmet's NTT equipment. (Compl. ¶ 33, 129-30).[2]

But the Complaint does not allege that management conducted *no* diligence. To the contrary, the Trustee pleads in the Complaint that management spent several months between December and April 2015 meeting with Valmet and exploring the advantages and downsides of each machine before choosing the QRT, and that management's April 2015 board presentation acknowledged that the QRT machine's pilot status carried additional risk. (*Id.* ¶¶ 27, 33). In other words, management made a good-faith effort to diligence the QRT machine, and also recognized that opting for new technology might entail unforeseen issues—not to mention the problems that can arise in any construction project.

"The standard for judging the informational component of the [fiduciary's] decision making does not mean that the [fiduciary] must be informed of every fact." *Brehm*, 746 A.2d at 259. Fiduciaries need only consider "material facts that are reasonably available, not those that are immaterial or out of [their] reasonable reach." *Id.*; *accord In re Goldman Sachs Group, Inc. Shareholder Litig.*, 2011 WL 4826104 at *16 ("At most, the Plaintiffs' allegations suggest that there were other metrics not considered by the [fiduciary] that might have produced better results.

---

[2] The allegation that Valmet had never built a paper mill in the US is demonstrably false. *See, e.g., Aldy v. Valmet Paper Machinery*, 74 F.3d 72, 74 (5th Cir. 2005) ("Valmet had designed, manufactured, and supervised the on-site construction of the paper machine [at Stone Container Corporation's paper mill in Hodge, Louisiana].").

The business judgment rule, however, only requires the [fiduciary] to *reasonably* inform itself; it does not require perfection or the consideration of every conceivable alternative.").

Although the Trustee tries to frame these allegations as failures of process, management's determination that the potential benefits of the new QRT (provided by a leading manufacturer) outweighed the risks associated with new technology was justified by the need to remain technologically competitive, and constituted a valid exercise of protected business judgment. *See, e.g., Goldman Sachs*, 2011 WL 4826104, at *16. ("[T]he essence of [the plaintiffs'] complaint is that I should hold the director defendants 'personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the company.' If an actionable duty to monitor business risk exists, it cannot encompass any substantive evaluation by a court of a board's determination of the appropriate amount of risk. Such decisions plainly involve business judgment.").

The allegations pled by the Trustee do not establish the gross negligence needed to overcome the business judgment rule and sustain a breach of fiduciary duty claim against management. At bottom, the Trustee's criticism of management's selection of the QRT machine boils down to the fact that it was new technology. It simply cannot be the case that embracing new technology developed by a leading manufacturer, in an arm's length transaction, is a basis for triggering fiduciary liability.

C.    **The Allegations Concerning the Barnwell Planning & Construction Are Insufficient to Support Any Claims.**

Next, the Trustee conclusorily accuses management of "failing to properly plan for, oversee, or comprehend the buildout process for Barnwell" and "failing to apprise themselves of the process for building a new manufacturing facility and/or hiring an appropriate professional to oversee the buildout." (Compl. ¶ 144). Yet, there is no question that the Debtor hired numerous

outside industry experts to help design and build the Barnwell facility, including the general contractor (whose qualifications or expertise the Trustee does not question in the Complaint) and Valmet (whose proprietary technology served as the foundation for the paper mill), so the Trustee's allegations are insufficient to rebut the presumption that management acted on an informed basis (let alone show that their diligence process was grossly negligent). *See, e.g., Zucker v. Hassell*, 2016 WL 7011351, at *10 n. 113 (Del. Ch. Nov. 30, 2016) (crediting corporate fiduciaries' hiring of outside expert as "a reasonable step" taken "to avail [themselves] of reasonable information").

Rather, these allegations boil down to a suggestion that management should have hired *someone else*. There are no allegations that the industry specialists hired by management were not competent, or any facts that would support an inference that management's decisions to hire these specialists (instead of other specialists, or more specialists) were reckless at the time they were made. Management's hiring decisions for the Barnwell planning and construction are thus plainly protected by the business judgment rule. *See, e.g., Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 943 (Del. 1985) (holding that company's selection of engineering firm to appraise company's subsurface petroleum reserves was protected by business judgment rule); *Zucker*, 2016 WL 7011351 at *10 (holding that a company's choice of outside counsel to conduct an internal investigation was protected by business judgment rule in the absence of allegations that selection "was conflicted or otherwise improper").

