## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OPP LIQUIDATING COMPANY, INC.<br>(f/k/a Orchids Paper Products Company),<br>et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10729 (MFW)<br><br>Jointly Administered |
| BUCHWALD CAPITAL ADVISORS LLC,<br>as Liquidating Trustee of the Orchids Paper<br>Products Liquidating Trust,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY S. SCHOEN, individually;<br>MINDY BARTEL, individually; RODNEY<br>D. GLOSS, individually; KEITH<br>SCHROEDER, individually; STEVEN R.<br>BERLIN, individually;<br>JOHN C. GUTTILLA, individually;<br>DOUGLAS E. HAILEY, individually;<br>ELAINE MACDONALD, individually; and<br>MARK RAVICH, individually,<br><br>Defendants. | Adv. Case No. 21-50431 (MFW) |

## FIRST AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY

Buchwald Capital Advisors LLC, as Liquidating Trustee ("Plaintiff") of the Orchids Paper

Products Liquidating Trust established pursuant to the Court's *Findings of Fact, Conclusions of*

*Law, and Order Confirming Combined Disclosure Statement and Chapter 11 Plan of Orchids*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are OPP Liquidating Company, Inc., a Delaware corporation (6944) (f/k/a Orchids Paper Products Company), OPP Liquidating Company of South Carolina, Inc., a Delaware corporation (7198) (f/k/a Orchids Paper Products Company of South Carolina), and OLSC Liquidating Company, LLC, a South Carolina limited liability company (7298) (f/k/a Orchids Lessor SC, LLC).

*Paper Products Company, et al.* [Main Case ECF No. 714], alleges the following against JEFFREY S. SCHOEN ("Schoen"), MINDY BARTEL ("Bartel"), RODNEY D. GLOSS ("Gloss"), KEITH SCHROEDER ("Schroeder"), STEVEN R. BERLIN ("Berlin"), JOHN C. GUTTILLA ("Guttilla"), DOUGLAS E. HAILEY ("Hailey"), ELAINE MACDONALD ("MacDonald"), and MARK RAVICH ("Ravich," and together with Schoen, Bartel, Gloss, Berlin, Guttilla, Hailey, and MacDonald, the "Defendants"), and states:

## I.  PRELIMINARY STATEMENT

1.     This is an action for damages brought against the Defendants, each of whom is a former officer and/or director of Orchids Paper Products Company (the "Debtor"), for breaches of their fiduciary duties owed to the Debtor and its creditors.

2.     Schoen, former Chief Executive Officer ("CEO") and Director of the Debtor, embarked on an overly ambitious and ill-conceived expansion of the Debtor's operations, attempting to take the company from a regional manufacturer of value and extreme value tissue products, to a national manufacturer of premium and ultra-premium tissue products by, among other things, building a state-of-the-art paper manufacturing facility with a high-end, untested paper machine.

3.     Despite his ambition, Schoen failed at every turn to comprehend the complexities of undertaking a bi-coastal expansion, intentionally withheld material information from the Board of Directors ("BOD"), and failed to plan sufficiently or hire experienced individuals to assist him in this endeavor.   Meanwhile, throughout the entire expansion period culminating in the bankruptcy filing, and through the tenures of various Chief Financial Officers ("CFO"), including Schroeder, Gloss, and Bartel (together with Schoen, the "Officer Defendants"), the Debtor's financial records were so fraught with problems that they were largely unreliable, failing to

disclose the true state of the Debtor's financial affairs. And the expansion, coupled with reckless and grossly negligent actions, caused the Debtor's insolvency and substantially increased the amounts due to the Debtor's creditors.

4. The BOD, comprised of Berlin, Guttilla, Hailey, MacDonald, and Ravich (together, the "Director Defendants")[2] allowed Schoen to implement his plan for a simultaneous bi-coastal physical expansion, and expansion of the Debtor's market niche, without oversight. The majority of the Director Defendants had little knowledge about the paper industry and failed to educate themselves to apprise the risks of this multi-faceted expansion or how to oversee it. The Director Defendants also failed to act in the face of known issues, such as the Debtor's inaccurate financial records and unrealistic budgets and projections. The Director Defendants rubber stamped Schoen's plans and strategies while pocketing generous stipends and stock grants.

5. As set forth herein, each of the Officer Defendants breached their respective fiduciary duties by, among other things: (a) failing to impose corporate safeguards and controls over the Debtor's financial and operational affairs, causing significant losses to the Debtor's enterprise value; (b) burdening the Debtor with additional debt even after the Debtor was insolvent; (c) failing to oversee or hire competent individuals to manage the Debtor's Barnwell buildout; and (d) incurring significant additional expenses while the Debtor was hopelessly insolvent.

6. The Director Defendants breached their respective fiduciary duties by, among other things: (a) failing to oversee and monitor the Officer Defendants' operations of the business; (b) failing to educate themselves about the Debtor's industry to understand the inherent risks in Schoen's actions; (c) knowingly ignoring glaring issues in the Debtor's financials, budgets, and projections; (d) failing to make a change in leadership when it was clear the Officer Defendants

---

[2] Additionally, although not named as a party here, Mario Armando Garcia ("Garcia") was also a member of the BOD.

were not competent in directing the Debtor's activities; (e) approving continued extensions of the Debtor's credit facility when the Debtor was already insolvent, thereby increasing its debts; and (f) allowing the Debtor to continue operating at a time when it was insolvent, unnecessarily increasing its insolvency.

7.      As a direct and proximate result of the actions or omissions of the Defendants, the Debtor incurred millions of dollars in damages in the form of lost assets, lost revenue, lost corporate opportunities, increased insolvency, lost enterprise value, unnecessary proliferation of creditor claims, and expenses incurred in the Debtor's bankruptcy case.

## II.      PARTIES, JURISDICTION, AND VENUE

8.      On April 1, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

9.      On February 24, 2020, the Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Combined Disclosure Statement and Chapter 11 Plan of Orchids Paper Products Company, et al.* [Main Case ECF No. 714], appointing Plaintiff as the Liquidating Trustee of the Orchids Paper Products Liquidating Trust.

10.     Prior to the Petition Date, the Debtor was a Delaware corporation with its principal place of business in Pryor, Oklahoma.

11.     Defendant Schoen served as a member of the Debtor's BOD from 2007 until the Petition Date, and as its CEO from 2013 until the Petition Date.

12.     Defendant Schroeder served as CFO from 2002 to July 8, 2016.

13.     Defendant Gloss served as CFO from August 25, 2016 to March 16, 2018.

14.     Defendant Bartel served as CFO from April 16, 2018 until the Petition Date.

15.     Defendant Berlin served as a member of the BOD from 2005 until the Petition Date, including serving as its Chairman from 2007 until the Petition Date.

16.     Defendant Guttilla served as a member of the BOD from 2005 until the Petition Date.

17.     Defendant Hailey served as a member of the BOD from 2004 until the Petition Date.

18.     Defendant MacDonald served as a member of the BOD from 2013 until the Petition Date.

19.     Defendant Ravich served as a member of the BOD from 2013 until the Petition Date.

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334; 28 U.S.C. §§ 157(a), (b)(2)(A), (H), and (O); and Federal Rule of Bankruptcy Procedure 7001.  Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1409(d), as the Debtor was organized under the laws of Delaware.

### III.     FACTS SUPPORTING CLAIMS

#### A.  Background

21.     The Debtor was formed in April 1998, when it acquired its primary facility in Pryor, Oklahoma, from its predecessor entity's bankruptcy.  And in July 2005, the Debtor made its initial public offering, the proceeds of which were used to purchase capital equipment to increase production capacity at its facility in Pryor.

22.     From its inception through 2014, the Debtor's focus was on being a low-cost, value manufacturer of tissue products, manufacturing a full range of private label bathroom tissues, paper

towels, and napkins.  Indeed, the Debtor had secured a market niche serving "extreme value" retail establishments such as Dollar General and Family Dollar.

23.     The Debtor's production of tissue products included both paper-making and converting.  In making the paper products, the Debtor used pulp, and the finished products were wound on giant rolls, called "parent rolls."  The Debtor would sometimes sell these parent rolls to other manufacturers.  But more often, it converted the parent rolls in-house.  In the converting process, the Debtor would unwind the giant rolls and cut and perforate the paper, wind it onto individual consumer-sized rolls, and package it for retail sale.

