## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OPP LIQUIDATING COMPANY, INC. | ) | Case No. 19-10729 (MFW) |
| (f/k/a Orchids Paper Products | ) | |
| Company), et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |
| BUCHWALD CAPITAL ADVISORS LLC, | ) | |
| as Liquidating Trustee of the | ) | |
| Orchids Paper Products | ) | |
| Liquidating Trust, | ) | Adv. Proc. No. 21-50431 |
| | ) | (MFW) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY S. SCHOEN, et al., | ) | **Re: Docket Nos. 82, 83,** |
| | ) | **84, 85, 86, 87, 88, 89,** |
| Defendants | ) | **90, 129, 130, 132, 133,** |
| | ) | **134, 135, 137, 138, 139** |

### OPINION[1]

Before the Court is the Defendants' Motion for Summary Judgment on Time-Barred Claims in the Trustee's Second Amended Complaint. The Trustee asserts that summary judgment is improper, contending that the statute of limitations has been tolled by the fraudulent concealment of relevant information. The Defendants argue that the Trustee has failed to produce any evidence to support its tolling argument. For the reasons stated below, the Court will grant the Defendants' Motion.

---

[1]   This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.   <u>BACKGROUND</u>

Orchids Paper Products Company (the "Debtor") was formed in 1998.  The Debtor was a public company that operated as a low-cost manufacturer of tissue products serving "extreme value" retail establishments such as Dollar General and Family Dollar.[2] After expansion efforts failed and its financial condition deteriorated, the Debtor (and several of its subsidiaries) filed for relief under chapter 11 of the Bankruptcy Code on April 1, 2019 (the "Petition Date").  On February 24, 2020, the Court confirmed the Combined Disclosure Statement and Chapter 11 Plan (the "Plan") filed by the Debtor and its subsidiaries.[3]  Under the terms of the Plan, Buchwald Capital Advisors LLC was named as Liquidating Trustee (the "Trustee") for the benefit of the Creditors' Trust, to which was assigned various causes of action belonging to the Debtor.

On May 4, 2021, the Trustee commenced an adversary proceeding against the Debtor's former Chief Executive Officer - Jeffrey S. Schoen ("Schoen"),[4] the Debtor's former Chief Financial Officer, Keith Schroeder ("Schroeder"), two of the

---

[2]   Adv. D.I. 17 ¶ 22.  References to the docket in this adversary proceeding are to "Adv. D.I. #" while references to the docket in the main case are to "D.I. #."

[3]   D.I. 714.

[4]   From 2007 to the Petition Date, Schoen was a member of the Debtor's Board of Directors; beginning in 2013, Schoen was CEO. At all times relevant to the Second Amended Complaint, Schoen and the CFOs were officers of the Debtor.

Debtor's other former Chief Financial Officers – Rodney D. Gloss and Mindy Bartel (collectively, the "Former CFOs"), and members of the Debtor's Board of Directors (the "Board") – Steven R. Berlin, John C. Guttilla, Douglas E. Hailey, Elaine MacDonald, and Mark Ravich (collectively, the "Directors").  The Trustee's Amended Complaint asserted claims for breach of fiduciary duties against Schoen, Schroeder, and the Former CFOs (Count I), breach of fiduciary duties against the Directors (Count II), aiding and abetting the breach of fiduciary duties against Bartel and the Directors (Count III), and avoidance of fraudulent transfers under federal and state law against all of the Defendants (Count IV).

On June 25, 2021, the Defendants filed Motions to Dismiss the Trustee's Complaint in its entirety on the basis that most of the Trustee's claims were time-barred.[5]  Rather than replying to the Motions to Dismiss, the Trustee filed its First Amended Complaint, alleging that Schoen and Schroeder fraudulently concealed or misrepresented certain information to the Board.[6] On August 13, 2021, the Defendants filed Motions to Dismiss the Trustee's First Amended Complaint, again alleging that many of the claims were time-barred.  On March 14, 2022, the Court granted in part and denied in part the Motions, finding that the

---

[5]    Adv. D.I. 11, 12, 13, 14.

[6]    Adv. D.I. 17.

Complaint had alleged affirmative acts of concealment that, if proven, would support tolling of the statute of limitations.[7]  On March 25, 2022, the Trustee filed its Second Amended Complaint.[8]

After the parties conducted discovery, the Defendants filed their Motion for Summary Judgment on the Time-Barred Claims on December 23, 2022.  The matter has been fully briefed and is ripe for decision.

II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this adversary proceeding.[9]  This action involves both core and non-core claims.[10]  The fraudulent transfer claims are core claims, as they rely on sections 544 and 548 of the Bankruptcy Code.[11]  The fiduciary duty claims are non-core "related to" claims, as they are claims arising under state law, not arising "in" or

---

[7]    Adv. D.I. 36.

[8]    Adv. D.I. 38.

[9]    28 U.S.C. §§ 157(a), 1334(b).

[10]    <u>Id.</u> § 157(b)(2).

[11]    <u>Id.</u> § 157(b)(2)(H); 11 U.S.C. §§ 544(b), 548.  The Liquidating Trustee invokes its power under section 544 to assert claims under the Uniform Fraudulent Transfer Act (the "UFTA"). Under section 157(b)(2)(H), these claims are core, as they seek to "determine, avoid, or recover fraudulent conveyances." <u>See</u> <u>Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.)</u>, 597 B.R. 235, 243 (Bankr. D. Del. 2019) (holding that section 544 claims are core because "though state law supplies the substance of the claim, the power to bring the claim in the first place arises under federal law.").

4

"under" the Bankruptcy Code.[12]  The parties have consented to entry of a final order or judgment by the Court on the Motion for Summary Judgment.[13]

## III. STANDARD OF REVIEW

A. Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] The court must make its determination based upon the record of the case presented by the parties, including the pleadings, exhibits, and the products of discovery.[15]

The movant bears the initial burden of proving that it is entitled to relief and there is no genuine dispute of material fact,[16] with the court viewing the record in the light most

---

[12]   28 U.S.C. § 157(b).

[13]   Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 686 (2015) (holding that the bankruptcy court may enter a final order without offending Article III so long as the parties consent). The parties' consent in this case is evidenced by the Defendants' proposed form of order and the Plaintiff's prayer for relief, both of which ask the Court to enter a final order on the Motion for Summary Judgment.  Adv. D.I. 82 Ex. A; Adv. D.I. 129.

[14]   Fed. R. Civ. P. 56(a), made applicable by Fed R. Bankr. P. 7056.

[15]   Fed. R. Civ. P. 56(c).

[16]   Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986).

favorable to the non-moving party.[17]  A fact is material when, under applicable substantive law, it "might affect the outcome of the suit."[18]  A dispute over a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[19]

When the movant has met its burden, the non-moving party must show more than "some metaphysical doubt as to the material facts."[20]  Where a court ultimately finds there is no genuine dispute of material fact, it may enter a judgment as a matter of law, either for or against the movant, in full or in part, applying the applicable substantive law.[21]

B.    The Statute of Limitations

Claims for breach of fiduciary duties are subject to a three-year statute of limitations under Delaware law.[22]  The statute of limitations period begins to run on the date of the

---

[17]    United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

[18]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[19]    Id.