The Trustee also accuses management of "recklessly ced[ing] responsibility for implement[ing] [the necessary design changes] to the general contractor", "failing to bridge the gap between Valmet and the general contractor", and "fail[ing] to intervene when Valmet was slow to provide requested and necessary information to the general contractor." (Compl. ¶¶ 46-47). Yet, an "informed decision to delegate a task [to an outside specialist] is as much an exercise

of business judgment as any other." *Rosenblatt*, 493 A.2d at 943 (holding that delegation to engineering firm of discretion to "select prices, costs, and risk factors" in connection with appraising company's oil reserves was protected by business judgment rule); *accord Zucker*, 2016 WL 7011351 at *10. The facts that form the basis for the Trustee's allegations—design changes and construction negotiations—are precisely the types of matters that *should* be delegated to an outside expert. There are no factual allegations that the experts hired by management were not competent, or facts from which one could reasonably infer that management's decision to rely upon outside experts to utilize their expertise was improper, let alone facts showing that their reliance on experts to work through design and construction issues was so reckless so as to overcome the business judgment rule.

Also instructive on this point is the *Bridgeport Holdings* case, in which Judge Walsh rejected an analogous breach of fiduciary duty claim premised on allegations that the company's officers improperly ceded decision-making authority to and failed to properly supervise an outside restructuring professional they had hired to conduct a sale process. In *Bridgeport*, the restructuring professional sold the company's $126 million business for only $28 million the day before the company filed for bankruptcy without hiring an investment banker or making any other effort to solicit competing bids. 388 B.R. at 556-57. Even so, Judge Walsh refused to impose oversight liability on the company's officers, reasoning that "[s]elling the assets was squarely within the scope of strategies [the outside professional] was hired to execute" and that "[it] was highly unlikely that it was the responsibility of other officers to oversee, supervise, or second-guess [the outside professional's] performance of his job." *Id.* at 574-75.

This logic is even more forceful here, where the allegations amount to pure conjecture that management's intervention perhaps might have facilitated smoother interactions among the

13

construction vendors (as opposed to making things worse), and where no quantifiable damages are alleged. (Compl. ¶¶ 46-47). Nor does the Trustee allege a lack of communication between Orchids' management and the general contractor or Valmet—just the opposite, the Trustee criticizes management for pushing the general contractor *too hard* to stay on schedule. (*Id.* ¶¶ 42-43). These allegations show that Orchids' management was working in good faith to keep the project on track, which is what their fiduciary duties required. *See, e.g., Goldman Sachs*, 2011 WL 4826104, at *23 ("Good faith, not a good result is what is required of [corporate fiduciaries].").

### D.    The Cost Overrun Allegations Are Insufficient to Support Any Claims.

The Trustee next asserts that Orchids' management "consciously disregard[ed] and fail[ed] to address significant cost and time overruns in the Barnwell buildout." (Compl. ¶ 144(c)). Again, the Complaint pleads only conclusions (which courts disregard in evaluating the sufficiency of allegations under Rule 12(b)(6)), and is devoid of facts detailing what management supposedly should/could have done to address the purported cost overruns, let alone facts demonstrating that management's conduct rose to the level of a breach of fiduciary duty.

The Trustee first tries to portray the $127 million preliminary Barnwell buildout estimate discussed at the January 2015 board meeting as a hard "budget" for the "original plans" approved by the board. (*Id.* ¶¶ 30, 42(c), 48, 54). Yet these characterizations are readily refuted by the Trustee's own admissions elsewhere in the Complaint that, at the end of the January 2015 meeting, the board had only approved the initial $40 million of expenses for Barnwell, and directed management to continue their planning efforts. (*Id.* ¶ 27). The fact that management subsequently updated its estimates as construction plans were finalized, material costs were defined, and auxiliary facilities (the offices, a boiler room, a maintenance shop, and storage necessary to support the paper mill and converting facilities) were added (*id.* ¶ 41) is hardly remarkable. *See Weekapaug Groove LLC v. Charles Gallanti, Inc.*, 2019 WL 1643945, at *2 (Del. Ch. April 15, 2019) (rejecting

14

breach of fiduciary duty claim premised on defendant exceeding initial construction budget that "was an estimate, and . . . changed when the scope of the project changed"). In any event, even if there was a "hard" budget, <u>no</u> case has ever imposed fiduciary liability premised on a failure to meet a budget, and to do so would be an extraordinary expansion of existing law.

Apparently recognizing that weakness of his position, the Trustee also faults management for "stay[ing] the course on the unfinished project" in December 2016 and "continu[ing] to perpetuate their poor planning by recklessly failing to reevaluate their plans." (*Id.* ¶ 53).  This again amounts to rank speculation—without identifying any concrete alternatives—that (1) there was a better and completely obvious business decision for management to make, and (2) it was reckless for management not to take that action. If there were any alternatives available, the Trustee would have pled them. That he did not exposes the weakness of his claim.