24.     Pursuant to the Debtor's corporate bylaws, Schoen's duties as CEO included providing general supervision of the business of the Debtor, subject to the control of the BOD.

25.     Pursuant to the Debtor's corporate bylaws, in their role as CFO, Schroeder, Gloss, and Bartel were assigned certain duties, including:

   a.  supervising the Debtor's corporate-wide treasury functions and financial reporting to outside bodies;

   b.  maintaining custody of all funds, securities, evidence of indebtedness, and other valuable documents of the Debtor;

   c.  making all disbursements and receiving all funds of the Debtor; and

   d.  providing the BOD, CEO, and others with accounts of all transactions and of the financial condition of the Debtor.

26.     Pursuant to the Debtor's corporate bylaws, the Director Defendants' duties included managing the business and affairs of the company.

27.     In March 2014, during a meeting of the BOD, Schoen advised the BOD that the Debtor should be repositioned as a national supplier of high-quality tissue products in the value,

premium, and ultra-premium tiers through a bi-coastal expansion of its operations. Indeed, Schoen urged the BOD to embark on a plan of building an additional manufacturing facility on the East Coast, and acquiring existing manufacturing facilities and customers from another manufacturer, Fabrica de Papel San Francisco, S.A. de C.V. ("Fabrica"), on the West Coast.

28. During that meeting, Schoen told the BOD that his vision for the expansion was to "to be recognized as a 100% retailer focused, national supplier of high-quality consumer tissue products," and stated that the "end game strategy" was to maintain the Debtor as a public company and to merge with Fabrica.

29. Despite Schoen telling the BOD that his goal for expansion was to reposition the Debtor as a national supplier, Schoen's actual goal, from the time the initial plan to expand was conceived through the Petition Date, was instead to sell the Debtor to a larger competitor. Indeed, the assets Schoen urged the Debtor to purchase were those that he thought would make the Debtor an attractive target for acquisition. Based on his misrepresentations to the BOD, Schoen obtained the BOD's consent to embark on his ill-fated plan.

30. Due to his misrepresentations, the BOD was unable to consider, for instance, whether potential acquirers would be receptive to a facility dependent upon an unproven technology – the QRT, which lacked market validation.

31. During the course of the expansion, in his discussions with and presentations to the BOD, Schoen misrepresented and actively concealed his true intentions for the Debtor and prevented the BOD from considering all material information. In doing so, Schoen knowingly withheld material information from the BOD that would have otherwise allowed the BOD to know or have a reason to inquire about Schoen's true intentions for the Debtor, and which would have allowed the BOD to properly evaluate Schoen's recommendations.

32.    By misrepresenting his intentions for implementing the bi-coastal expansion of the Debtor to the BOD, Schoen prevented the BOD and, thus the Debtor from gaining knowledge of the truth and discovering its rights.

33.    By making misrepresentations to the BOD and actively concealing his true intentions from the BOD, Schoen prevented the BOD from properly evaluating whether positioning the Debtor for a sale was in the Debtor's best interest, whether adopting a technology lacking market validation to accomplish a sale was in the Debtor's best interest, and further prevented the BOD from having full access to all of the information necessary to fully analyze each decision made in furtherance of expansion – including but not limited to approving:

    a.   the initial bi-coastal expansion plan;

    b.   the Fabrica transaction;

    c.   the purchase of the Barnwell land; and

    d.   the purchase of the QRT.

**B.  The East Coast Expansion**

34.    The Debtor's plan for East Coast expansion was to acquire land in South Carolina, Virginia, or Tennessee on which to build a new manufacturing facility.

35.    In November 2014, the BOD approved the Debtor's acquisition of 86 acres of land in Barnwell, South Carolina for the purpose of building an integrated paper and converting mill with up to 3 converting lines.

36.    In evaluating the Barnwell location, Schoen failed to advise the BOD and the BOD failed to consider: (i) whether skilled workers – which would be needed to staff the facility – were available in the region, and (ii) the availability and/or price differential of raw materials that would be needed to supply the facility.

37.     In January 2015, Schoen presented the BOD with a 5-year financial plan, including the Barnwell buildout, totaling $127 million, which included recommendations to purchase an Atmos paper machine, and Futura Andromeda converting equipment.  At that time, the BOD approved $40 million for the buildout of Barnwell, and the purchase and installation of its equipment.  The BOD charged Schoen and Schroeder with the planning and execution of the buildout and equipment for the Barnwell facility.

38.     Importantly, the plan presented to and approved by the BOD was premised upon the purchase and use of an Atmos paper machine.  The Atmos was a well-known, industry standard machine.  The Atmos' reliability, serviceability, maintenance, efficiency, and productivity made it a machine that was generally easily quantifiable for purposes of planning the new facility.

39.     These factors were especially important in the Debtor's industry in which prudent capital investment in equipment and technologies is necessary to remain competitive – a fact which was expressly acknowledged in the Debtor's annual reports to shareholders.

40.     Despite the BOD's approval of the Barnwell plan utilizing the Atmos machine, in March 2015 Schoen and other representatives from Debtor's management met with Valmet Oyj ("Valmet"), a Finnish developer of pulp and papermaking technologies, and began discussing instead the acquisition of an Advantage QRT (the "QRT").  The QRT was Valmet's newest offering, and, given that it was a first of its kind machine, had no track record at that time.

41.     In April 2015, the Debtor completed a follow-on stock offering, the entire proceeds of which, $32.1 million, were earmarked for the Barnwell construction.

42.     By late April 2015, after meeting with Valmet, Schoen completely abandoned the idea of using the conventional Atmos machine, and advised Valmet he intended to recommend the

QRT to the BOD as part of a revised plan. At the time Schoen made this decision and communicated it to Valmet he did not even have a quote to determine how much the QRT might cost to purchase, know how or if the Debtor could maintain the first of its kind machine, know what it might cost to maintain it, or know whether the machine was capable of processing "broke" into its papermaking process.[3]

43. At the next BOD meeting held May 4-5, 2015, Schoen presented the BOD with proposals to install one of three paper machines: two conventional machines, Atmos and NTT, and the QRT pilot machine. In Schoen's presentation to the BOD about the pros and cons of the QRT versus each of the other machines, the only "con" identified for the QRT was that it was a pilot machine.

44. Moreover, known to Schoen at the time but conspicuously missing, and intentionally omitted, from his presentation were the following:

    a. Valmet had never built a full paper mill in the US;

    b. Valmet had only ever built one full tissue plant, located in Mexico;

    c. Valmet's preferred boiler was not available in the US; and

    d. Valmet's technicians were located overseas and their availability to troubleshoot issues was uncertain.

45. In doing so, Schoen knowingly withheld material information from the BOD that would have otherwise allowed the BOD to properly evaluate Schoen's recommendations.

46. By misrepresenting the extent of the "cons" of purchasing the QRT, Schoen prevented the BOD and, thus, the Debtor from gaining knowledge of the truth and discovering its rights.

---

[3] "Broke" is the ends of other rolls left over from the conversion process, recycled back into pulp.

47.     By making misrepresentations to the BOD and actively concealing the drawbacks to purchasing the QRT, Schoen prevented the BOD from properly evaluating his recommendation of purchasing the QRT.

48.     The BOD had a duty to inquire further about Valmet and the QRT, particularly given that it was a pilot machine and the circumstances under which this option was presented.

49.     Schoen's presentation to the BOD stated that the cost of Atmos and QRT were comparable, at $30.9 million and $31.7 million, respectively; and estimated the QRT could be delivered and installed in 25 months from the order date. But the capital costs presented to the BOD did not include, for example, the additional substantial cost of the de-inking plant.

50.     Despite the obvious omissions, however, the BOD failed to inquire regarding the incompleteness of the cost estimate, the costs and ability of the Debtor to maintain the QRT, and whether the QRT was capable of processing broke, and simply rubberstamped Schoen's recommendations in derogation of their fiduciary duties to the Debtor.