[20]    Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[21]    Fed. R. Civ. P. 56(a), (f).

[22]    10 Del. Code Ann. § 8106.  See also Miller v. Bradley (In re W.J. Bradley Mortg. Cap., LLC), 598 B.R. 150, 167 (Bankr. D. Del. 2019) (holding that a breach of fiduciary duty claim is subject to a three-year statute of limitations under Delaware law); Halpern v. Barran, 313 A.2d 139, 141 (Del. Ch. 1973) (same).

alleged harm,[23] which occurs at "the moment of the wrongful act —
not when the harmful effects of the act are felt — even if the
plaintiff is unaware of the wrong."[24]

The Bankruptcy Code provides a two-year extension post-
petition of the statute of limitations for any claims which have
not expired by the petition date.[25]  The Trustee commenced this
adversary proceeding within that period.  Even with that
extension, the parties agree that application of the three-year
statute to the present adversary proceeding would ordinarily
require that any wrongful act must have occurred on or after
April 1, 2016 (i.e., three years before the Petition Date).[26]

The Trustee argues, however, that the statute of limitations
has been tolled by operation of Delaware law.  Under Delaware
law, the statute of limitations may be extended by any of three
doctrines: "(1) inherently unknowable injuries, (2) fraudulent
concealment, and (3) equitable tolling."[27]  "Each of these
doctrines permit tolling of the limitations period where the

---

[23]    W.J. Bradley, 598 B.R. at 167.

[24]    In re Coca-Cola Enters., Inc., C.A. No. 1927-CC, 2007 WL
3122370, at *5 (Del. Ch. Oct. 17, 2007).

[25]    11 U.S.C. § 108(a)(2).

[26]    Adv. D.I. 83 at 12; Adv. D.I. 129 at 23.

[27]    Winner Acceptance Corp. v. Return on Cap. Corp., Civ. A. No.
3088-VCP, 2008 WL 5352063, at *15 (Del. Ch. Dec. 23, 2008).  See
also W.J. Bradley, 598 B.R. at 168; In re Dean Witter P'ship
Litig., No. CIV. A. 14816, 1998 WL 442456, at *5 (Del. Ch. July
17, 1998).

facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them."[28]

Although the Trustee mentions all three bases, it does not make any specific arguments or present any facts to support tolling based on inherently unknowable injuries or equitable reasons.  Therefore, the Court cannot conclude that the Trustee has met its burden of establishing that the statute of limitations has been tolled under either of those theories. Instead, the Trustee relies solely on the first basis, asserting that Defendants Schoen and Schroeder fraudulently concealed relevant facts from the Board, thereby warranting a tolling of the statute of limitations.

To prove fraudulent concealment under Delaware law, the Trustee must establish:

> that something affirmative [was] done by a defendant, some "actual artifice" which prevent[ed] a plaintiff from gaining knowledge of the facts, or some misrepresentation which [was] intended to put the plaintiff off the trail of inquiry. . . .  Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations].[29]

The Trustee asserts that even absent an affirmative act of concealment, however, a plaintiff can prove fraudulent

---

[28]    Dean Witter P'ship Litig., 1998 WL 442456, at *5.

[29]    Halpern, 313 A.2d at 143.  See also Lebanon Cnty. Emps.' Ret. Fund v. Collis, 287 A.3d 1160, 1215 (Del. Ch. 2022); Eni Holdings, LLC v. KBR Grp. Holdings, LLC, No. 8075-VCG, 2013 WL 6186326, at *12 (Del. Ch. Nov. 27, 2013); Dean Witter P'ship Litig., 1998 WL 442456, at *5.

concealment where a defendant "fail[s] to disclose facts when there is a duty to disclose."[30]  The Defendants disagree.  They contend that the fraudulent concealment doctrine requires an affirmative act of concealment separate and apart from the alleged fraud or misrepresentation that forms the basis of the underlying claim.[31]  The Defendants argue that, while equitable tolling may rely on a breach of a fiduciary duty to disclose, it must also involve self-dealing,[32] which the Trustee does not allege.

The Trustee contends that it is not relying on the equitable tolling doctrine and, therefore, that it need not establish self-

---

[30]    <u>In re Fruehauf Trailer Corp.</u>, 250 B.R. 168, 186 (Bankr. D. Del. 2000) (quoting <u>Litman v. Prudential-Bache Props., Inc.</u>, Civ. A. No. 12137, 1994 WL 30529, at *4 (Del. Ch. Jan. 14, 1994)).

[31]    <u>See Eni Holdings</u>, 2013 WL 6186326, at *12 (rejecting fraudulent concealment theory premised on same fraud allegations as underlying claim).  <u>See also</u> <u>Norman v. Elkin</u>, 726 F. Supp. 2d 464, 472 (D. Del. 2010) (applying analogous Pennsylvania law in holding that plaintiff "failed to prove that [the defendant] engaged in an affirmative, independent act of concealment" because "the only concealment suggested by [p]aintiff is the alleged inaccuracies and misinformation . . . which form[ed] the basis of the [underlying] fraud claim itself.").

[32]    <u>In re MAXXAM, Inc.</u>, Civ. A. Nos. 12111, 12353, 1995 WL 376942, at *6 (Del. Ch. June 21, 1995) ("To invoke the doctrine of equitable tolling, an abuse of the fiduciary relationship through actionable self-dealing must be claimed."); <u>Firemen's Ret. Sys. of St. Louis ex rel. Marriot Int'l, Inc. v. Sorenson</u>, C.A. No. 2019-0965-LWW, 2021 WL 4593777, at *10 (Del. Ch. Oct. 5, 2021) ("For claims that do not involve self-dealing, 'equitable tolling operates in much the same way as the doctrine of fraudulent concealment,' and an affirmative act of concealment is required.").

dealing.[33]  It insists, however, that fraudulent concealment can be established by either: "(1) the commission of affirmative acts of misrepresentation or (2) the failure to disclose facts when there is a duty to disclose."[34]  The Trustee argues that to establish fraudulent concealment without the occurrence of an affirmative act, it need establish only that the Defendants breached their fiduciary duty to disclose.[35]

The Court concludes that the Defendants correctly state the standard for application of the doctrine of fraudulent concealment under Delaware law as requiring an affirmative act of concealment.[36]  The Trustee relies on the Fruehauf Trailer case for the proposition that an affirmative act is not required for fraudulent concealment.  The Fruehauf Trailer Court cited a Delaware Chancery Court decision that relied on equitable tolling cases and a fraudulent concealment case decided by the First Circuit for that standard.[37]  More recent Delaware caselaw,

---

[33]    Adv. D.I. 129 at 23 n.10.

[34]    Fruehauf Trailer Corp., 250 B.R. at 186 (quoting Litman, 1994 WL 30529, at *4).

[35]    Id.

[36]    See supra notes 29 & 31.