The applicable pleading standards require the Trustee to plead facts showing that the business judgment rule presumption should not be applied. No facts are pled showing that there was an obvious, better alternative available to management, and there are no facts that would plausibly support an inference of bad faith or gross negligence required to support a claim for breach of fiduciary duty.

> **E.**     ***The Allegations Concerning Management's Oversight of Maintenance and Training at Barnwell Are Insufficient to Support Any Claims.***

The Trustee also criticizes the Barnwell maintenance and training practices. (*Id.* ¶¶ 59-81). However, the Trustee tacitly concedes that Orchids' management evaluated Barnwell's maintenance needs (*id.* ¶¶ 60-62), hired Valmet technicians to provide on-site training and assistance for the first three months of Barnwell's operations (*id.* ¶ 66), diagnosed and attempted to correct issues as they arose (*id.* ¶¶ 78-79), and had a process in place to receive feedback on maintenance from Valmet. (*id.* ¶¶ 68-69). The Complaint therefore provides no basis to conclude

that Orchids' management acted with gross negligence, in bad faith, or on an uninformed basis with respect to maintenance and training at Barnwell.

Whether maintenance and training were performed in the way and to the standards the Trustee would have preferred, and whether in hindsight it *might* have been better to use Valmet's $2 million-per-year maintenance program,[3] are irrelevant to the question of fiduciary liability. Management's decision to forego Valmet's maintenance plan in favor of an in-house maintenance program reflected a good-faith exercise of business judgment— made at a time when the Trustee's own Complaint recognizes the company did not have a blank check to address every issue it was facing—that the company could handle maintenance internally for less. And even if that proved not to be the case, an inability to accurately project the maintenance costs of a new facility with no maintenance history does not constitute negligence, let alone gross negligence or bad faith. *See, e.g., Goldman Sachs*, 2011 WL 4826104, at *23 ("Oversight duties under Delaware law are not designed to subject directors, even expert directors, to personal liability for failure to predict the future and to properly evaluate business risk."). Simply labelling conduct as "grossly negligent," without facts showing that the decision was in fact grossly negligent at the time it was made, is insufficient to meet the applicable pleading standards.

### F.    The Allegations Concerning Orchids' Raw Material Costs Are Insufficient to Support Any Claims.

Next, the Trustee conclusorily alleges that Orchids' management "fail[ed] to keep themselves apprised of current market conditions for raw materials and ensure the Debtors were being availed of cost reductions in the market" (Compl. ¶ 144(h)) and "never bothered" seeking better pricing from their long-time exclusive recycled fiber supplier, Dixie Pulp, after market

---

[3] There is no allegation that the Barnwell start-up maintenance and repair expenses incurred by the Debtor actually would have been covered by the manufacturer's limited maintenance program, had it been selected.

prices purportedly "significantly declined." (*Id.* ¶ 102). The sole concrete allegation underlying these sweeping accusations is that management purportedly overlooked quarterly price index reports provided by Dixie—which the Trustee acknowledges did not even include the specific materials the Debtor regularly purchased—until 2018. (*Id.* ¶ 100). The Trustee portrays this as proof that the executives of a publicly traded company made no effort to monitor their principal input costs. Such a patently unwarranted inference need not be accepted even on a motion to dismiss, particularly in the absence of any reason to doubt the obvious explanation—that management relied on other, more relevant sources to track raw material price trends. *See LMI Legacy Holdings*, 625 B.R. at 278-79 (declining to draw implausible inferences in ruling on a motion to dismiss). Thus, the Trustee alleges at most an unconsidered failure to review price reports that did not include most of the materials Orchids purchased, which cannot possibly constitute gross negligence.

Management's decision to continue doing business with Dixie was perfectly reasonable because, as demonstrated by the U.S. Bureau of Labor Statistics producer price index charts attached hereto as Exhibit A, the prices of recycled and virgin fiber dramatically *increased* in 2017 and 2018.[4]  Under basic supply-and-demand principles, these price increases indicate scarcity in the market, which is when a reliable exclusive supplier relationship is most valuable. And even if prices had been declining, a decision not to terminate a supply contract with a long-term supplier which had a proven track record of being able to supply the recycled fiber needed for the Barnwell

---

[4] Courts "can take judicial notice of publicized commodities prices on a motion to dismiss." *In re Crude Oil Commodity Futures Litig.*, 913 F.Supp.2d 41, 52 (S.D.N.Y. 2012); *accord Matter of Beach*, 731 Fed. Appx. 322, 327 (5th Cir. 2018) (upholding bankruptcy court's judicial notice of commodity prices); *VWP of Am., Inc. v. United States*, 163 F.Supp.2d 645, 658 (Ct. Intl. Trade 2001) ("[T]he Court takes judicial notice of the producer price index for "woolen" products in the U.S. published by the Bureau of Labor Statistics, U.S. Department of Labor.").

facility hardly rises to a level of gross negligence or recklessness needed to support a claim for breach of fiduciary duty.