51.     For his part, Schroeder should have provided the BOD with accurate financials reflecting the cost to purchase and maintain the QRT, and to build and operate the Barnwell facility.  At minimum, Schroeder should have made the proper inquiries in an effort to obtain the financial information needed to inform the BOD in advance of any decision.  However, Schroeder either abdicated his duties to Schoen, or was complicit in Schoen's plan, by keeping highly relevant and potentially unflattering information from the BOD.

52.     Based on this incomplete information, the BOD approved the purchase of the QRT at the May 2015 meeting.

53.     In authorizing the purchase of the QRT, the BOD failed to consider or request any due diligence on several important assertions made by Schoen in his pitch to the BOD for the QRT,

and questions that would naturally and reasonably arise from same, including: (i) whether Valmet could deliver the turn-key machine; (ii) whether Valmet had the requisite experience to properly and efficiently engineer the buildout of a full paper mill; (iii) whether Valmet's designs were compatible with U.S. building standards; (iv) the likelihood of, or timeline for, achieving the "higher" operating speeds of the QRT touted by Valmet; (v) the basis for the "lower" operating cost estimates of the QRT; (vi) whether the Debtor's maintenance staff was equipped to maintain the QRT; (vii) whether the Debtor's employees had the knowledge to properly operate the QRT; (viii) whether spare parts for a first of its kind machine would be readily available; and, (ix) devastatingly, the special considerations of purchasing a pilot machine, which included longer startup times, higher startup costs, higher maintenance expenses, the need for additional time and support from Valmet at the Debtor's expense, and the potential that the machine would not meet stated production expectations. Instead, the BOD abdicated its responsibility to consider all material information and acquiesced to Schoen's recommendations based on incomplete information. Schoen also failed to consider or inform the BOD regarding these important issues when making the decision to recommend the QRT, to the Debtor's detriment.

54.     By mid-June 2015, Valmet provided the Debtor with several updates to the QRT quote, increasing the cost $9 million over the estimate provided to the BOD a few weeks prior. Even at this increased price, several important line items in the order (*e.g.*, the de-inking plant line) were missing entirely from the cost estimates.

55.     With each update to the quote, Schoen and Schroeder failed to ascertain the full, actual cost of the QRT, and what vital components were still missing from each estimate. Despite the significant increase in price before ground had even broken on the Barnwell facility, Schoen and Schroeder pressed ahead with the QRT without educating themselves or inquiring about the

additional costs that were still missing, and the BOD failed to demand from Schoen or consider such information.

56.     Nor, importantly, did Schoen, Schroeder, or the BOD ascertain at any time whether Valmet could deliver the turnkey machine that it promised.

### *(2) Barnwell Buildout*

57.     From the time the Barnwell project commenced, the Debtor's top priority was to bring the facility online as quickly as possible.  However, none of the Defendants present at the time of the Barnwell planning or buildout had prior experience building a manufacturing facility from the ground up.  Nor did they seek out anyone with such experience to advise them and provide necessary front-end planning or ongoing oversight on the project in order to protect the Debtor's interests.

58.     Instead, Schoen simply abdicated his responsibility to oversee the project and handed the entire project over to the general contractor that had never previously worked with Valmet.

59.     Valmet, which had never built a QRT in the U.S., kept increasing cost estimates for the machine.  In May 2015, when presented to and approved by the BOD, the QRT was estimated to cost $31.7 million, but by November 2015 the estimated cost increased to over $48 million, by which time the Barnwell construction was already underway.  At no point during this time did Schoen, Schroeder, or the BOD reconsider whether the QRT purchase was reasonable or feasible in light of the spiraling costs.

60.     Additionally, the cost of the Barnwell building itself kept increasing because the building specifications needed to house and operate the QRT continued to be changed in the midst of construction.  For example:

a. The piping requirements for the QRT significantly increased after the subcontract for this work had already been bid and awarded.

b. Months later, it was determined that required additional support needed to be installed for those pipes.

c. The boiler Valmet used in its original estimates was not up to U.S. requirements and could not be used.

d. The pump motors were not delivered pre-mounted as is industry standard in the U.S., and the general contractor was not alerted to this fact in advance.

61. Schoen also contributed to the cost overruns and delays, ironically, by pushing for the project to be finished faster:

a. The general contractor complained that the pace at which the project was required to move meant his team was unable to breakdown costs estimates and to compare them with budget.

b. In September 2016, at a time when the buildout was already several weeks behind schedule and in an effort to meet Schoen's directives to get back on schedule, the general contractor attempted to rush transporting a piece of the QRT. In this rush, the general contractor damaged the piece of equipment, which ultimately had to be replaced.

c. Due to Schoen's lack of planning on the front end and failure to include all essential elements of the Barnwell facility, throughout the project costly changes were required to be made to the Barnwell design, to include, among other things: adding offices, a boiler room, maintenance shop, and storage areas – all of which should have been, but were not, included or anticipated in the original plans.

62.     When changes to the Barnwell design needed to be made, Schoen recklessly ceded responsibility for implementation to the general contractor.  Although the general contractor attempted to reduce costs, time pressures placed on it by Schoen as well as late changes to building requirements from the Debtor and Valmet resulted in cost overruns.

63.     During the course of the Barnwell buildout, the CFO position changed hands from Schroeder to Gloss.  However, without regard to who was in the role of CFO during this time, neither Schroeder nor Gloss provided up-to-date and accurate financials tracking the costs incurred, or the anticipated cost of completion of Barnwell, and failed to provide such information to Schoen or the BOD.

64.     Additionally, at times the general contractor did not understand what Valmet needed or wanted, which also increased costs, delays, and confusion.  For example, in December 2015 the general contractor sent a list of questions to Valmet regarding the electrical needs for the QRT.  Valmet was unable to provide U.S. specifications because the QRT was developed using EU specifications.  As a result, the general contractor had to speculate as to the requirements.

65.     The differences between U.S. and EU standards was a source of constant friction and uncertainty as Valmet generally supplied plans, designs, and other information that were not to U.S. standards and Schoen failed to consider, and the BOD failed to inquire, whether Valmet could deliver plans, designs, and other information to U.S. standards – despite Schoen's knowledge that Valmet had never built a full paper mill in the U.S. and the BOD's knowledge that the QRT was a first of its kind machine.

66.     Schoen failed to intervene when Valmet was slow to provide requested and necessary information to the general contractor, leaving the general contractor to guess at materials and cost estimates instead of using information from the actual designs.

67.     In all respects, Schoen failed to bridge the gap between Valmet and the general contractor.

68.     By the beginning of December 2016, almost two years into the project that was over two months behind schedule and $24 million over budget, Schoen admitted that the project was not designed well on the front end, or managed throughout. He further acknowledged that the Debtor should have retained a project manager experienced in such a buildout to oversee the project and protect the Debtor's interests rather than leaving the general contractor and Valmet substantially in control.

69.     Despite this acknowledgement, Schoen and Gloss stayed the course on the unfinished project.

70.     As the project approached completion, the cost overruns became so problematic the Debtor was unable to pay Valmet for costs as they were incurred, and had to resort to "creative" ways to pay Valmet, including offering Valmet stock options in exchange for a reduction in amounts due, and seeking concessions and extended terms.

71.     Although Valmet did not accept responsibility for any of the unanticipated cost increases in either the QRT or the buildout overall, it did ultimately agree to provide some pricing concessions and extended terms for payment.

72.     It was, however, Schoen, Schroeder, and later Gloss' responsibility to oversee Valmet's work and project implementation, and to educate themselves through inquiry or hiring appropriate professionals about proper steps for purchasing and installing such machinery. To that end, Schoen, Schroeder, and Gloss wholly failed to fulfill their duties in regard to the Barnwell buildout.

73.     Moreover, Schoen, Schroeder, and Gloss continued to perpetuate the poor initial planning of the project by recklessly failing to reevaluate the plans and continuing on the same course of action despite the mounting evidence that these decisions were causing damage to the Debtor.

74.     By the time production at Barnwell began in June 2017 with its paper mill and two converting lines, the project was more than $30 million over budget and 10 weeks behind schedule.