[37]    Litman, 1994 WL 30529, at *4 (citing Kahn v. Seaboard Corp., 625 A.2d 269 (Del. Ch. 1993)).  The Litman court also cited a First Circuit case applying Massachusetts law for the proposition that an affirmative act is not required for fraudulent concealment.  Id. (citing Shane v. Shane, 891 F.2d 976, 985 (1st Cir. 1989)).  That caselaw is contrary to Delaware caselaw and therefore not persuasive.

however, maintains the distinction between those two doctrines and confirms that fraudulent concealment requires an affirmative act of concealment.[38]  If the Trustee, as it argues, only had to establish that the Defendants failed to disclose information they had a duty to disclose, then it would effectively eliminate the statute of limitations for claims alleging a breach of the fiduciary duty to disclose.  That is not the standard.  Rather, under Delaware law, fraudulent concealment for purposes of tolling the statute of limitations requires an affirmative act of concealment.

Because the Second Amended Complaint on its face asserts claims that fall outside the statute of limitations, the Court concludes that the Trustee bears the burden of proving facts sufficient to establish an affirmative act of concealment by the Defendants in order to toll the three-year statute of limitations.[39]

---

[38]    See, e.g., Lebanon Cnty. Emps.' Ret. Fund, 287 A.3d at 1214-17; Sorenson, 2021 WL 4593777, at *10; Winklevoss Cap. Fund, LLC v. Shaw, No. CV 2018-0398-JRS, 2019 WL 994534, at *9 (Del. Ch. Mar. 1, 2019); Certainteed Corp. v. Celotex Corp., No. Civ. A. 471, 2005 WL 217032, at *8 (Del. Ch. Jan 24. 2005); Zakrzewski v. Singh, No. Civ. A. 00C-03-321-JEB, 2001 WL 1628312, at *5 (Del. Super. Ct. Nov. 15, 2001).

[39]    Winklevoss Cap. Fund, 2019 WL 994534, at *6 (holding that if the complaint asserts a cause of action which on its face accrued outside the statute of limitations, the plaintiff has the burden to plead facts "leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies"); Zakrzewski, 2001 WL 1628312, at *5.

IV.   <u>DISCUSSION</u>

The Trustee argues that summary judgment is not appropriate because there is a genuine issue of material fact regarding whether Schoen fraudulently concealed from the Board that his ultimate goal was always to sell the company and that his decision to recommend expansion of the Barnwell facility and purchase of the QRT machine (a new, untested process of manufacturing) was to make the Debtor an attractive target for acquisition.

The Defendants contend that the Trustee has failed to produce sufficient evidence to establish that the statute of limitations was tolled by fraudulent concealment.  They assert that the evidence establishes that the Board was heavily involved in efforts to sell the company and, even when a sale was not being aggressively pursued, knew it was always a possible option. Further, the Defendants argue that the Trustee alleges fraudulent concealment only by Schoen and Schroeder, and consequently, fails to establish grounds for tolling the statute of limitations against the other Defendants.

A.   <u>Former CFOs and Directors</u>

While the Trustee did allege in the Second Amended Complaint that Schoen and Schroeder breached their fiduciary duties by providing inadequate disclosures to the Board,[40] it does not

---

[40]   Adv. D.I. 38 ¶ 167(a)-(b).

contain any allegations that the Former CFOs or Directors concealed any information.[41]

In their Motion for Summary Judgment, the Defendants contend that the Trustee has not produced any evidence that even suggests that any of the Defendants (other than Schoen) engaged in fraudulent concealment.  In support, the Defendants attach the Trustee's Response to an Interrogatory seeking facts supportive of the Trustee's fraudulent concealment argument in which the Trustee fails to identify any facts that were allegedly misrepresented or concealed by any Defendant other than Schoen.[42]

---

[41]   Id. ¶¶ 167(c)-(d), 171-176, 178-183, 185-190.

[42]   Adv. D.I. 132 Ex. A at 37-38 (emphasis added):
         24. State with specificity the basis for your contention that [the Debtor's] management misrepresented or concealed any material fact in the discussions with and presentations to [the Debtor's] board of directors.
         RESPONSE: Plaintiff objects to this interrogatory as vague and ambiguous to the extent that it relies on the term "management," which is not defined in Defendant's Second Set of Discovery Requests.  Subject to the foregoing objection, Plaintiff states that Defendant Schoen failed to inform the board that his goal, from the time the initial plan to expand the Debtor's operations was conceived through the Petition Date, was to sell the Debtor to a larger competitor and that [Schoen] recommended the Valmet QRT to the Board because he thought it would make the Debtor an attractive target for acquisition.  Rather, Defendant Schoen had previously informed the Board that his vision for the expansion was to [sic] "to be recognized as a 100% retailer focused, national supplier of high-quality tissue products," and stated that the "end game strategy" was to maintain the Debtor as a public company and to merge with Fabrica.  Due to his misrepresentation regarding his underlying reason for recommending the QRT, the Board was unable to exercise

The Defendants also cite the testimony of Lee Buchwald, the Trustee's Rule 30(b)(6) representative, who stated that he had no reason to believe that the Trustee's Responses to the Defendants' Interrogatories were "inaccurate," "incomplete," or "need[ed] to be supplemented."[43]

In its response to the Motion for Summary Judgment, the Trustee does not provide any argument or cite any evidence to establish that the Former CFOs or the Directors fraudulently concealed any information.

Consequently, the Court concludes that the Trustee has failed to meet its burden of establishing a basis to toll the statute of limitations for claims against the Former CFOs and Directors.[44]  The Court will, therefore, grant the Motion for Summary Judgment on the Time-Barred Claims as to the Former CFOs and Directors.

B.  Schroeder

In the Second Amended Complaint, the Trustee does allege that Schroeder breached his fiduciary duties by failing to disclose "highly relevant and potentially unflattering information" to the Board concerning the costs associated with

---

its judgment and consider, for instance, whether potential acquirers would be receptive to a facility dependent upon an unproven, first-of-its-kind technology – the QRT which lacked market validation.

[43]  Adv. D.I. 132 Ex. B at 89-90, 230-31.

[44]  Winklevoss Cap. Fund, 2019 WL 994534, at *6.

the Barnwell buildout.[45]  While the Trustee does not argue in its

response to the Motion for Summary Judgment that this is

fraudulent concealment sufficient to toll the statute of

limitations as to Schroeder, the Trustee does refer to evidence

that it contends supports its allegations against Schroeder.

Specifically, the Trustee relies on deposition testimony in

which the Directors could not recall certain details about the

cost of the Barnwell project or whether they were advised of

expected contingencies and variances to the projected costs.[46]

---

[45]    Adv. D.I. 38 ¶¶ 51, 63, 167(b).