This portion of the Complaint amounts again to second-guessing, this time that management should have been playing-the-market instead of sticking with a tried-and-true supplier, as well as speculation that other suppliers would have been able to meet the company's supply demands, and at lower prices. The facts alleged by the Trustee on this issue neither rise to the level of a breach of fiduciary duty, nor give rise to any quantifiable damages claim.

### G.    The Allegations Concerning the Debtor's Financial Statements and Projections Neither Give Rise to Any Claims, Nor Resulted in Any Damages.

The Trustee conclusorily asserts in the introduction to the Complaint that that the "Debtor's financial records were so fraught with problems that they were largely unreliable." (Compl. ¶ 3). However, the Complaint then fails to identify a single example of an error in the Debtor's financial statements that rendered them unreliable. Indeed, there are no allegations that any financial statements of the Debtor, a publicly traded company whose financial statements were audited, were ever the subject of a qualified audit opinion. Instead, the sole "facts" relied upon by the Trustee are excerpts from an auditor's report to Orchids' audit committee following an interim review which identified certain "significant deficiencies."[5] (*See* Ex. B, referenced at Compl. ¶ 109).[6] Notwithstanding the auditor's recommendations, the auditors unequivocally concluded:

"*we are not aware of any material modifications that should be made to the interim financial*

---

[5] As explained in the auditor's report, a "significant deficiency" is a "deficiency, or combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the Company's financial reporting." (Ex. B. at MED0000466).

[6] "A document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *In re Washington Mutual, Inc.*, 2013 WL 3757330, at *2 (Bankr. D. Del. July 16, 2013) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (internal quotations and citations omitted).

*information for them to be in conformity with U.S. generally accepted accounting principles*"
(Ex. B, at MED0000459), and "we have discussed the uncorrected misstatements with
management and . . . *we concur that these amounts are immaterial*." (*Id.* at 8). Thus, the allegation
of "largely unreliable" financial records is completely contradicted by the very document upon
which the Trustee relies.

The Complaint also alleges no facts showing that management did not act to address areas
needing improvement, and indeed the auditor's report reflects that management *was* addressing
the areas flagged for improvement. (*Id.* at MED0000467 ("[Management] has been working to
improve the necessary controls so that errors are identified and adequately explained earlier in the
financial close process", and "management has made adjustments to their staffing mix in order to
specifically address [the issue identified] as well as identified and hired additional staffing
resources."). Thus, there is no basis to assert any claim against management based upon these
facts, let alone a claim for breach of fiduciary duty. *See In re Qualcomm Inc. FCPA Stockholder
Deriv. Litig.*, 2017 WL 2608723, at *3 (Del. Ch. June 16, 2017) (rejecting breach of fiduciary duty
claim based on purported "red flags" in audit reports because the complaint did "not allege that
the board consciously disregarded the red flags").

Equally lacking are the Trustee's quibbles with management's financial *projections*, which
neither form a part of the Debtor's financial statements nor can serve as basis for liability when
missed. *See, e.g., Goldman Sachs*, 2011 WL 4826104, at *23 (holding that failing to predict the
future is not a breach of fiduciary duty). Specifically, the Trustee pleads no facts that would suggest
it was reckless for Orchids' management to believe that Barnwell's maintenance costs would
stabilize around the budgeted amount once the initial start-up issues were resolved. No facts are

pled that would show that these projections were so reckless that the decision to use them should not be protected by the business judgment rule, or that the missed projections led to any damages.

### H.    The Allegations Concerning Orchids' Pre-Petition Restructuring Efforts Are Insufficient to Support Any Claims.

Finally, the Trustee alleges management breached their fiduciary duties by continuing to operate Orchids after it was insolvent. (Compl. ¶ 144(j)).  In particular, the Trustee criticizes management for spending $10 million over 16 months on outside advisors in an effort to sell and/or refinance the company. (*Id.* ¶ 119). However, the Trustee does not allege that the roughly $625,000 average per month spent on professional fees was outlandish, or that there was no reasonable prospect of a successful sale or refinancing. Rather, the Trustee merely alleges that the "Defendants continued the Debtor's operations for several more months, hopelessly deepening the Debtor's insolvency, [before] ultimately filing for bankruptcy[.]" (*Id.* ¶ 122).