*(3) Barnwell QRT Operations*

75.     Valmet promised the Debtor it would provide a turnkey QRT.  However, the QRT fell far short of expectations.

76.     From the start of production, the QRT proved to be unreliable.

77.     The Debtor's customary processes included incorporating "broke" into its papermaking process, but, prior to making his recommendation to the BOD to purchase the QRT, Schoen failed to confirm whether the QRT was designed to handle broke pulping – it was not – and the QRT repeatedly broke down when trying to process broke.

78.     In fact, by June 2018, a year into operations, the Debtor reported to Valmet that the pulp conveyor was "falling apart" because the cleats of the conveyor were breaking off, falling into the machine, and damaging the motor.  In Valmet's response to the report, the Debtor apparently learned for the first time that the machine was not designed to handle broke processing. Indeed, despite additional engineering to attempt to add the ability to process broke to the QRT, due to its design, the QRT was never able to correctly process broke.

79.     After the fact, Schoen admitted that he should have been more careful in the procurement process because it was always the Debtor's intention to process broke instead of merely discarding it.

80.     Schoen gave little, if any, thought to the specific upkeep and maintenance requirements of the QRT (a first of its kind machine) prior to selecting it for Barnwell, or much at all prior to the end of the buildout.

81.     Indeed, Schoen and Schroeder only began scrutinizing Valmet's QRT maintenance program in the spring of 2016, mere weeks before production was scheduled to begin.

82.     Valmet advised the Debtor that its maintenance program would cost $822,000 for implementation of the QRT and $2,000,000 per year for maintenance.  The Valmet program included service by knowledgeable technicians and spare parts for the QRT.

83.     Subsequently, Schoen and Gloss decided, based on nothing more than their own uninformed cost estimates, that the Debtor could provide a maintenance program for the QRT at approximately half the cost.  Accordingly, they decided to reject Valmet's maintenance program based on cost alone, and handle it in-house by, among other things, hiring a full-time employee to head up the QRT maintenance.

84.     However, the Debtor never hired an employee solely focused on maintenance of the QRT, and the QRT's performance suffered significantly.

85.     As he did during the buildout, Schoen rushed to bring Barnwell's machinery, including the QRT, from start-up to production.  As a result of this rush to production, Barnwell never formulated optimal procedures, training for its employees, or even developed an understanding of how the QRT operated.

86.     In late 2018, Schoen again acknowledged that his rush to production was a mistake. And yet, prioritizing speed over planning was a mistake that Schoen kept repeating, to the Debtor's continuing detriment.

87.     Although Valmet technicians were on-site at Barnwell for the first three months of operations, the QRT never met its anticipated production of 100 tons per day.

88.     The Debtor's production and maintenance staff had little knowledge about how to operate or maintain the QRT. When problems arose triggering alarms on the QRT, the Barnwell production staff routinely just reset the machine to clear the alarms (sometimes repeatedly) and continued operations.

89.     Throughout the time the Debtor operated the QRT at Barnwell, Valmet repeatedly told Schoen and other members of the Debtor's management that lack of maintenance and deplorable housekeeping conditions at Barnwell were causing significant performance issues for the QRT. Despite these admonishments, Schoen failed to recommend or ensure implementation of the necessary changes at Barnwell.

90.     Indeed, more than a year after commencing production, Valmet reported the QRT's preventative maintenance was still not being performed. The machinery was evidencing this lack of maintenance. As a result, the QRT machine experienced significant downtime – sometimes as much as 45% during an entire month.

91.     The QRT also routinely suffered downtime due to a lack of available parts. Because Schoen and Gloss eschewed Valmet's maintenance program, opting for their own, the Debtor was responsible for ordering and keeping necessary parts on hand. When the Debtor failed to do this, as it routinely did, parts had to be special ordered from foreign producers. In one instance the motor of the QRT's non-standard boiler needed to be replaced, which motor was made by a single company in South Africa and required a lead time of six weeks to produce. Until the issue arose, Schoen and the Debtor's management apparently weren't aware that the QRT used a boiler that

was not standard for the U.S., because they failed to take into consideration the availability of spare parts for the QRT at the time that Schoen recommended the QRT for Barnwell.

92.     Moreover, Schoen's and Gloss' assertions that they could maintain the QRT as well as *and* at a lower cost than Valmet were not only baseless, but also absolutely wrong. This fact was immediately evident from the time production started at Barnwell, and continued to be the case at all times through the Petition Date as maintenance spending for the QRT far exceeded the Debtor's estimates. From 2017 through 2019, Gloss, then Bartel, estimated the monthly maintenance cost for the QRT at $127,000, or an annual amount totaling $1.5 million. From the information available in the Debtor's records, not once in two years did the Debtor manage to actually keep the cost of maintenance for the QRT at or below the budgeted monthly amount of $127,000. In fact, the actual cost of maintenance was often significantly above the budgeted amount. Indeed, in 2018, the Debtor was more than 250% over budget for QRT maintenance.

93.     Even when Gloss and then Bartel knew or should have known that the initial maintenance projections were too low, they each failed to inform the BOD or adjust the projections going forward, routinely under-projecting the cost of maintaining the QRT and the other Barnwell machinery.

94.     While Schoen and Gloss made the decision to decline Valmet's maintenance program at a cost of $2 million per year, a decision based solely on cost and without an actual understanding of what it would cost the Debtor to maintain the QRT itself, the Debtor spent over $5 million on maintenance of the QRT in 2018 alone – the only full calendar year that Barnwell was in operation prior to the Petition Date.

*(4) Barnwell Organizational Issues*

95.     In addition to problems with the machines and equipment at Barnwell, the staffing and operations at Barnwell were incredibly problematic.

96.     Schoen chose Barnwell, South Carolina for the Debtor's new production facility based in large part on tax and other incentives offered by the state and local governments.

97.     In choosing Barnwell for these reasons, Schoen overlooked the lack of a skilled workforce in the area. Nor did Schoen attempt to develop or attract a skilled workforce while Barnwell was in construction.

98.     At times and as a result of Schoen's reckless decision-making (or lack thereof) management found themselves hiring out of desperation to fill positions rather than finding qualified people with necessary technical skills.

99.     Virtually all of the Barnwell workforce lacked knowledge about even the basics of papermaking, a fact acknowledged by Schoen, who suggested that they all needed to enroll in "Papermaking 101."

100.     The Barnwell workforce was also found to be using the converting machines improperly. Unlike the QRT, the converters were fairly standard machines, which were used across the Debtor's operations. The Barnwell workforce, however, was found to be rolling the products on converters inside out, producing products of inferior feel and quality.

101.     Further, in choosing the location of the facility in Barnwell, Schoen completely overlooked the local availability of the Debtor's preferred pulp, a specialized higher end recycled fiber that it used in place of more expensive virgin pulp. Pryor's operations were used as the template for Barnwell, including setting the price points for products. However, because of the lack of preferred recycled pulp in the surrounding market, Barnwell had to use more expensive

virgin pulp. This made everything Barnwell produced with virgin pulp more expensive than budgeted.

102. In other instances when the Debtor could not find its preferred recycled pulp to use at the Barnwell facility, it used an inferior pulp. However, the QRT was not designed to process this inferior pulp, leading to additional machine malfunctions and breakdowns.

### C. The West Coast Expansion

103. In 2014, the Debtor acquired certain assets of Fabrica.

104. Pursuant to the Asset Purchase Agreement executed on May 5, 2014 (the "APA"), by and among the Debtor, Fabrica, and Orchids Mexico (DE) Holdings, LLC, the Debtor purchased certain machinery including a Manchester paper machine and two converting lines (which were operated by Fabrica under a lease agreement), Fabrica's U.S. customer list, certain customer contracts, substantially all of Fabrica's open customer purchase orders, and government permits. In total, the Debtor paid $36.7 million in value for the Fabrica transaction, made up of the following: $16,700,000 cash, plus 685,083 shares of the Debtor's common stock, valued at approximately $20,000,000, representing 7.9% ownership of the Debtor. Fabrica's President and Chairman, Mario Armando Garcia ("Garcia"), also became a BOD member of the Debtor after the transaction.