[46]    See Adv. D.I. 130 (Ravich Dep.) at A067-A068 ("Q. Do you
know why there was an $8 million difference in the costs related
to the paper machine building at Barnwell between the original
bank estimate and the final estimate? . . . A. No.  I mean, . .
. could be that they changed the specs, added different
equipment.  You'd have to really have a lot of detail to figure
that out.  Q. What about the 'DIP Equipment'?  There appears to
be about a $5 million difference between the 'Original Bank
Estimate' and 'Final Revision.'  Would you have the same answer?
A. Yeah, I mean, again, it's . . . what happened in between.");
Adv. D.I. 130 (Hailey Dep.) at A036-A039 ("Q. . . .  So tell me
specifically what you are referencing when you say 'changes to
engineering and design specifications.'  A. That would have been
the – like the best example of that would be the de-inking
additions.  That's a change in engineering design spec. . . .  Q.
Anything else that you're referring to there?  A. Not that I have
on the top of my head, but I certainly wouldn't be surprised if
there ended up being others, but those are the ones I remember. .
. .  Q. Are you aware of any fluctuations in the cost of
equipment that occurred with respect to Barnwell?  A. No, I'm
not.  Q. Are you aware of any fluctuations in the market with
respect to the cost of materials? . . .  A. . . .  I mean, I'm
sure there had to be.  You know, there were so many materials
being purchased, but I do remember one, do I have a current
knowledge of one, no."); Adv. D.I. 130 (Ravich Dep.) at A060 ("Q.
What was the magnitude of variance that you were expecting?  A.
Didn't really have any expectation at the initial time other
than, you know, risk factors to, basically, any construction

The Trustee contends that the Directors' differing recollections of whether a contingency was built into the Barnwell budget contradict Schroeder's testimony that a contingency was built into the budget.[47]  It argues that this creates a genuine issue

---

project of this type."); Adv. D.I. 130 (Ravich Dep.) at A059 ("Q. And do you recall what [the Barnwell project] ultimately ended up costing?  A. Not as much exactly on an apples-to-apples comparison.  There were changes made to the budget during it, but it was more than [$127 million].  Q. . . . [D]o you know if it was $10 million more than [$127 million]?  A. Well, I think it was more than that, although . . . I can't really recall what was the result of changes to project and what was the result of just straight overruns."); Adv. D.I. 130 (Ravich Dep.) at A059-A060 ("Q. . . . [G]iven the expectation for a variance from the original estimate, how much contingency funding did the board insist be available to account for the variance?  A. I don't recall what was in the budget for that."); Adv. D.I. 130 (MacDonald Dep.) at A074-A075 ("Q. . . . .  And so given the expectation that the actual capital requirements would materially vary, did the board provide for any contingency funding for the Barnwell project?  A. My recall was roughly around 15 percent for overall start up including purchases, anything that had to do with overall costs associated with installation.  Q. So a $127 million project, that would be approximately $18 or $19 million?  A. . . .  Yes."); Adv. D.I. 130 (Guttilla Dep.) at A108-A109 ("Q. . . .  Do you recall if any contingency funding was built into the initial budget for the Barnwell project?  A. No, I explained that the way we approached this was to stress test our existing business to be sure that we had cash flow to cover contingencies.").

[47]    Adv. D.I. 130 (Schroeder Dep.) at A357 ("Q. . . . At the time the $127 million cost estimate was prepared, what sort of cost variance was being contemplated?  A. I believe the project . . . would have already had a contingency built in.  I don't remember the percentage.  But normally when we would do a capital project of any size – like the first two paper machines that we put in at the Oklahoma site would have been 10 to 15 percent at least built in."); Adv. D.I. 132 Ex. I (Schroeder Dep.) at 33 ("Q. So does that mean that the $127 million number already contained a 10 to 15 percent contingency?  A. Correct.").

of material fact as to whether Schroeder fraudulently concealed relevant information from the Board.

In their Motion for Summary Judgment, the Defendants contend that the only evidence of fraudulent concealment presented by the Trustee were the Answers to Interrogatories and deposition testimony of Buchwald which stated only that Schoen concealed his intent to sell the Debtor.[48]  Accordingly, the Defendants assert that the Trustee has presented no evidence that Schroeder engaged in any fraudulent concealment which would support tolling the statute of limitations as to him.

When the movant has presented evidence to meet its burden on a summary judgment motion, the burden shifts to the non-moving party to present evidence in rebuttal sufficient to create a genuine issue of material fact.[49]  In this case, the Court concludes that the Trustee has failed to meet its burden.  First, the Trustee's Response to Interrogatories and the Trustee's 30(b)(6) representative's deposition testimony do not identify any fraudulent concealment by Schroeder.  Second, the Trustee's only proffered evidence to support a claim that Schroeder engaged in fraudulent concealment was the Directors' testimony that they could not recall specific details relating to the costs of the

---

[48]   See supra notes 42 & 43.

[49]   Matsushita Elec. Indus. Co., 475 U.S. at 586 (holding that when the moving party has met its burden under Rule 56(c), the non-moving party must present evidence demonstrating that a trial is warranted because a genuine issue of material fact exists).

Barnwell project.[50]  The Court does not find this surprising, or
evidence of concealment, given the fact that the project was
addressed by the Board a decade ago.  Third, the Trustee's
assertion that the Directors' deposition testimony is evidence
that they were not given the facts related to the Barnwell
project at the time it was approved is not supported by that
testimony.  Although the Directors were unclear about the
specifics of the discussions, their testimony was that they were
aware of details of the budget related to the Barnwell buildout
at the time for the project was discussed.[51]  The Court,
therefore, concludes that the Trustee has failed to establish
that the statute of limitations should be tolled as to Schroeder.

Even if, as the Trustee contends, Schroeder did not fully
inform the Board of the details of the Barnwell project, that is
not sufficient to tole the statute of limitations.  As the
Debtor's CFO, Schroeder had a fiduciary duty to disclose all
relevant information about the Barnwell project to the Board.[52]

---

[50]    See supra note 46.

[51]    Id.

[52]    See In re Nat'l Serv. Indus., Inc., Adv. No. 14-50377, 2015
WL 3827003, at *6 (Bankr. D. Del. June 19, 2015) (noting that an
officer, as an agent of a Delaware corporation, owes the
corporation and its shareholders the duty of care, duty of
loyalty, and duty to act in good faith); Science Accessories
Corp. v. Summagraphics Corp., 425 A.2d 957, 962 (Del. 1980)
(holding that encompassed within the general duties of care,
loyalty, and good faith is a duty to disclose information that is
relevant to the affairs entrusted to the officer or director).

18

As the Court concluded above, to toll the stature of limitations
on a breach of fiduciary duty claim, the Trustee simply cannot
rely on evidence of a failure to disclose information that
Schroeder had a duty to disclose.  Instead, the Trustee must show
an affirmative act of concealment independent of his fiduciary
duties.[53]  The Trustee has not presented any evidence to raise a
genuine dispute of material fact that Schroeder did so.
Consequently, the Court will grant the Motion for Summary
Judgment on the Time-Barred Claims as to Schroeder.

    C.   <u>Schoen</u>

    With respect to Schoen, the Second Amended Complaint alleges
that Schoen misrepresented and actively concealed the fact that
he always intended to sell the Debtor and took actions to
position the Debtor for sale, even though those actions might not
have been in the Debtor's best interests at the time.[54]  The
Second Amended Complaint alleges, in particular, that Schoen
pushed the Board to approve the purchase of the QRT machine (a
new, untested process) and to expand the Debtor's operations on
many simultaneous fronts in order to position the Debtor as an
attractive target of acquisition, while not revealing that goal
to the Board.[55]

---

[53]  <u>See</u> supra notes 31 & 38.