"[A]s stated by the courts time and time again, directors [and officers] have no automatic duty to place an insolvent corporation in bankruptcy to preserve its 'immediate value.' . . . Delaware law recognizes that even insolvent companies may, in good faith, pursue other strategies to maximize the value of the business." *In re Xtreme Power Inc.*, 563 B.R. 614, 639 (Bankr. W.D. Tex. 2016) (applying Delaware law); *accord Quadrant Structured Prod. Co., Ltd. v. Vertin*, 115 A.3d 535, 547 (Del. Ch. 2015) ("Directors cannot be held liable for continuing to operate an insolvent entity in the good faith believe that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors."); *In re Our Alchemy, LLC*, 2019 WL 4447541, at *9 (Bankr. D. Del. Sept. 16, 2019) ("Directors do not have a duty to creditors of an insolvent corporation to abandon the effort to rehabilitate the corporation in favor of the creditors' interests."). Thus, "[s]imply alleging that a corporation was insolvent and took on further debt to

continue operating is not enough to plead a claim for breach of fiduciary duty." *In re Fedders North America, Inc.*, 405 B.R. 527, 541 (Bankr. D. Del. 2009).

For all of these reasons, Count I fails to state a plausible claim for breach of fiduciary duty on the part of any officers, and therefore must be dismissed.

### III.    Count II Fails to State a Non-Exculpated Claim for Breach of Fiduciary Duty Against the Director Defendants.

In Count II, the Trustee conclusorily alleges that the directors breached their fiduciary duties by (a) failing to properly monitor Orchids' management, (b) failing to educate themselves about the paper industry, (c) ignoring purported financial reporting and budgeting issues, (d) failing to "make a change in leadership", (e) approving extensions of Orchids' credit facility; and (f) allowing Orchids to continue operating while insolvent. (Compl. ¶ 151). Yet the handful of concrete allegations underlying these purported missteps do not come close to stating a non-exculpated claim.

Under section 102(b)(7) of the Delaware General Corporation Law, a certificate of incorporation may contain:

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) [f]or any breach of the director's duty of loyalty . . . (ii) [f]or acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. § 102(b)(7). Courts construe section 102(b)(7) as allowing corporations to exculpate director liability for "duty of care" violations. *Chen v. Howard Anderson*, 87 A.3d 648, 676 (Del. Ch. 2014). Thus, absent allegations of disloyalty or bad faith, Courts routinely dismiss breach of fiduciary duty claims against directors protected by exculpation provisions. *See, e.g., Lyondell*

*Chemical Co. v. Ryan*, 970 A.2d 235, 239-40 (Del. 2009); *In re Cyan, Inc. Stockholders Litig.*, 2017 WL 1956955, at *8 (Del. Ch. May 11, 2017).

Here, Article VI(1) of Orchids' Amended and Restated Certificate of Incorporation provides, "To the fullest extent permitted by the General Corporation Law of the State of Delaware . . . a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." (Ex. 3.1 to Orchids' Form 10-Q filed on July 31, 2013, attached hereto as Exhibit C). Thus, absent a showing of disloyalty, intentional misconduct or bad faith, Orchids' directors are immune from fiduciary liability.

The Trustee's allegations do not plausibly support an inference of disloyalty, intentional misconduct, or bad faith. The sole allegation even hinting at a private interest is that the directors received routine compensation packages while Orchids continued operating. (Compl. ¶¶ 4, 136). But "[a]n allegation that a director received a large salary is not enough—if it were then virtually all shareholders could allege claims for breach of fiduciary duty whenever a director made a decision that didn't turn out as well as hoped." *In re Essar Steel Minnesota LLC*, 2019 WL 2246712, at *7 (Bankr. D. Del. May 23, 2019). And, tellingly, the Trustee does not allege that the directors approved management's recommendations *in order to* receive compensation; the allegation is merely that they did so *while* receiving compensation (Compl. ¶¶ 4, 136). *See id.* at *6 (finding "causal link" lacking where complaint merely alleged that the director received payment "around the time of" the transaction at issue). As the Trustee neither links the directors' compensation to the conduct at issue, nor questions the reasonableness of their pay, this allegation "falls short of the heavy burden imposed on meeting the standard for breach of the duty of loyalty." *Id.* at *7.