105. The Debtor admitted in its Annual Reports to shareholders that the actual value of the assets purchased from Fabrica was only approximately $25 million: $7.2 million for the machinery and equipment, and $18 million for the intangible assets. The Debtor attributed the remaining $7.5 million as the value of the agreement itself, which the Debtor would recover from future earnings.

106.    Following the sale, the Debtor and Fabrica entered into the Product Supply Agreement dated June 3, 2014 (the "Supply Agreement"), pursuant to which the Debtor had the right but not the obligation to buy up to 18,000 tons of product per year from Fabrica at cost over the next 20 years.

107.    Combined, the APA and Supply Agreement were intended to add a turnkey, West Coast manufacturing facility along with a Southwest customer base and exclusive rights to sell products under Fabrica's brand names in the U.S., and convert the Debtor into a nationwide manufacturer.

108.    However, the arrangement was never likely to produce sufficient income to recoup the Debtor's hefty $36.7 million investment.

109.    In approving the Fabrica transaction, the BOD failed to consider, and Schoen failed to advise the BOD on, material risks inherent in the relationship, including:

    a.    Fabrica's ability to unilaterally control the Debtor's ability to deliver on sales made to West Coast clients;

    b.    how the Debtor would service West Coast clients if Fabrica couldn't (or wouldn't) fill an order;

    c.    whether Fabrica would permit "ethical audits" of its facilities, which are a requirement of certain customers; and

    d.    the likelihood of recovering the value paid for the Fabrica transaction either in a sale back to Fabrica, a sale of the West Coast business, or a sale of the Debtor's entire operation.

110.    The economics of the industry determined that it was only cost-effective for the Debtor to deliver to customers within a 500-mile radius of its manufacturing facilities. Because

the Debtor did not previously have a customer base within 500 miles of Fabrica's facility, it was largely dependent on servicing Fabrica's existing customer base, and some of the western locations of the Debtor's existing customers.

111.    The Debtor's ability to sell in the Southwest was entirely driven by the cost at which Fabrica supplied the products.  A fact driven home when the Debtor attempted to service some of its Southwest clients from its Pryor facility.   During 2017, the Debtor's main manufacturing facility in Pryor was experiencing a decline in demand.  To avoid laying off its workers, Gloss directed the Debtor to supply some of the Fabrica clients from the Pryor location, but failed to consider the economics of supplying customers over such a vast distance, which, due to the increased distance and overall higher production costs, had higher shipping costs and a higher per-ton cost.  The shift in tonnage from Fabrica to Pryor was quickly abandoned because, despite Gloss's assertion that it would be more beneficial than laying off Pryor employees, it was simply too costly.  Accordingly, the Southwest clients could only be serviced from Fabrica.

112.    Schoen's failure to negotiate an assignability clause into the Fabrica transaction was problematic for the Debtor as it potentially prevented the Debtor from being able to recover any portion of its $36.7 million West Coast investment in a sale of the company as there was no guarantee Fabrica would agree to provide the product at cost (or at any reasonable cost) to a buyer. Moreover, because Schoen misrepresented to the BOD his intentions to sell the company, the Director Defendants were unable to assess the impact of the lack of an assignability clause in approving the transaction.

113.    Despite his role as BOD member for the Debtor, Garcia was known to put his personal interests and that of Fabrica ahead of the Debtor's interests in dealings between Fabrica and the Debtor.  This was a known concern prior to the Debtor closing on the transaction with

Fabrica. For example, in mid-2018, when the Debtor was in a cash flow crunch, Schoen discussed the need to delay payments to suppliers with Berlin, along with the Debtor's financial advisors. Schoen advised that when they tried to "short pay" Fabrica in January 2018, despite maintaining payment terms under the Supply Agreement, Garcia responded by threatening to stop shipments.

114.     Additionally, in 2017, when the Debtor sought to sell back to Fabrica some of the customers it purchased in the APA in order to make production room for an anticipated agreement with Sam's Club, Garcia refused to repurchase the assets at fair market value, instead demanding a discount. Garcia also refused to permit an "ethical audit" to occur at the Fabrica facility, which was required as part of the due diligence for Sam's Club. Ultimately, the buyback with Fabrica did not occur because negotiations with Garcia and Fabrica fell through.

115.     The Debtor paid a premium for the Fabrica transaction, which was ill-conceived, was never going to provide the value as stated by Schoen and Schroeder, and was fraught with complications because Garcia was both a BOD member for the Debtor and President of Fabrica, and did not always act in the Debtor's interests in dealings between the companies.

### D. Operational Issues

116.     The Debtor's hapless bi-coastal expansions were not the only problems with the company's operations. The Debtor further suffered due to the Officer Defendants' failure to correct issues with the cost of raw materials, inaccurate financial reporting and controls, and the exorbitant amount of funds being spent on advisors and outside professionals.

#### (1) Raw Material Costs

117.     One of the key factors contributing to the Debtor's profitability was the type and cost of raw goods, including fiber, used in producing its paper.

118.     Years prior to the bi-coastal expansion, the Debtor entered into an exclusive supply agreement with a pulp supplier (the "Pulp Agreement").  The Pulp Agreement was evergreen, and after an initial term, it renewed each year unless either party terminated within 90 days of its expiration.

119.     The pulp broker sold to the Debtor at a "market rate" – meaning the broker would bid on the fiber, add an unknown amount for markup and resell the fiber to the Debtor.  The Debtor did not receive any discounted rate under the Pulp Agreement.

120.     According to Gloss, the sole benefit the Debtor received under the Pulp Agreement was binding the broker to supply fiber to the Debtor.  While access to raw materials was important, Schoen and each of Schroeder, Gloss, and Bartel during their respective tenures, ignored the shortcomings in the Debtor's relationship with the broker, to the detriment of the Debtor.

121.     Nor was this the only broker with access to the raw materials the Debtor needed. Indeed, there were other suppliers and brokers.  During the later course of the Debtor's relationship with the broker, not only were there sufficient raw materials in the market, but the cost of those materials significantly declined.  The broker, however, did not pass along these savings to the Debtor.

122.     Under the Pulp Agreement, the broker was obligated to provide the Debtor with quarterly reports on the indexed prices for raw materials in the market.  However, the Officer Defendants never reviewed these reports, and, in fact, did not even know they were being provided. Starting in mid-2018, after the loss of a significant client, Schoen and then Bartel were desperately trying to cut costs, and only then inquired if the broker had ever supplied the index reports.  As it turned out, the broker had provided the latest quarterly index report, but the index did not include all of the specific materials the Debtor purchased regularly.

123.    Based upon the information supplied by the broker, the Officer Defendants had no way of knowing if the Debtor was being charged the true market rate for *all* of the materials, but they could have discovered they were being overcharged for certain materials *had they ever bothered to look or inquire*.

124.    By way of example, had the Officer Defendants reviewed the index reports and compared them with the prices charged by the broker, they would have learned that the Debtor was routinely paying a premium of approximately 20% over market rate for light print fiber, and unnecessarily driving up the Debtor's raw materials cost by approximately $1,000,000 per year for that type of fiber alone.

125.    Despite acknowledging in every annual report to shareholders that raw material cost was a key factor in profitability, the Officer Defendants never bothered to see if the Debtor was paying the true market rate for pulp, and never bothered to negotiate or instruct others to negotiate with the broker (or any other supplier) to determine if the Debtor could obtain a better rate.  The Officer Defendants were simply asleep at the wheel.

*(2) CFO turnover*

126.    The Debtor experienced turnover of the CFO position in its last three years of operations, causing significant disruption in the Defendants' access to complete and accurate financial information of the company.

127.    Defendant Schroeder was CFO for the majority of the Debtor's operations – from 2002 to August 2016, leaving in the midst of the Barnwell buildout.

128.    Despite Schroeder's long tenure during the Debtor's operations as a regional value supplier, he had difficulty transitioning to meet the needs of the company when it sought to expand. For example, Schroeder handled the United States Securities and Exchange Commission ("SEC")

reporting regarding the Fabrica transaction. Errors in the Debtor's letter to the SEC detailing the transaction raised red flags for the SEC, which prompted the SEC to request an explanation from the Debtor. The Debtor only narrowly avoided an adverse ruling from the SEC due to these errors.