[54]  Adv. D.I. 38 ¶¶ 27-33, 47, 167(a)(ii).

[55]  <u>Id.</u> ¶¶ 29-33.

In their Motion for Summary Judgment, the Defendants assert that the evidence does not support the Trustee's allegations of fraudulent concealment.  Instead, they presented evidence which they contend establishes that the Board was always aware that the sale of the Debtor was an option.

### 1.   The Defendants' Evidence

In support of their Motion for Summary Judgment, the Defendants attached Declarations of Schoen and the Directors, all of whom state that a sale of the Debtor was always considered "one potential option."[56]  In his declaration, Schoen states that he had "numerous discussions with the Board and its members, both formally and informally, concerning strategic options for the company."[57]  Those discussions included conversations about "potential mergers" and "a sale to a competitor or strategic investor," among other possibilities.[58]  The Directors' Declarations corroborate the statements in Schoen's Declaration. The Directors state that they did not think that Schoen concealed or failed to disclose a secret plan to sell the Debtor or any other material information concerning a potential future sale from the Board.[59]  Rather, they state that "Schoen shared his

---

[56]    Adv. D.I. 89 ¶ 27; Adv. D.I. 84, 85, 86, 87, 88 ¶ 12.

[57]    Adv. D.I. 89 ¶ 28.

[58]    Id.

[59]    Adv. D.I. 84, 85, 86, 87, 88 ¶ 12.

views regarding potential sale scenarios with the Board on
multiple occasions in 2013, 2014, and 2015."[60]  The Directors'
deposition testimony to that effect was also offered by the
Defendants to support their Motion.[61]

     2.   The Trustee's Evidence

The majority of the Trustee's response to the Motion for
Summary Judgment sought to undermine the Defendants' evidence,
rather than present its own evidence of any actual concealment by

---

[60]    Id.

[61]    In his deposition, Director Berlin testified that at least
two sale opportunities were presented to the Board, and "if [a
sale opportunity] was provided to the investment banks or
directly, [the Board] would consider it every time."  Adv. D.I.
130 at A014.
    Similarly, Director Hailey testified that once the Debtor's
investment banker failed to deliver a buyer in 2013, the goal
"shifted from a sale to an expansion."  Adv. D.I. 130 at A032.
Hailey stated, however, that the Board was "still actively trying
to sell the company" in 2013 and "[e]veryone knew it," though
"[t]here was no reason to reach out to the market again" because
the Board "had already talked to every strategic [buyer] six
months before this."  Adv. D.I. 132 Ex. D at 167.  The Board's
failure to locate a buyer despite "want[ing] to sell the
company," and the subsequent shift to expansion efforts was
merely "Plan B."  Adv. D.I. 130 at A032.
    Director Ravich echoed Berlin and Hailey's testimony.
Ravich explained that the Board was "trying to get the maximum
value out of the company" and that they were "not concerned with
whether it would be by sale, merger, [or] expansion.  Just
whatever would probably generate the highest price."  Adv. D.I.
130 at A056.  Because the Board "didn't see an opportunity to
sell [the Debtor] for . . . a greater price than it was being
valued at," Ravich explained that "the next alternative was
expansion to create value."  Id.  The Board was never opposed to
the option of a sale, they just "didn't think a sale [of the
Debtor] was possible."  Adv. D.I. 132 Ex. G at 116.
    Similarly, both MacDonald and Guttilla testified that the
Board would always consider an opportunity to sell the Debtor.
See Adv. D.I. 132 Ex. F at 15, Ex. E at 21.

Schoen.  In particular, the Trustee presented evidence which it contends contradicts the Declarations submitted by the Defendants.  It argues that, at the very least, the evidence it presented creates a genuine dispute of material fact on the fraudulent concealment issue.

a.  <u>December 27, 2018, Email</u>

The Trustee presented an email dated December 27, 2018, from Schoen (the "December 2018 Email") in which Schoen stated that the Debtor's "<u>Goal always was to sell the Company to a larger competitor.</u>"[62]  The Trustee asserts that this statement is evidence that Schoen's personal goal was always to sell the Debtor, which was never disclosed to the Board.  The Trustee also contends that it contradicts Schoen's Declaration in which he stated that he "never considered a sale to be the most desirable option — either for [the Debtor], its shareholders, or for [him]self personally — at any point during 2014, 2015, or 2016."[63]

In response, the Defendants presented Schoen's Supplemental Declaration,[64] in which Schoen explained that he prepared the December 2018 Email in connection with negotiations between the Debtor and its senior secured lender in an effort to delay or

---

[62]    Adv. D.I. 130 at A002 (emphasis added).

[63]    Adv. D.I. 89 ¶ 27.

[64]    Adv. D.I. 132 Ex. J.

obviate the need for a bankruptcy filing.[65]  Schoen stated that
he believed the lender would be more likely to accommodate the
Debtor's request if it was framed as consistent with the Debtor's
historical strategy.[66]  Schoen further explained that he did not
intend to suggest that selling to a larger competitor was ever
the Debtor's only goal or even a personal goal of his.[67]

The Trustee objected to the Court's consideration of
Schoen's Supplemental Declaration, asserting that the Defendants
were asking the Court to resolve contradictory evidence in their
favor, thereby acknowledging there was a material issue of fact
in dispute.  The Court rejects this assertion.  The Supplemental
Declaration does not contradict the December 2018 Email but
simply places it in context.

Nor does the Court find that the December 2018 Email
establishes that Schoen concealed from the Board his goal to sell
the Debtor or even creates a genuine issue of material fact on
this point.  First, the document was created in 2018, not during
the period at issue (2013-2016).  Second, it states that it was
the intent of the Debtor (not Schoen personally) to sell.[68]
Third, the document is not contrary to the testimony of the

---

[65]    Id. ¶ 5.

[66]    Id. ¶ 9.

[67]    Id. ¶ 10.

[68]    Adv. D.I. 130 at A002.

Directors who all stated that they were aware that a sale of the Debtor was always a possibility.[69]  Fourth, the December 2018 Email highlights the market factors that caused the Debtor to pursue a sale strategy in 2018 rather than continue its prior expansion strategy.[70]  Fifth, the document was not concealed by Schoen from the Debtor; a copy was sent to Bartel, the Debtor's CFO at the time.[71]  Therefore, the Court does not find that the December 2018 Email establishes that Schoen fraudulently concealed information from the Board.

b.  <u>Directors' Deposition Testimony</u>

The Trustee also asserts that the Directors' deposition testimony contradicts the Directors' Declarations and supports its contention that Schoen hid his intent to sell the Debtor from the Board.  It cites testimony in which the Directors state that expansion, not a sale, was the Company's main goal between 2014 and 2016.[72]  The Trustee asserts that this evidence shows Schoen

---

[69]   Adv. D.I. 84, 85, 86, 87, 88 ¶ 12.  <u>See also</u> Adv. D.I. 130 at A014, A056; Adv. D.I. 132 Ex. D at 167, Ex. E at 21, Ex. F. at 15.