While the Trustee conclusorily accused the director of "failing to properly oversee" the company's operations and "knowingly ignoring glaring issues," no facts alleged in the Complaint support an inference of bad faith under the notoriously stringent *Caremark* standard for directorial oversight liability. The Trustee does not allege "an utter failure to implement any" reporting system or controls necessary to implicate the first *Caremark* prong. The Trustee attempts to argue a "conscious failure to monitor" under the second *Caremark* prong, but the Trustee's own allegations show just the opposite. Tellingly, there are no allegations that this public company board did not regularly meet; no facts from which a factfinder could infer that they were not engaged at the board meetings or taking their responsibilities seriously; and no facts showing that the board ignored any illegality or regulatory noncompliance. To the contrary, the Trustee concedes that management made multiple presentations to the board at which they discussed the pros, cons, and potential risks associated with various aspects of Orchids' expansion strategy. (Compl. ¶¶ 27, 33), and that the Board "received regular updates about the cost and progress of the Barnwell buildout" throughout the project (*id.* ¶ 133). These allegations demonstrate that Orchids' directors made a good-faith effort to fulfill their oversight responsibilities. *See McElrath*, 224 A.2d at 993; *Goldman Sachs*, 2011 WL 4826104, at *23 ("Good faith, not a good result, is what is required of the board.").

The Trustee criticizes the directors' reliance on management's analyses, projections, and recommendations, but "Delaware law entitles corporate directors and their designees to rely on corporate records and other information, opinions, reports, or statements presented by officers, employees, or outside experts." *See* 8 Del. C. § 141(e). Indeed, the Delaware Supreme Court recently rejected a *Caremark* claim premised on analogous allegations that Uber's board of directors failed to sufficiently inform itself before approving a transaction recommended by its

CEO where the complaint also alleged that the "directors heard a presentation that summarized the transaction, reviewed the risk[s], generally discussed due diligence, asked questions, and participated in a discussion." *McElrath*, 224 A.2d at 993. The Court concluded, "[t]he inference from these allegations shows a functioning board that did more than rubberstamp the transaction presented by Uber's CEO . . . On the contrary, it appears that the directors considered the risks and nonetheless proceeded with the transaction." *Id.*

Nor do the Trustee's allegations suggest that the construction glitches, Barnwell maintenance and training issues, or any of the other unremarkable business hurdles facing Orchids' management were ever raised (or required to be raised) to the board level—let alone any evidence that the directors "knowingly ignored" them. And even if the directors were aware of these issues, courts routinely reject *Caremark* claims premised on deficient oversight of ordinary business risk, as opposed to illegality or regulatory noncompliance. *See, e.g., Tilden v. Cunningham*, 2018 WL 5307706, at *16 (Del. Ch. Oct. 26, 2018) ("In determining whether scienter has been well-pled, our courts must be mindful that Delaware law does not "subject directors, even expert directors, to personal liability for failure to predict the future and to properly evaluate business risk."); *Oklahoma Firefighters Pension & Retirement Sys. v. Corbat*, 2017 WL 6452240, at *18 (Del. Ch. Dec. 18, 2017) ("[Whereas] *Caremark* claims involve a knowing failure to prevent or remedy illegality within a corporation[,] . . . a failure to monitor or properly limit business risk [is] a theory of director liability that this Court has never definitively accepted."); *Corporate Risk Holdings LLC v. Rowlands*, 2018 WL 9517195, at *5 (S.D.N.Y. Sept. 28, 2018) (applying Delaware law) ("Put another way, although the Board must respond to red flags pointing to an actual compliance failure or instance of corporate misconduct, no such 'duty to respond' exists for 'yellow flags' concerning business risk. Such a distinction is entirely sensible given *Caremark*'s emphasis on

bad faith, and courts have uniformly enforced it in *Caremark* cases."); *accord Reiter v. Fairbank*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016); *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *14 (Del. Ch. May 22, 2015).

At most, the Trustee calls into question the <u>effectiveness</u> of the Board's oversight— accusing it of failing to "*properly* oversee and monitor" (Compl. ¶ 151(a)) or "ask *appropriate* questions" (*id.* ¶ 130) or "*adequately* inform themselves" (*id.* ¶ 131) or "*sufficiently* inform themselves" (*id.* ¶ 132). But merely alleging that Orchids directors "failed to do all that they should have under the circumstances . . . is a far cry from bad faith." *Tilden*, 2018 WL 5307706 at *18 (rejecting *Caremark* claim based on directors' purported failure to properly diligence expansion strategy). And, as the Delaware Supreme Court emphasized in *McElrath*, "'there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.' It is not enough to allege that the directors should have been better informed—a due care violation exculpated by the corporation's charter provision." *Id.* (quoting *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009)). So too here.

The Trustee's remaining allegations against the directors—that they approved unrealistic maintenance budgets, approved amendments to Orchids' credit facility, allowed Orchids to continue operating while insolvent, and declined to make a change in Orchids' leadership—each involved business decisions that implicate an exculpated duty of care claim.