129. Further in March 2016, shortly before resigning from the company in July of that year, and in connection with the Barnwell buildout, Schroeder requested a $3.6 million draw on the Debtor's credit facility. In making that draw, Schroeder represented to the bank that the Barnwell project was on time and on budget – despite having previously been explicitly informed that the project was delayed and substantially over budget.

130. Following Schroeder's departure, the CFO position was filled by Defendant Gloss in September 2016, who held the office for less than two years.

131. Gloss complained that the historical financial information, prepared by his predecessor, Schroeder, was inaccurate and could not be trusted.

132. Despite this acknowledgement, under Gloss' watch, there were repeated issues with accuracy and transparency in the Debtor's financials. In April 2017, the Debtor's independent auditor, complained it was having trouble understanding the Debtor's numbers, which were provided by the Debtor for an upcoming press release. Additionally, in an audit performed for the first six months of 2017, the auditor found misstatements in the Debtor's financial statements that were characterized as "overall misinterpretation and lack of understanding of accounting system information" and "deficiencies in monitoring controls[.]"

133. Additionally, neither Gloss nor the Debtor's accounting department could determine exactly how much was spent on the Barnwell buildout. In February 2017, Gloss and others attempted to prepare a summary of the spending to date, but could not reconcile a $3.3 million discrepancy in the numbers.

134. Gloss' tenure was also marked by liquidity issues. For example, in April 2017, a welding subcontractor at the Barnwell project stopped work due to non-payment, resulting in days of delay. As it turned out, the welding subcontractor had not been paid in three months due to "cash flow priorities," according to Gloss.

135. To rectify the cash flow issues and reign in the budget at Barnwell, Schoen requested that Gloss dispute some of the contractor's work.

136. Shortly before Gloss resigned, the Debtor's cash position was so dire, the Debtor was contemplating purchasing spare parts for the QRT on a consignment basis.

137. Gloss resigned in March 2018, and Bartel took over the following month, by which time, as described more fully below, the Debtor was negotiating its eighth amendment to loan agreements with its lenders as a result of breaches of loan covenants. While Bartel inherited a financial quagmire, she did little to address the issues.

138. Further, at the end of Gloss' tenure and into the beginning of Bartel's, the Debtor continued to record costs at Barnwell as "startup" costs despite the fact that production at Barnwell had been ongoing for some time.

*(3) Project Odyssey*

139. In 2014, the Debtor entered into a revolving credit agreement to provide cash to fund the Debtor's operations (the "Credit Agreement").

140. The Debtor, however, repeatedly defaulted under the Credit Agreement. Each series of defaults by the Debtor was cured through an amendment to the underlying Credit Agreement containing increasingly severe terms, including payment of penalty and transactional fees, and additional reporting requirements and oversight at the Debtor's expense.

141.     In all, between 2014 and August 2018, the Credit Agreement was amended nine times due to the Debtor's continuing defaults.

142.     Between early 2017 and August 2018, the Debtor hired a series of outside professionals, consultants, and financial advisors to simultaneously prepare the Debtor for sale, obtain replacement financing, and/or engage in a capital raise, which it dubbed "Project Odyssey." Over the course of 16 months, the Debtor spent over $10 million on these professionals and the only thing it was able to accomplish was additional amendments to the Credit Agreement.

143.     In the midst of Project Odyssey, the Debtor's financial condition continued to deteriorate.  The Debtor reported large losses in 2017 and 2018.  The Debtor's poor financial condition caused it to lose one of its largest customers in July 2018.

144.     In August 2018, following the loss of one of its largest customers, the bank gave the Debtor the ultimatum to sell the company or refinance.

145.     Schoen and Bartel continued the Debtor's operations for several more months, hopelessly deepening the Debtor's insolvency, ultimately filing for bankruptcy protection pursuant to Chapter 11 of Title 11 of the United States Code on April 1, 2019.

### E.  BOD's Failure to Act

146.     The Debtor's BOD was largely comprised of individuals with no prior experience in the paper industry, or in manufacturing at all.  Indeed, of the seven BOD members, except for Schoen and Garcia, none of them had experience in the paper industry. Instead, most of the members of the BOD had finance or accounting backgrounds.  Despite this relative lack of prior industry and/or manufacturing experience, the Director Defendants had a duty to educate and inform themselves of the Debtor's operations to properly oversee management, and to have a sufficient base of knowledge to approve (or reject) actions proposed by management.

147. Throughout their tenure, the Director Defendants abdicated their directorial duties by failing to educate themselves and knowingly failing to make decisions on an informed basis. This fundamental lack of industry insight by those charged with overseeing the Debtor's management was problematic on several fronts.

148. The BOD was entirely dependent upon the Officer Defendants to both ascertain the risks and alternatives to the company's proposed actions and strategies, and to provide the Director Defendants with all of the information necessary to make informed decisions and provide effective oversight. Because of this, the Director Defendants did not recognize when the Officer Defendants' information, analyses, or projections were missing or misrepresented important information or considerations.

149. Accordingly, the Director Defendants were unable to appreciate the increased level of risk when the Officer Defendants suddenly changed course on an issue from one extreme to another, and failed to consult with knowledgeable experts that could have provided them with the information necessary to have informed deliberations and make reasonable decisions.

150. Perhaps nowhere was this more prevalent than in the Director Defendants' approval of the QRT and the development of the Barnwell facility.

151. The Debtor's annual reports to shareholders indicated that a key aspect of profitability in the paper industry is capital spending – in order to remain competitive, the Debtor needed to responsibly invest in purchasing, upgrading, and/or replacing equipment.

152. When Schoen initially presented the BOD with plans for Barnwell, he included a proposal to outfit the facility with a used paper machine. A short time later, Schoen more specifically proposed that a previously owned and operated NTT or Atmos machine would be purchased and provided estimates for costs, efficiency, and operating expenses.

153.     But a few weeks later, without warning or explanation, Schoen pivoted from a used NTT or Atmos machine, and instead recommended the new, untested QRT.  The Director Defendants failed to ask appropriate questions or otherwise inform themselves to determine whether the QRT was in the Debtor's best interest instead of a known and tested machine.  Relying only on Schoen's rosy and incomplete estimates for the purchase price of the QRT (stripped of any estimated operating or repair expenses), the Director Defendants approved the QRT purchase on short notice and without further investigation.

154.     The Director Defendants failed to inform themselves of the risk with the QRT before it was approved, and then failed to act when the costs quickly spiraled out of control.  Within weeks after approving the purchase of the QRT, new estimates from Valmet added millions of dollars to the price, and continued to rise thereafter.

155.     The Director Defendants also failed to inform themselves of the risks of locating the new East Coast facility in Barnwell, including its lack of a sophisticated workforce or access to raw materials in the market, as Schoen and Schroeder failed to consider either of these issues, or failed to report them to the BOD.  Indeed, once operational, the Debtor had difficulty finding individuals who could operate and maintain the manufacturing equipment at Barnwell, and its preferred raw materials for paper.

156.     Although the Director Defendants received regular updates about the cost and progress of the Barnwell buildout, they failed to act and failed to require Schoen, Schroeder, and Gloss to act when construction cost overruns and delays mounted.

157.     The Director Defendants approved budgets and projections they knew or should have known were inaccurate and unreasonable.  For example, from the time Barnwell's operations came online, Gloss estimated maintenance and repair costs for the QRT to be $1.5 million

annually, or $125,000 per month, but had no basis for the estimate. Moreover, after Bartel became CFO, she simply adopted Gloss' estimate for maintenance costs without updating the amount to account for the actual costs incurred. And there was not a single month of operation when the reported actual spend for the QRT maintenance and repairs was at or below $125,000, nor, going forward, did Gloss or Bartel ever provide the BOD with a basis to support their continued use of woefully incorrect cost estimates. Despite this, throughout their tenures, Schoen, Gloss, and Bartel provided, and the Directors Defendants approved, maintenance and repair budgets for Barnwell that only estimated $125,000 per month. Meanwhile, the actual maintenance spending for the QRT in 2018 was over $5 million, equal to a monthly average of more than $400,000. The BOD was either supplied with this information or nothing at all. Either way, the BOD failed miserably in its oversight.