[70]   Adv. D.I. 130 at A001-A005.

[71]   <u>Id.</u>

[72]   <u>See</u> Adv. D.I. 130 (Berlin Dep.) at A015 ("Q. Would you ever say that during your tenure that the goal was to sell the company? A. No.  Let me correct that.  At the very end we were instructed by the banks to find a purchaser, then, yes, the goal was to sell the company."); Adv. D.I. 130 (Hailey Dep.) at A030 ("Q. So the goal [in 2013, once William Blair failed to deliver a buyer] . . . then shifted from a sale to an expansion that is both offensive and defensive.  A. Yes."); Adv. D.I. 130 (Ravich

concealed his personal goal of achieving a sale of the Debtor from the Board.

The Defendants respond that the Directors' deposition testimony does not support the Trustee's contention that a potential sale was hidden from the Board.  While several members of the Board testified that expansion, not a sale, was the Debtor's main goal between 2013 and 2016,[73] every Director also testified that a sale opportunity was always a possibility that the Board would consider.[74]

The Court agrees with the Defendants that the cherry-picked deposition testimony cited by the Trustee is insufficient to prove that Schoen fraudulently concealed from the Board an intent to sell the Debtor.  The Directors and Schoen testified that the Debtor was pursuing an expansion strategy between 2013 and 2016

---

Dep.) at A056 ("Q. And so beginning in 2013, the goal for [the Debtor's] business became expansion; is that correct?  A. Yes."); Adv. D.I. 130 (MacDonald Dep.) at A072 ("Q. So it is correct to say from 2013 on, the strategic plan for [the Debtor] was to expand the business?  A. Expand the business.  Yes."); Adv. D.I. 130 (Guttilla Dep.) at A095 ("Q. . . .  Can you tell me why the board adopted [an expansion] plan?  A. William Blair . . . specifically listed six alternatives in their presentation.  And that was one of the alternatives. . . .  In the judgment of the board and the management committee, that was the course of action we decided to pursue.").

[73]  Id.

[74]  See Adv. D.I. 130 at A014, A032, A056; Adv. D.I. 132 Ex. D at 167, Ex. E at 21, Ex. F. at 15, Ex. G at 116.

only because it had been unable to find a buyer at that time.[75]
Consequently, the Court does not find the Directors' testimony
that the Debtor was pursuing an expansion strategy at that time
as inconsistent with their testimony that the Board was always
open to a sale of the business.[76]  More importantly, the Court
does not find it is evidence of concealment by Schoen of an
intent to sell the Debtor.

    c.   <u>Fabrica Transaction</u>

The Trustee also offered a Board Meeting Presentation and
Board Meeting Minutes as evidence proving that Schoen did not
fully apprise the Directors of relevant information relating to a
proposed strategic transaction with Fabrica, another paper

---

[75]   <u>See</u> Adv. D.I. 130 (Hailey Dep.) at A032 ("Q. But during
[2013], [a sale or merger] wasn't specifically the goal; is that
correct?  A. . . . [I]t wasn't just [William Blair's]
recommendation that we move [towards expansion efforts].  It was
them saying, 'Nobody will buy you.  So, unfortunately, even
though you want to sell the company, there is nobody that will
buy you, so what's Plan B.'  [Expansion] was Plan B.  Q. So [once
William Blair failed to deliver a buyer in 2013] . . . the goal
then shifted from a sale to an expansion that is both offensive
and defensive?  A. Yes."); Adv. D.I. 132 Ex. D (Hailey Dep.) at
166-67 ("[W]e were trying to sell the company.  As I mentioned
earlier, that was what I wanted to have happen in 2012.  We just
couldn't find a suitor.  So that didn't suddenly stop in 2013.
There was no reason to reach out to the market again.  We had
already talked to every strategic [buyer] six months before this.
So [from 2013 to 2016] we were still actively trying to sell the
company.  Everyone knew it.").  <u>See also</u> Adv. D.I. 130 (Ravich
Dep.) at A056; Adv. D.I. 132 Ex. H (Schoen Dep.) at 46; Adv. D.I.
84, 85, 86, 87, 88 ¶ 10.

[76]   <u>See</u> <u>supra</u> note 74.

company.[77]  Those Board Meeting Minutes show that during the
March 18-19, 2014, Board Meeting, Schoen and Schroder gave a
presentation to the Board about the Fabrica proposal.  Although
those Board Meeting Minutes unequivocally state that the Board
was advised of, and discussed, the benefits and risks associated
with the Fabrica transaction,[78] the Trustee asserts that the
Minutes are contradicted by the fact that none of the Directors
could recall in their deposition testimony what risks, if any,
were disclosed to them at that Board meeting.[79]  The Trustee
contends that the Directors' failure to recall the risks and
benefits of the Fabrica transaction at their depositions is
evidence that Schoen failed to disclose the risks to the Board
and that their Declarations are not based on their personal
knowledge.

The Court rejects the Trustee's arguments.  The Board
Presentation and Minutes provide evidence that the risks and
benefits of the Fabrica transaction were disclosed to the Board,
not concealed by Schoen.  The failure of the Directors to recall
the details of the board meeting and presentation in their
depositions nearly a decade later is not evidence that Schoen
failed to apprise them of those risks and benefits.

---

[77]    Adv. D.I. 130 at A117-A121, A122-A228, A315-A354.

[78]    Id. at A117.

[79]    Id. at A028-A029, A100-A105, A072-A073.

d.    QRT Machine

The Trustee presented evidence which it maintains establishes that Schoen concealed from the Board risks associated with the acquisition of the QRT machine: the January 2015 Board Meeting Minutes with accompanying Presentation and an October 16, 2018, email between Schoen and the QRT manufacturer (the "October 16, 2018, Email").[80]  The Trustee points out that there is no mention of the QRT machine in the January 2015 Board Meeting Presentation and Minutes.[81]  It also cites the deposition testimony of the Directors stating that they were not apprised of the risks (known to Schoen) that the Debtor was taking in buying the QRT machine, a new and untested technology.[82]

The Trustee finally asserts that Schoen admitted in the October 16, 2018, Email that the Debtor underestimated the

---

[80]    Id. at A312-A354.

[81]    Id. at A312-A354 (Minutes of a Meeting of the Board of Directors of Orchids Paper Products Company (Jan. 21-22, 2015)).