The "maintenance budget" and "deepening insolvency" claims are both exculpated and fail for the same reasons as the analogous claims against Orchids' officers, discussed above. The other remaining claims (approval of amendments to Orchids' credit facility, and a failure to make a change in Orchids' leadership) also fail for numerous additional reasons. The "approved amendments to the credit facility" claim is tantamount to an impermissible deepening insolvency

claim; there are no facts showing that there was any reasonable alternative to acceding to the banks' demands; and no damages are identified. Similarly, no facts are pled showing illegal conduct or a level of incompetence that would mandate removal of senior management (and indeed, the Trustee complains of *too much* turnover in the senior ranks (Compl. ¶ 103)), and no damages are pled.

The pre-April 2016 claims against the directors fail for the same reasons they fail as to the officers, both because they are time-barred and because the business judgment rule protects those business expansion decisions. The facts alleged in support of the post-April 2016 claims are insufficient to state any breach of fiduciary claim against an officer or director, let alone a non-exculpated *Caremark* breach of duty of loyalty claim.  Count II must be dismissed.

## IV.    Count III Fails to State a Claim for Aiding and Abetting Breach of Fiduciary Duty.

In an attempt to circumvent exculpation, the Trustee also alleges that the director defendants (and confusingly one officer) aided and abetted the officers' purported breaches of fiduciary duty. This claim is meritless.

As a preliminary matter, the Delaware Court of Chancery has explicitly rejected the notion that "a director of a Delaware corporation can be subject to non-exculpated, aiding and abetting liability for knowingly participating in [another fiduciary's] breach of fiduciary duty" as "an overbroad and unsubstantiated expansion of Delaware law, which would seem to contravene decades of settled precedent . . . and the General Assembly's adoption of 8 Del. C. § 102(b)(7)." *Hamilton Partners, L.P. v. Highland Capital Management, L.P.*, 2014 WL 1813340, at *17 n. 151 (Del. Ch. May 7, 2014); *accord CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021, at *20 (Del. Ch. June 23, 2015) ("Delaware cases dealing with claims for aiding and abetting a breach of fiduciary duty have held that, as a matter of law, aiding and abetting liability generally cannot attach to defendants who themselves owe fiduciary duties to the relevant entity and plaintiff.").

The *Hamilton* court, for example, instead reasoned that, because "a director's knowingly participating in another's breach of fiduciary duty would *itself* be a breach of [the director's] fiduciary duty [of loyalty]," such allegations should be analyzed under the substantive duty of loyalty rubric. *Id.* As discussed above, the Trustee's allegations are insufficient to state an underlying claim for breach of fiduciary duty.

Even analyzed under an aiding and abetting framework, Count III fails. To state a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must plausibly allege: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and non-fiduciary. *See Twin Bridges LP v. Drager*, 2007 WL 2744609, *23 (Del. Ch. Sept. 14, 2007).

Here, all of the defendants are co-fiduciaries, and also for the reasons explained above, none of them breached their fiduciary duties.  Even if that were not the case, glaringly lacking are any facts supporting the "knowing participation" element, which "requires that the third party act with the knowledge that the conduct advocated or assisted constitutes . . . a breach [of fiduciary duty]." *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001). No facts in the Complaint support a conclusion that any director or officer knew that an officer was breaching their fiduciary duties, or that they "rendered substantial assistance in regard to such acts and omissions of the Officer Defendants[.]" (Compl. ¶ 57). Indeed, the Trustee makes no effort to specify *which* director knew of or assisted *which* act or omission of *which* officer, let alone provide any concrete facts to substantiate the purported knowledge and assistance. Such generalized allegations plainly fail to give each defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests," *In re Wonderwork, Inc.*, 611 B.R. 169, 199 (Bankr. S.D.N.Y. 2020), and group pleading is even

more problematic in the context of aiding and abetting claims, which like *Caremark* claims, require *scienter*. *Id.* ("The problem of group pleading is especially acute when analyzing . . . *Caremark* claims[,] which require allegations of bad faith or conscious indifference.").

The Trustee's allegations as to the directors amount to nothing more than grumbling about things they purportedly ignored, allowed, or failed to do, rather than anything they affirmatively did (*see, e.g.,* Compl. ¶ 151). Mere alleging that the directors were too passive or uninformed cannot satisfy the "knowing participation" prong because, **"[w]hile a failure to act can certainly constitute a breach of a party's [fiduciary] duties, . . . 'aiding and abetting,' by definition, implies active participation or affirmative action."** *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 132 (Bankr. D. Del. 2016); *accord In re DSI Holdings, LLC*, 2020 WL 7054390, at *6 (Bankr. D. Del. Dec. 2, 2020) (same); *In re Xura, Inc., Stockholder Litig.*, 2018 WL 6498677, at *15 (Del. Ch. Dec. 10, 2018) ("[A]n aiding and abetting claim based on a third-party's alleged failure somehow to *prevent* a [breach of fiduciary duty] rests on thin ice." (emphasis in original)); *Crescent/Mach I Partnership, L.P. v. Turner*, 2005 WL 3618279, at *4 (Del. Ch. Dec. 23, 2005) (holding that allegation that defendants "remain[ed] silent while [the fiduciary] was disseminating . . . projections . . . they knew . . . were not accurate" was insufficient to satisfy the "knowing participation" prong). As the Trustee does not specify any affirmative act any director or officer took to induce or facilitate a breach of any officer's fiduciary duties, the Complaint fails to sufficiently allege "knowing participation." For all of these reasons, Count III must be dismissed.