158. The Director Defendants continued to approve extensions of the Debtor's credit facility to fund operations despite the imposition of increasingly draconian terms and exorbitant fees with each amendment. Indeed, the Director Defendants approved three extensions alone in the nine-month period *after* the Debtor lost one of its largest customers, but before the bankruptcy filing. This, despite Schoen and management's acknowledgement that the loss of this customer meant that a bankruptcy was all but unavoidable.

159. The Director Defendants abdicated the duties they owed to the Debtor and its creditors, allowing Schoen alone to steer the ship without a reasonable plan; meanwhile, personally benefitting from the Debtor's continued operations, receiving annual stipends of up to $130,000, plus stock grants.

### F. Damages

160.    Schoen and Schroeder's all-at-once expansion plan was unreasonable and poorly executed.  Because of Schoen's failure to fully actualize the potential of either the West or East coast expansions, the Debtor quickly found itself running at a deficit and continually amending its credit facility to keep operations afloat.

161.    Further, the Director Defendants reviewed and approved each extension of the credit facility, and each stage of the expansion.  The Director Defendants knew or should have known that Barnwell was a boondoggle and the Fabrica Supply Agreement lacked cognizable value for the Debtor.

162.    As a direct and proximate result of the Defendants' acts and omissions, the Debtor suffered tens of millions of dollars in damages in the form of unpaid creditor claims and diminution in value of the enterprise.

**COUNT I**
**<u>BREACH OF FIDUCIARY DUTY</u>**
*(Against Schoen, Schroeder, Bartel, and Gloss)*

163.    Plaintiff re-alleges paragraphs 1 through 162 as if fully set forth herein.

164.    At all times material hereto, Schoen, Schroeder, Bartel, and Gloss were officers of the Debtor.  As such, the Officer Defendants owed the Debtor and its creditors fiduciary duties, including the duty of care and the duty of loyalty.

165.    The Officer Defendants had an obligation to discharge their duties in good faith with the care an ordinarily prudent officer in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtor and its creditors, and to consider all material information reasonably available in making business decisions.

166. The Officer Defendants exhibited a conscious, grossly negligent, and/or reckless disregard for the best interests of the Debtor and its creditors.

167. The Officer Defendants breached their fiduciary duties owed to the Debtor and its creditors by, among other acts or omissions, the following:

    a. Schoen breached his fiduciary duties to the Debtor by, among other things:

        i. Failing to properly plan for, oversee, or comprehend the buildout process for Barnwell;

        ii. During the course of the expansion, in his discussions with and presentations to the BOD, Schoen misrepresented and actively concealed his true intentions for the Debtor. In doing so, Schoen knowingly withheld material information from the BOD that would have otherwise allowed the BOD to know or have a reason to inquire about Schoen's true intentions for the Debtor, and which would have allowed the BOD to properly evaluate Schoen's recommendations;

        iii. Failing to determine if Valmet would be able to deliver a functional QRT machine within budget and on schedule;

        iv. Consciously disregarding and failing to address significant cost and time overruns in the Barnwell buildout;

        v. Failing to apprise himself of the process for building a new manufacturing facility and/or hiring an appropriate professional to oversee the buildout;

        vi. Failing to plan for a trained and/or skilled workforce to operate and maintain the QRT;

vii. Failing to negotiate reasonable terms in the APA and Fabrica Supply Agreement;

viii. Failing to keep himself apprised of current market conditions for raw materials and ensure the Debtor was taking advantage of cost decreases in the market and/or obtaining alternate suppliers; and

ix. Continuing to operate the Debtor once it was hopelessly insolvent, thereby greatly increasing amounts owed to creditors.

b. Schroeder breached his fiduciary duties to the Debtor by, among other things:

i. Failing to properly plan for, oversee, or comprehend the buildout process for Barnwell;

ii. Consciously disregarding and failing to address significant cost and time overruns in the Barnwell buildout;

iii. Failing to apprise himself of the process for building a new manufacturing facility and/or hiring an appropriate professional to oversee the buildout;

iv. Failing to properly plan for or budget adequate maintenance for the QRT, and failing to update the budget when costs vastly exceeded projections;

v. Failing to negotiate reasonable terms in the APA and Fabrica Supply Agreement;

vi. Failing to keep himself apprised of current market conditions for raw materials and ensure the Debtor was being availed of cost decreases in the market and/or obtaining alternate suppliers; and

vii. Failing to maintain accurate books and records of the Debtor.

c. Gloss breached his fiduciary duties to the Debtor by, among other things:

    i. Consciously disregarding and failing to address significant cost and time overruns in the Barnwell buildout;

    ii. Failing to apprise himself of the process for building a new manufacturing facility and/or hiring an appropriate professional to oversee the buildout;

    iii. Failing to properly plan for or budget adequate maintenance for the QRT, and failing to update the budget when costs vastly exceeded expectations;

    iv. Failing to keep himself apprised of current market conditions for raw materials and ensure the Debtor was being availed of cost decreases in the market and/or obtaining alternate suppliers;

    v. Failing to maintain accurate books and records of the Debtor; and

    vi. Continuing to operate the Debtor once it was hopelessly insolvent, thereby greatly increasing amounts owed to creditors.

d. Bartel breached her fiduciary duties to the Debtor by, among other things:

    i. Failing to properly plan for or budget adequate maintenance for the QRT, and failing to update the budget when costs vastly exceeded expectations;

    ii. Failing to keep herself apprised of current market conditions for raw materials and ensure the Debtor was being availed of cost decreases in the market and/or obtaining alternate suppliers;

    iii. Failing to maintain accurate books and records of the Debtor; and

    iv. Continuing to operate the Debtor once it was hopelessly insolvent, thereby greatly increasing amounts owed to creditors.

168.    The acts and omissions of the Officer Defendants were adverse to the best interests of the Debtor and its creditors, and were neither intended to confer nor conferred any benefit upon the Debtor.

169.    As a direct and proximate result of the Officer Defendants' breaches of fiduciary duties, the Debtor's creditors have tens of millions of dollars in unpaid claims against the Debtor's bankruptcy estate.  Additionally, the Debtor has suffered damages including corporate waste; increased expenses, liabilities, and administrative costs; a decrease in value of the Debtor's assets; and a substantial diminution in the Debtor's enterprise value.

WHEREFORE, Plaintiff demands judgment against Schoen, Schroeder, Bartel, and Gloss, jointly and severally, for compensatory damages, together with pre-judgment interest, court costs and for such other and further relief as this Court deems appropriate.  Plaintiff reserves the right to seek punitive damages at the appropriate time.

## COUNT II
## **BREACH OF FIDUCIARY DUTY**
*(Against Berlin, Guttilla, Hailey, MacDonald, and Ravich)*

170.    Plaintiff re-alleges paragraphs 1 through 162 as if fully set forth herein.

171.    At all times material hereto, Berlin, Buttilla, Hailey, MacDonald, and Ravich were members of the Debtor's BOD.  As such, the Director Defendants owed the Debtor and its creditors fiduciary duties, including the duty of loyalty.

172.    The Director Defendants had an obligation to discharge their duties in good faith with the care an ordinarily prudent manager or director in a like position would exercise and in a manner reasonably believed to be in the best interests of the Debtor and its creditors, to consider all material information reasonably available in making business decisions, and to seek out information reasonably necessary to fulfill their duty to monitor the activities of management.

173. The Director Defendants exhibited a conscious, grossly negligent and/or reckless disregard for the best interests of the Debtor and its creditors.

174. The Director Defendants breached their fiduciary duties owed to the Debtor and its creditors by, among other acts or omissions, the following:

      a. failing to oversee and monitor the Officer Defendants' management and operations of the Debtor's business and financial affairs;

      b. failing to educate themselves about the Debtor's industry to understand the inherent risks in the Officer Defendants' actions;

      c. knowingly ignoring glaring issues in the Debtor's financial reporting, budgets, and projections;

      d. failing to make a change in leadership when it was clear the Officer Defendants were not competent in directing the Debtor's activities;

      e. approving continued extensions of the Debtor's credit facility when the Debtor was already insolvent, thereby increasing its debts; and

      f. allowing the Debtor to continue operating at a time when it was insolvent, unnecessarily increasing its insolvency.