[82]    Id. (MacDonald Dep.) at A076-A078 ("Q. . . .  In this e-mail dated October 16, 2018, and in the third paragraph Mr. Schoen says the product QRT 'could support were not well understood or developed.'  Were you aware of that at the time you approved the QRT?  A. Not to this depth, no. . . .  Q. At the time you approved the QRT, were you aware that [the Debtor] lacked the depth and breadth of resources to develop product and process for the QRT? . . .  A. Absolutely not."); Adv. D.I. 130 (Guttilla Dep.) at A110-A112 ("Q. . . .  At the time you approved the purchase of the QRT, were you aware that the products the QRT could support were not well understood or developed?  A. No. . . .  Q. Were you aware at the time you approved [the Debtor's] purchase of the QRT that [the Debtor] lacked the depth and breadth of resources to develop product and process for the QRT? . . .  A. No.  Q. Did Mr. Schoen ever tell you that?  A. No.").

research and development requirements of the QRT machine because,
although it was marketed as a commercial paper machine, the QRT
machine turned out to be a first of a kind technology.[83]   The
Trustee asserts that Schoen's concession that he "should have
recognized these issues" is evidence that he fraudulently
concealed information from the Board about his decision to
recommend and select the QRT machine.[84]

The Defendants respond that a consideration of all the
evidence proves that those risks were not hidden from the Board.
Preliminarily, the Defendants assert that the October 16, 2018,
Email is not evidence that Schoen failed to disclose the QRT
machine's risks to the Board three years earlier in 2015.   They
contend that the Directors' deposition testimony establishes
unequivocally that the Directors were fully apprised of the risks
and benefits of the QRT machine at the time of its acquisition in
2015.[85]   Further, the Defendants argue that the Trustee's

---

[83]    Adv. D.I. 130 at 230.

[84]    Id.

[85]    See, e.g., Adv. D.I. 132 Ex. G (Ravich Dep.) at 137 ("Q. And
does reviewing this document refresh your recollection regarding
what type of paper machine was initially planned to be included
in the Barnwell facility? . . .  A. Well, . . . my understanding
is we were examining all the options. . . .  [T]he process took a
certain amount of time and ultimately concluded with the machine
we chose.  But everything considered in this document, it looks
like they were looking at the ATMOS machine. . . .  I seem to
recall there was an analysis between the ATMOS and the QRT and .
. . [w]e thought the QRT was the better decision."); id. at 143-
45 ("Q. And so at this point, Mr. Schoen was presenting to the
board the relative merits of the QRT versus the ATMOS machine?

contention that the QRT machine was not discussed at the January 2015 Board Meeting is contrary to the evidence.  Although the QRT was not explicitly mentioned in the January 2015 Board Meeting Minutes, the Minutes show that the Board directed Schoen and the management team to continue exploring the risks and benefits of other paper machines, which they did.[86]  The Defendants cite Schoen's Declaration[87] and the testimony of Directors Berlin and

_____

A. Yeah.  Yes. . . .  Q. And so is it represented to the board that the cost of the two machines was comparable?  A. Well, it appears to me that the QRT machine is cheaper.  Well, cheaper per ton.  If you look at the last line. . . .  Q. Even though the full cost outlay is 33 million versus 21 million?  A. Well, again, . . . the cost per ton, which is the relevant concept, is cheaper for the QRT.  Q. . . .  And so, here, Mr. Schoen identifies . . . ten pluses on the QRT versus the ATMOS and just one delta; is that correct?  A. Correct. . . .  Q. Were you aware that Mr. Schoen agreed to recommend the QRT to the board before he even knew the cost of it? . . .  A. I guess I can't comment exactly on that because . . . there is a lot in that assumption.  I mean, if he knew that it was going to be cheaper per ton, more flexible, this, this, and this, but he didn't know the ultimate total cost, it's not a fair statement the way you're asking the question.  So I think he was recommending the machine based on the fact that he knew from all the pluses that it would be probably a better option.  He may not have actually known the specific cost at that time."); Adv. D.I. 132 Ex. C (Berlin Dep.) at 197-98 ("Q. Based upon your recollection of the meetings, was the QRT discussed?  A. I don't recall whether it was mentioned then [as] an alternative or not.  I know that we knew that there was an alternative in the QRT, but I don't remember if [it] came up specifically here.").

[86]    Adv. D.I. 130 at A314 ("Messrs. <u>Schoen and Schroeder were authorized and directed to continue to examine</u> the property, building and <u>equipment needs</u>, availability and cost in the context of the planned integrated mill in Barnwell, South Carolina, as discussed in the meeting.") (emphasis added).

[87]    Adv. D.I. 89 ¶¶ 18, 21 (explaining that Schoen and the management team had initially identified the ATMOS paper machine as superior to the Valmet NTT machine but had advised the Board

Ravich,[88] which show their awareness in January 2015 that Schoen was still in the process of exploring the risks and benefits of various paper machines.  The Defendants also rely on the Directors' Declarations in which each Director confirms that "[t]he Board fully understood that the QRT machine was a new technology, and the inherent risks associated with any new technology, in making its decision."[89]

The Court concludes that the evidence presented by the Trustee does not support its argument that Schoen fraudulently concealed relevant facts about the QRT machine in 2015 or even raises a genuine issue of material fact on that point.  First, the October 16, 2018, Email was authored three-and-a-half years <u>after</u> the QRT machine acquisition was approved by the Board.  It does not provide any evidence that Schoen withheld information from the Board in 2015, but only shows that Schoen, in hindsight years later, realized there were problems with the QRT machine.[90]  Second, the Court cannot conclude that the Directors' failure to recall all the details regarding the risks and benefits

---

at the January meeting that he was not ready to make a final recommendation because he and the management team wanted to evaluate Valmet's newly available QRT machine.  Schoen stated, however, that at the May 2015 Board Meeting he advised the Board of the risks and benefits of the newly developed QRT machine compared to the ATMOS, NTT, and other conventional machines).

[88]    <u>See</u> <u>supra</u> note 85.

[89]    Adv. D.I. 84, 85, 86, 87, 88 ¶ 24.

[90]    Adv. D.I. 130 at A230.

associated with the QRT machine purchase years after the fact is evidence that those risks were not disclosed in 2015.  The Directors' Declarations and deposition testimony, as well as the January 2015 Board Minutes, establish that Schoen was not only authorized, but was directed, by the Board to explore other paper machine options.[91]  The Declarations of Schoen and the Directors evidence that the acquisition of the QRT machine was fully discussed at the time the Board approved it.[92]  The Court concludes that the evidence presented does not support the Trustee's contention that Schoen withheld information from the Board in an undisclosed effort to make the Debtor an attractive target for acquisition.

Even if there were any evidence that Schoen failed to disclose to the Board facts relevant to the QRT machine acquisition, the Court concludes that it fails to establish fraudulent concealment necessary to toll the statute of limitations.  As the Debtor's CEO, Schoen had a duty to disclose information relevant to that acquisition.[93]  As noted above, it is insufficient to establish fraudulent concealment with evidence

---

[91]    See supra notes 85-88.

[92]    See Adv. D.I. 132 Ex. G at 143; Adv. D.I. 130 at A043, A077, A314; Adv. D.I. 89 ¶ 18.