## V.    Count IV Fails to State a Claim for Avoidance and Recovery of Fraudulent Transfers.

Finally, the Trustee seeks to avoid and recover the routine compensation paid to the Defendants as constructive fraudulent transfers on the grounds that as a result of their purported

breaches of fiduciary duty, the Debtor did not receive reasonably equivalent value in exchange for the payments. (Compl. ¶¶ 158-59).

First, Count IV fails to identify any specific payment or even the total sought to be avoided —let alone facts supporting a reasonable inference that Orchids was insolvent at the time(s) all of those payments were made —and should therefore be dismissed for that reason alone. *See, e.g., In re Lexington Health Group, Inc.*, 339 B.R. 570, 575 (Bankr. D. Del. 2006).

More substantively, in the context of a constructive fraudulent transfer claim based on salaries or bonuses paid to directors and officers, the fact that a fiduciary's decisions or actions prove unsuccessful or ill-advised does not mean the company did not receive reasonably equivalent value in exchange for the compensation paid to that person. *See, e.g., In re SRC Liquidation, LLC*, 581 B.R. 78, 97-98 (Bankr. D. Del. 2017) ("Plaintiffs' assertion that the Acquisition was ultimately unsuccessful in saving the Company does not detract from the work undertaken by Defendants for which they were compensated."); *accord In re Midway Games Inc.*, 428 B.R. 303, 323 (Bankr. D. Del. 2010) (finding company received reasonably equivalent value for fees paid to directors accused of breaching fiduciary duties). There is no allegation that the amounts paid to the defendants were over-market or otherwise excessive, nor is there any allegation that the defendants did not render the services for which they were paid, and thus the Complaint fails to allege facts showing that reasonably equivalent value was not received in exchange for the compensation.

Even if the Court were to find that one or more of the defendants breached their fiduciary duties, the Count IV constructive fraudulent transfer claims would still fail. That is because the relevant question is whether, under applicable non-bankruptcy law, the breach of fiduciary duty is one that would negate the company's obligation to pay the compensation. Though Delaware law permits a corporation to recover compensation paid to a fiduciary "in a situation where the

disloyalty of the officer or director constitutes the usurpation of a corporate opportunity[, not] every illegal act or breach of fiduciary duty committed by a corporate officer [or director] warrants a forfeiture of his compensation." *Citron v. Merritt-Chapman & Scott Corp.*, 409 A.2d 607, 611 (Del. Ch. 1977) (internal citation omitted).  Delaware law is clear that only breaches of the *duty of loyalty* justify forfeiture of compensation, and the trustee does not accuse any Defendant of disloyalty. *See Citron*, 409 A.2d at 611.  And even in the case of a disloyal fiduciary, compensation is only recoverable as *damages* caused by the disloyal conduct; a breach of fiduciary duty does not retroactively negate a company's obligation to pay compensation. *See In re Tribune Company Fraudulent Conveyance Litig.*, 2018 WL 6329139, at *17 (S.D.N.Y. Nov. 30, 2018) ("[T]he trustee cites no case law or authority suggesting that a breach of fiduciary duty can be used under the Bankruptcy Code to avoid an otherwise unavoidable payment."). For this reason, the Count IV fraudulent transfer claims must fail no matter the outcome of the breach of fiduciary duty claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Trustee's Complaint against Defendants Jeffrey Schoen, Steven Berlin, John Guttilla, Douglas Hailey, Elaine MacDonald, and Mark Ravich in its entirety.

Dated: June 25, 2021
        Wilmington, Delaware

Respectfully submitted,

*/s/ D. Ryan Slaugh*
Jeremy W. Ryan (No. 4057)
D. Ryan Slaugh (No. 6325)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
       rslaugh@potteranderson.com
-and-
Vincent E. Lazar, Esq.
William A. Williams, Esq.
Monika N. Kothari, Esq.
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484
Email: vlazar@jenner.com
      wwilliams@jenner.com
      mkothari@jenner.com

*Counsel to Defendants Jeffrey Schoen, Steven Berlin,
John Guttilla, Douglas Hailey, Elaine MacDonald,
and Mark Ravich*