175. The Director Defendants' acts and omissions were adverse to the best interests of the Debtor and its creditors, and were neither intended to confer nor conferred any benefit upon the Debtor.

176. As a direct and proximate result of the Director Defendants' breaches of fiduciary duty, the Debtor's creditors have tens of millions of dollars in unpaid claims against the Debtor's bankruptcy estate. Additionally, the Debtor has suffered damages including corporate waste;

increased expenses, liabilities, and administrative costs; a decrease in value of the Debtor's assets; and a substantial diminution in the Debtor's enterprise value.

WHEREFORE, Plaintiff demands judgment against Berlin, Guttilla Hailey, MacDonald, and Ravich, jointly and severally, for compensatory damages, together with pre-judgment interest, court costs and for such other and further relief as this Court deems appropriate. Plaintiff reserves the right to seek punitive damages at the appropriate time.

**COUNT III**
**AIDING AND ABETTING**
**BREACH OF FIDUCIARY DUTY**
*(Against Berlin, Guttilla,*
*Hailey, MacDonald, and Ravich)*

177. Plaintiff restates and realleges paragraphs 1 through 162 as if explicitly stated herein.

178. At all material times hereto, the Director Defendants were directors of the Debtor. As such, the Director Defendants were obliged to discharge their duties in good faith, with the care an ordinarily prudent officer or director in a like position would exercise, in a manner reasonably believed to be in the Debtor's best interests, and to seek out information reasonably necessary to fulfill their duty to monitor the Debtor's actions.

179. If and to the extent any or all Director Defendants are found not to have had a fiduciary duty to the Debtor, each such Director Defendant is nonetheless liable for having aided and abetted the breach of fiduciary duty by one or more of the other Defendants possessing such fiduciary duties at the time. Accordingly, as to the Director Defendants, this count is plead in the alternative.

180.    To the extent each Director Defendant is found to have not had a fiduciary duty to the Debtor, each Director Defendant knowingly participated in, benefitted from, and aided and abetted the breach of fiduciary duty engaged in by the remaining officers and directors.

181.    The Director Defendants had actual knowledge of the facts and circumstances alleged in support of Count I of the Complaint and rendered substantial assistance in regard to such acts and omissions of the other Defendants, thereby aiding and abetting the other Defendants' breaches of fiduciary duties to the Debtor and its creditors.  Based upon the foregoing, the Count III Defendants are liable for all damages proximately caused by the other Defendants' acts and omissions.  The foregoing breaches, as aided and abetted by the Director Defendants, proximately caused tens of millions of dollars in damage to the Debtor and its creditors.

182.    As a direct and proximate result of the Director Defendants aiding and abetting the other Defendants' breaches of fiduciary duties, the Debtor's creditors have substantial unpaid claims against the bankruptcy estate totaling in the tens of millions of dollars.

183.    Additionally, as a direct and proximate result of the Director Defendants aiding and abetting the other Defendants' breaches of fiduciary duties, the Debtor has suffered damages including loss of business opportunity; insolvency and deepening insolvency; corporate waste; increased expenses, liabilities, and administrative costs; a decrease in value of the Debtor's assets; and a substantial diminution in the Debtor's enterprise value.

WHEREFORE, Plaintiff demands judgment against Berlin, Guttilla, Hailey, MacDonald, and Ravich, jointly and severally, for compensatory damages, together with pre-judgment interest, court costs, and for such other and further relief as this Court deems just and proper.  Plaintiff reserves the right to seek punitive damages at the appropriate time.

**COUNT IV**
**AVOIDANCE AND RECOVERY OF**
**FRAUDULENT TRANSFERS**
**UNDER 11 U.S.C. §§544, 548 AND 550, AND**
**CHAPTER 13 OF THE DELAWARE CODE**
*(Against all Defendants)*

184.    Plaintiff re-alleges paragraphs 1 through 162 as if fully set forth herein.

185.    Pursuant to 11 U.S.C. §§ 544, 548, and 550 and/or Delaware Code Chapter 13, the debtor or a creditor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years (under Section 548 of the Bankruptcy Code) and 4 years (under Chapter 13 of the Delaware Code) before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted, on or after the date that such transfer was made or such obligation was incurred; or (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small amount of capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

186.    Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under 11 U.S.C. §§ 544 and 548 and Chapter 13 of the Delaware Code, a creditor may recover, for the benefit of the Estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

187.   The Defendants received compensation and other benefits from the Debtor as follows:

    a.   Schoen received compensation and other benefits as the Debtor's CEO during the 4-year period ending on the Petition Date;

    b.   Schroeder received compensation and other benefits as the Debtor's CFO from April 1, 2015, through and including his date of separation from the company on or about July 8, 2016;

    c.   Gloss received compensation and other benefits as the Debtor's CFO from August 25, 2016, through and including his date of separation from the company on or about March 16, 2018;

    d.   Bartel received compensation and other benefits as the Debtor's CFO from April 16, 2018, through and including the Petition Date;

    e.   Berlin received a stipend and other benefits as the Chairman of the Debtor's BOD during the 4-year period ending on the Petition Date;

    f.   Guttilla received a stipend and other benefits as a member of the Debtor's BOD during the 4-year period ending on Petition Date;

    g.   Hailey received a stipend and other benefits as a member of the Debtor's BOD during the 4-year period ending on the Petition Date;

    h.   MacDonald received a stipend and other benefits as a member of the Debtor's BOD during the 4-year period ending on the Petition Date; and

    i.   Ravich received a stipend and other benefits as a member of the Debtor's BOD during the 4-year period ending on the Petition Date.

(collectively, the "Transfers").  Such payments constitute transfers of property of the Debtor.

188.    Based upon the breaches of fiduciary duty set forth in Counts I and II of the Complaint, the Debtor received less than reasonably equivalent value in exchange for the Transfers.

189.    The Debtor (a) did not receive reasonably equivalent value in exchange for the Transfers; (b) was insolvent at the time of the transfers or became insolvent as a result thereof; (c) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor was unreasonably small in relation to the business or transaction; or (d) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

190.    As a result of the conduct alleged above, the Plaintiff can avoid the Transfers pursuant to 11 U.S.C. §§ 544 and 548 and Chapter 13 of the Delaware Code and recover the value thereof for the benefit of the Estate pursuant to 11 U.S.C. § 550.

WHEREFORE, Plaintiff demands judgment against Schoen, Schroeder, Bartel, Gloss, Berlin, Guttilla, Hailey, MacDonald, and Ravich as follows: (a) determining that the Transfers were fraudulent and avoiding the transfers for the benefit of the Estate under 11 U.S.C. §§ 544, 548 and 550, and Delaware Code Chapter 13; (b) entering judgment in favor of the Plaintiff against Schoen, Schroeder, Bartel, Gloss, Berlin, Guttilla, Hailey, MacDonald, and Ravich for the amount of the Transfers that each received pursuant to 11 U.S.C. § 550, together with pre-judgment and post-judgment interest, costs and reasonable attorneys' fees; and (c) granting such other and further relief as the Court deems just and proper.

Dated: July 23, 2021

MONTGOMERY McCRACKEN WALKER & RHOADS LLP

*/s/ Marc J. Phillips*
Marc J. Phillips (No. 4445)
1105 North Market Street
Suite 1500
Wilmington, DE 19801
Telephone: (302) 504-7823
Email: mphillips@mmwr.com

-and-

**BAST AMRON LLP**
Brett M. Amron, Esq. (*admitted Pro Hac Vice*)
Dana R. Quick, Esq. (*admitted Pro Hac Vice*)
Peter J. Klock, Esq. (*admitted Pro Hac Vice*)
SunTrust International Center
One SE Third Avenue, Suite 1400
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile: 305.379.7905
Email: bamron@bastamron.com
Email: dquick@bastamron.com
Email: pklock@bastamron.com

*Special Litigation Counsel to Buchwald Capital Advisors LLC, as Liquidating Trustee of the Orchids Paper Products Liquidating Trust*