[93]    See Nat'l Serv. Indus., 2015 WL 3827003, at *6; Science Accessories Corp., 425 A.2d at 962.

of the underlying claim for breach of a fiduciary duty to
disclose.[94]

### e.   Barnwell Project Estimate

The Trustee also argues that Schoen withheld material
information pertaining to the Barnwell expansion from the Board
to further his secret goal of selling the Debtor.[95]   The Trustee
relies on the deposition testimony of the Directors in which they
could not recall the details of the variances between the
projections and actual costs or whether the company's budget for
the project contained any contingencies.[96]   The Trustee argues
that the Directors' inability to recall relevant information
about the Barnwell project is evidence that Schoen failed to keep
the Board fully informed about the project, thereby allowing him
to misrepresent and actively conceal his personal goal of
effectuating a sale.

In response, the Defendants rely on declarations of each
Director stating that they were presented with relevant details
about the estimated and actual costs of the Barnwell expansion.[97]

---

[94]   See supra notes 31 & 38.

[95]   See Adv. D.I. 38 ¶ 167(a)(i)-(ii), (iv).

[96]   See Adv. D.I. 130 at A036-A041, A059-A069, A075, A108-A109,
A357, A361-A368.

[97]   Adv. D.I. 84, 85, 86, 87, 88 ¶ 20 ("The members of the Board
(including myself) were fully aware that the anticipated capital
requirements under discussion during the 2013-2015 period were
only projections, and that as with any construction project the
actual capital requirements would materially vary depending on a

The Directors explained that they were aware that the estimated costs were merely projections and that the actual costs of the Barnwell project could materially increase based on a number of factors.[98]  The Defendants assert that the Directors' failure to recall specific details about the Barnwell expansion in their depositions, nearly a decade after it was approved by the Board, does not make the Directors' Declarations inaccurate.  Further, the Defendants note that the Barnwell cost projections were prepared by an outside engineering firm and internal engineering employees, not by Schoen.[99] Therefore, the Defendants assert that the Barnwell cost projections are not evidence of any fraudulent concealment by Schoen of an intent to sell the Debtor.[100]

The Court concludes that the Trustee has failed to present evidence sufficient to establish that Schoen fraudulently concealed relevant information about the Barnwell project from the Board.  The Court finds that the Directors' failure to recall information related to the Barnwell project in depositions taken many years later does not establish that Schoen failed to inform

---

number of factors, including but not limited to changes to engineering and design specifications; market fluctuations in equipment, material, and labor costs; local construction requirements; and potential delays.").

[98]    See supra notes 95 & 96.

[99]    Adv. D.I. 132 Ex. I at 33, 139.

[100]    Id. Ex. A at 37-38, Ex. B at 231.

the Board about the expected costs at the time of approval of the
Barnwell project.

Furthermore, as noted above, evidence that Schoen failed to
disclose to the Board facts about the Barnwell expansion would
not be sufficient to establish fraudulent concealment sufficient
to toll the statute of limitations.  As the Debtor's CEO, Schoen
had a duty to disclose information relevant to that expansion.[101]
As noted above, fraudulent concealment cannot be established by
evidence of the underlying claim of breach of a fiduciary duty to
disclose.

### f.   Stock Options

Lastly, the Trustee asserts that Schoen's compensation
package provides support for its contention that Schoen concealed
information from the Board.  According to the Trustee, the
November 8, 2013, Nonqualified Stock Option Agreement (the
"Option Agreement")[102] between the Debtor and Schoen incentivized
Schoen to push a sale of the Debtor.  Under the Option Agreement,
Schoen had the option to purchase up to 400,000 shares of the
Debtor's stock when the share price hit certain targets.[103]
Although Schoen was able to exercise options for 100,000 shares
on June 30, 2016, the subsequent drop in the Debtor's share price

---

[101]   See Nat'l Serv. Indus., 2015 WL 3827003, at *6; Science
Accessories Corp., 425 A.2d at 962.

[102]   Adv. D.I. 130 at A380-A384.

[103]   Id. at A380.

precluded him from exercising any more options.  However, the
Option Agreement also provided that if a "Change in Control"
occurred on or before November 8, 2018, Schoen's options would
become fully exercisable without regard to the share price.[104]  As
a result, the Trustee asserts that the Option Agreement
contradicts Schoen's claim in his Declaration that he "never
considered a sale to be the most desirable option."[105]

The Defendants assert that the Directors' deposition
testimony directly refutes the Trustee's contention.  The
Directors testified that the change in control provision in the
Option Agreement was a standard corporate component of executive
compensation[106] that would be triggered only if the Board decided
to approve a sale.[107]  The Directors further testified that the
Option Agreement incentivized Schoen to drive company revenue and
create value for shareholders in many ways; if a sale created
that value and the Board approved it, then they testified that
Schoen would have earned the options.[108]

The Court finds that the Option Agreement does not establish
that Schoen fraudulently concealed evidence from the Board.  As
the Directors testified, the Option Agreement is a typical

---

[104]   Id. at A381, ¶ 1(d).

[105]   Adv. D.I. 89 ¶ 27.

[106]   Adv. D.I. 132 Ex. D at 110-11.

[107]   Id. at 111.

[108]   Id. Ex. C at 147, Ex. F at 98, Ex. G at 84.

component of executive compensation.[109]  Because the Board had to
approve any sale of the Debtor as being in the best interest of
the Debtor and shareholders, the Option Agreement did not give
Schoen any ability to effectuate a sale by himself.  Therefore,
the Court concludes that the Option Agreement does not prove an
affirmative act of concealment by Schoen.

For all the above reasons, the Court finds that the Trustee
has failed to meet its burden of establishing that Schoen
fraudulently concealed information from the Board between 2013
and 2016.[110]  Because the Trustee's sole argument in support of
tolling the statute of limitations is its contention that Schoen
fraudulently concealed from the Board his goal to sell the
company,[111] the Court will grant the Defendants' Motion for

---

[109]    Adv. D.I. 132 Ex. D at 110-11.  Cf. In re Baker Hughes Inc.
Merger Litig., No. 2019-0638-AGB, 2020 WL 6281427, at *19 (Del.
Ch. Oct. 27, 2020) (holding that a similar provision vesting
equity options in a change of control transaction "does not
create a conflict of interest because the interests of the
shareholders and [fiduciaries] are aligned in obtaining the
highest price."); In re BioClinica, Inc. S'holder Litig., No.
8272-VCG, 2013 WL 5631233, at *5 (Del. Ch. Oct. 16, 2013) ("[T]he
Plaintiffs' contention that the vesting of stock options in a
change of control transaction implicates the duty of loyalty is
frivolous.").

[110]    See Halpern, 313 A.2d at 143 (holding that fraudulent
concealment requires an affirmative act of concealment or
misrepresentation.  See also Lebanon Cnty. Emps.' Ret. Fund, 287
A.3d at 1215; Eni Holdings, 2013 WL 6186326, at *12; Dean Witter
P'ship Litig., 1998 WL 442456, at *5.

[111]    Adv. D.I. 132 at 37-38.

Summary Judgment on the time-barred claims contained in the

Second Amended Complaint.


V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant the

Defendants' Motion for Summary Judgment as to the Trustee's time-

barred claims.

An appropriate Order is attached.


Dated: April 9, 2024              BY THE COURT:

                                 Mary F. Walrath
                                 United States Bankruptcy Judge