**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| OPP LIQUIDATING COMPANY, INC. | ) | Case No. 19-10729 (MFW) |
| (f/k/a Orchids Paper Products | ) | |
| Company), et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |
| BUCHWALD CAPITAL ADVISORS LLC, | ) | |
| as Liquidating Trustee of the | ) | |
| Orchids Paper Products | ) | |
| Liquidating Trust, | ) | Adv. Proc. No. 21-50431 |
| | ) | (MFW) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY S. SCHOEN, et al., | ) | Rel Docs. 38, 148, 149, |
| Defendants | ) | 158, 163 |
| | ) | |

**OPINION**[1]

Before the Court is the Motion of Defendant Rodney D. Gloss
for Summary Judgment on the only claims against him in the
Trustee's Second Amended Complaint (Counts I and IV). The
Trustee opposes the Motion, contending that there remains a
genuine dispute over material facts. For the reasons stated
below, the Court will grant Gloss' Motion.

I.  BACKGROUND

Orchids Paper Products Company (the "Debtor") was formed in
1998. The Debtor was a public company that operated as a low-

---

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

cost manufacturer of tissue products serving "extreme value" retail establishments such as Dollar General and Family Dollar.[2] Rodney D. Gloss ("Gloss") served as the Debtor's Chief Financial Officer from August 25, 2016, to March 16, 2018.[3] After its expansion efforts failed and its financial condition deteriorated, the Debtor (and several of its subsidiaries) filed for relief under chapter 11 of the Bankruptcy Code on April 1, 2019 (the "Petition Date"). On February 24, 2020, the Court confirmed the Combined Disclosure Statement and Chapter 11 Plan (the "Plan") filed by the Debtor and its subsidiaries.[4] Under the terms of the Plan, Buchwald Capital Advisors LLC was named as Liquidating Trustee (the "Trustee") for the benefit of the Creditors' Trust, to which was assigned various causes of action belonging to the Debtor.

On May 4, 2021, the Trustee commenced an adversary proceeding against the Debtor's former Chief Executive Officer, the Debtor's three former Chief Financial Officers, including Gloss, and members of the Debtor's Board of Directors (the "Board"). On June 25, 2021, the Defendants filed Motions to Dismiss the Trustee's Complaint in its entirety, contending that

---

[2]    Adv. D.I. 17 ¶ 22.  References to the docket in this adversary proceeding are to "Adv. D.I. #" while references to the docket in the main case are to "D.I. #."

[3]    Adv. D.I. 38 ¶ 13.

[4]    D.I. 714.

most of the Trustee's claims were time-barred.[5]  Rather than
replying to the Motions to Dismiss, the Trustee filed its First
Amended Complaint.[6]  On August 13, 2021, the Defendants filed
Motions to Dismiss the Trustee's First Amended Complaint, again
alleging that many of the claims were time-barred.[7]  On March 14,
2022, the Court granted in part and denied in part the Motions,
finding that the First Amended Complaint had alleged affirmative
acts of concealment that, if proven, would support tolling of the
statute of limitations.[8]  On March 25, 2022, the Trustee filed
its Second Amended Complaint.[9]  On December 23, 2022, the
Defendants filed a Motion for Summary Judgment on the Time-Barred
Claims.[10]  On April 9, 2024, the Court granted the Motion,
finding that the Trustee had failed to meet its burden of
establishing that the statute of limitations had been tolled on
claims arising before April 1, 2016.[11]

On June 17, 2024, Gloss filed a Motion for Summary Judgment
on the remaining claims against him: breach of fiduciary duties

---

[5]     Adv. D.I. 11, 12, 13, 14.

[6]     Adv. D.I. 17.

[7]     Adv. D.I. 18, 20.

[8]     Adv. D.I. 36.

[9]     Adv. D.I. 38.

[10]    Adv. D.I. 82.

[11]    Adv. D.I. 142.

and avoidance of fraudulent transfers under federal and state law.[12]  The matter has been fully briefed[13] and is ripe for decision.

II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this adversary proceeding.[14]  Although fraudulent transfer claims are designated by statute as core claims,[15] and rely on sections 544, 548, and 550 of the Bankruptcy Code, serious questions have been raised about whether, in light of constitutional concerns, they may be treated as core.[16]  The breach of fiduciary duty claims are non-core "related to" claims, as they are claims arising under state law, not arising "in" or "under" the Bankruptcy

---

[12]    Adv. D.I. 148.

[13]    Adv. D.I. 149, 158, 163.

[14]    28 U.S.C. §§ 157(a), 1334(b).

[15]    28 U.S.C. § 157(b)(2)(H).

[16]    <u>See</u> <u>Drivetrain LLC v. DDE Partners LLC (In re Cyber Litig., Inc.)</u>, Case No. 20-12702 (CTG), Adv. Proc. No. 22-50439 (CTG), 2023 WL 6938144, *4 (Bankr. D. Del. Oct. 19, 2023) (concluding that after <u>Stern v. Marshall</u>, a bankruptcy court cannot enter final judgment on a fraudulent conveyance claim absent consent of the parties).  <u>But see</u> <u>Paragon Litig. Trust v. Noble Corp. (In re Paragon Offshore PLC)</u>, 598 B.R. 761, (Bankr. D. Del. 2019) (holding that fraudulent conveyance claims are core claims on which the bankruptcy court had authority to enter a final judgment).

Code.[17] Because the parties have consented, the Court may enter a final order or judgment on the Motion.[18]

III. <u>STANDARD OF REVIEW</u>

   A.   <u>Summary Judgment</u>

   Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] The Court must make this determination based upon the record of

---

[17]   28 U.S.C. § 157(b); <u>Official Committee of Unsecured Creditors v. Yucaipa Am. Alliance Fund I, L.P. (In re Allied Sys. Holdings, Inc.)</u>, 524 B.R. 598, 606 (Bankr. D. Del. 2015) (holding that claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are non-core, related to proceedings).

[18]   <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 575 U.S. 665, 686 (2015) (holding that the bankruptcy court may enter a final order without offending Article III so long as the parties consent). The parties' consent in this case is evidenced by Gloss' Motion for Summary Judgment and the prayer for relief in the Trustee's response, both of which ask the Court to enter a final order on the Motion for Summary Judgment.  Adv. D.I. 148; Adv. D.I. 158. <u>See</u> Del. Bankr. L.R. 7008-1 (in the absence of a statement that a party does or does not consent as required by Rule 7008, the party waives the right to contest the authority of the court to enter a final order or judgment).  <u>See also</u> 28 U.S.C. § 157(c)(2) ("Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title."); 1 Norton Bankr. L. & Prac. § 4:109 (with consent of the parties, bankruptcy court can enter a final order on a non-core claim).

[19]   Fed. R. Civ. P. 56(a), made applicable by Fed. R. Bankr. P. 7056.

the case presented by the parties, which may include the pleadings, exhibits, and products of discovery.[20]

The movant bears the initial burden of proving that it is entitled to relief and there is no genuine dispute of material fact,[21] with the court viewing the record in the light most favorable to the non-moving party.[22]  When the movant has met its burden, the non-moving party must present evidence showing it is entitled to relief or that there is a genuine dispute of material fact.  The later requires more than "some metaphysical doubt as to the material facts."[23]  A fact is material when, under applicable substantive law, it "might affect the outcome of the suit."[24]  A dispute over a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[25]

When considering a motion for summary judgment, the court should not weigh the evidence and determine the truth of the matter; rather, the court must simply determine whether there is

---

[20]    Fed. R. Civ. P. 56(c).

[21]    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[22]    United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

[23]    Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[24]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[25]    Id.

a genuine issue for trial.[26]  In doing so, the court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."[27]  However, while reasonable factual inferences will be drawn against the moving party, "those inferences must be supported by evidence (as opposed to mere assertions or allegations) that supports each element of the claim."[28]  Normally, courts find that "conclusory, self-serving affidavits" are insufficient to meet a party's burden on summary judgment, unless they address specific factual allegations and are not rebutted by contrary evidence.[29]

---

[26]    Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.), 327 B.R. 210, 214 (Bankr. D. Del. 2005).  See also Brandywine One Hundred Corp. v. Hartford Fire Ins. Co., 405 F. Supp. 147, 149 (D. Del. 1975) ("all inferences, doubts and issues of credibility should be resolved against the moving party.") (quoting Suchomajcz v. Hummel Chem. Co., 524 F.2d 19, 24 (3d Cir. 1975)).

[27]    Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).

[28]    In re Sea-Land Corp. S'holders Litig., 642 A.2d 792, 799 (Del. Ch. 1993), aff'd sub nom. Sea-Land Corp. S'holder Litig. v. Abely, 633 A.2d 371 (Del. 1993) (citations omitted).

[29]    See, e.g., Paladino v. Newsome, 885 F.3d 203, 208 (3d Cir. 2018) (holding that a conclusory, self-serving affidavit was insufficient to withstand a motion for summary judgment given that it failed to "set forth specific facts that reveal a genuine issue of material fact.").  But see Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161-62 (3d Cir. 2009) (holding that a conclusory, self-serving affidavit was sufficient because it addressed specific facts raising a genuine issue of material fact and was not contested by any contradictory evidence submitted in rebuttal).

If a court ultimately finds that there is no genuine dispute of material fact, it may enter judgment as a matter of law, either for or against the movant, in full or in part, applying the applicable substantive law.[30]  Where the record could lead reasonable minds to draw conflicting inferences or conclusions, summary judgment is improper, and a trial is necessary.[31]

### B.  Breach of Fiduciary Duty

In Count I of its Second Amended Complaint, the Trustee alleges that Gloss breached his fiduciary duties as an officer of the Debtor.[32]

Officers of a Delaware corporation owe the corporation the duty of care, the duty of loyalty, and the duty to act in good faith.[33]  The duty of care requires that officers inform themselves fully and in a deliberate manner while conducting their duties.[34]  The duty of loyalty requires that the

---

[30]   Fed. R. Civ. P. 56(a), (f).

[31]   O'Connor v. Boeing N. Am., Inc., 311 F.3d 1139, 1150 (9th Cir. 2002) (holding that critical factual disputes precluded a grant of summary judgment).

[32]   Adv. D.I. 38 ¶ 167.

[33]   Forman v. Kelly Cap., LLC (In re Nat'l Serv. Indus., Inc.), No. 14-50377 (MFW), 2015 WL 3827003, at *6 (Bankr. D. Del. June 19, 2015) (holding that an officer of a Delaware corporation owes the corporation and its shareholders the duties of care, loyalty, and good faith).

[34]   Off. Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.), 405 B.R. 527, 539 (Bankr. D. Del. 2010) (holding that conduct amounting to gross negligence was fact-dependent, but generally

corporation's interests take priority over those of the officers'.[35]  The duty to act in good faith is encompassed in the duty of loyalty.[36]

The business judgment rule applies to each of these fiduciary duties.  The rule presumes that, in making a business decision, an officer "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[37]  "The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit."[38]  The strong protections afforded by the business judgment rule fail only where a loyal and informed officer's actions "cannot be 'attributed to any rational business

_____

constituted a failure to be fully informed).

[35]   <u>Cede & Co. v. Technicolor, Inc.</u>, 634 A.2d 345, 361 (Del. 1993) ("Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."), decision modified on other grounds, 636 A.2d 956 (Del. 1994).

[36]   <u>Fedders N. Am.</u>, 405 B.R. at 540.  <u>See also</u> <u>In re Walt Disney Co. Derivative Litig.</u>, 906 A.2d 27, 66-67 (Del. 2006) (discussing the interrelationship between the duty to act in good faith, the duty of care, and the duty of loyalty).

[37]   <u>In re McDonald's Corp. S'holder Derivative Litig.</u>, 291 A.3d 652, 685 (Del. Ch. 2023) (citation omitted).

[38]   <u>Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.</u>, 906 A.2d 168, 193 (Del. Ch. 2006), aff'd sub nom. <u>Trenwick Am. Litig. Tr. v. Billett</u>, 931 A.2d 438 (Del. 2007).

purpose.'"[39]  The presumption can be overcome by rebutting any one of the elements: good faith, loyalty, or due care.[40]  It is not rebutted, however, by the mere showing that an officer's business strategy was ultimately unsuccessful.[41]

A claim alleging breach of the fiduciary duty of care requires that the plaintiff demonstrate that the corporate officer acted with gross negligence.[42]  A corporate fiduciary has acted with gross negligence if he/she was "'recklessly uninformed' or acted 'outside the bounds of reason.'"[43]  The standard for proving gross negligence is extremely stringent given the business judgment rule's strong presumption that a

---

[39]  Cede, 634 A.2d at 361 (quoting Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)).

[40]  Cede, 634 A.2d at 361.

[41]  Hurwitz v. Mahoney (In re Space Case), Bankr. No. 22-10657 (BLS), Adv. Pro. No. 23-50748 (BLS), 2024 WL 1628440, at *9 (Bankr. D. Del. Apr. 15, 2024) (holding that "the alleged facts [which] describe business decisions, some of which were imperfect in hindsight, made by the Officers during a turbulent period of expansion" were insufficient to state a claim for breach of the duties of loyalty or good faith because the courts "do not equate a bad outcome with bad faith").

[42]  Burtch v. Opus, LLC (In re Opus E., LLC), 528 B.R. 30, 66 (Bankr. D. Del. 2015).

[43]  Albert v. Alex. Brown Mgmt. Servs., Inc., No. Civ. A. 762-N, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) (citation omitted).  See also McPadden v. Sidhu, 964 A.2d 1262, 1274 (Del. Ch. 2008) (holding that gross negligence in the duty of care context has been defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason") (citation omitted).

corporate officer acts on an informed basis.[44]

A claim for the breach of the fiduciary duty of loyalty may be proven by evidence that the officer "was on both sides of a transaction and that the transaction was not entirely fair to the company."[45]   A corporate officer's deliberate indifference and inaction with respect to his/her duties can also provide evidence of a breach of the duty of loyalty.[46]

Finally, a breach of the duty of good faith is proven by evidence that the fiduciary intentionally acted with a purpose other than that of advancing the corporation's best interests, acted with the intent to violate applicable positive law, or intentionally failed to act in the face of a known duty to act, demonstrating a conscious disregard for his/her duties.[47]   A

---

[44]   Freibott v. Miller, C.A. No. S08C-11-025-RFS, 2009 WL 1526912, at *2 (Del. Super. Ct. June 2, 2009) (holding that a corporate officer's simple negligence is insufficient to overcome the business judgment rule) (citation omitted).

[45]   Id.. See also Bridgeport Holdings Inc. Liquidation Tr. v. Boyer (In re Bridgeport Holdings, Inc.), 388 B.R. 548, 564-65 (Bankr. D. Del. 2008) (finding that a successful showing of bad faith supported a claim for breach of the duty to act in good faith and the duty of loyalty even where the director did not have a conflict of interest).

[46]   In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 755 (Del. Ch. 2005) (holding that a fiduciary's "[d]eliberate indifference and inaction in the face of a duty to act is" a breach of the duty of loyalty) (emphasis added), aff'd 906 A.2d 27 (Del. 2006).

[47]   Walt Disney Co., 907 A.2d at 755. See also Opus E., 528 B.R. at 67. The Trustee does not allege that Gloss acted with intent to violate applicable positive law.

breach of the duty of good faith may also be established by an officer's failure to implement and monitor sufficient oversight or control systems within the company.[48]  The application of the business judgment rule creates a powerful presumption that an officer acts in good faith and is not rebutted by a showing of ordinary negligence.[49]

    C.   Avoidance of Fraudulent Transfers

    Fraudulent transfers are avoidable under sections 544, 548, and 550 of the Bankruptcy Code.[50]  Those sections require proof that the debtor received less than reasonably equivalent value in exchange for each allegedly fraudulent transfer and that the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer.[51]  To determine whether

---

[48]    <u>Kravitz v. Tavlarios</u>, No. 19 CIV. 8438 (NRB), 2020 WL 3871340, at *7-8 (S.D.N.Y. July 8, 2020) (holding that failure to implement and monitor an oversight system could amount to a breach of the duty of loyalty but not the duty of care), aff'd, No. 20-2579-CV, 2021 WL 5365582, *4 (2d Cir. Nov. 18, 2021).

[49]    <u>Walt Disney Co.</u>, 907 A.2d at 760 (holding that the business judgment rule's application to the duty of care was not forfeited by an officer's ordinary negligence).

[50]    11 U.S.C. §§ 544, 548(a), 550.

[51]    Section 548(a)(1) of the Bankruptcy Code provides in relevant part that
    The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily

    . . . .

    (B)(i) received less than a reasonably

reasonably equivalent value was given, the Court must do a
factual analysis, considering the totality of the circumstances
rather than a specific formula.[52]

Routine salary payments are presumed to be an exchange of
reasonably equivalent value for an employee's services.[53]  That

---

> equivalent value in exchange for such
> transfer or obligation; and
> > (ii)(I) was insolvent on the date
> > that such a transfer was made or
> > such obligation was incurred, or
> > became insolvent as a result of
> > such transfer or obligation;
> > (II) was engaged in business or a
> > transaction, or was about to engage
> > in business or a transaction, for
> > which any property remaining with
> > the debtor was an unreasonably
> > small capital;
> > (III) intended to incur, or
> > believed that the debtor would
> > incur, debts that would be beyond
> > the debtor's ability to pay as such
> > debts matured; or
> > (IV) made such transfer to or for
> > the benefit of an insider, or
> > incurred such obligation to or for
> > the benefit of an insider, under an
> > employment contract and not in the
> > ordinary course of business.

Id. at § 548(a).

[52]   EiserAmper LLC v. Morgan (In re SRC Liquidation LLC), 581
B.R. 78, 97 (D. Del. 2017), ("In conducting the factual analysis
of reasonably equivalent value, the court looks to the totality
of the circumstances."), aff'd, 765 Fed. App'x 726 (3d Cir.
2019).  See also Sikirica v. Wettach (In re Wettach), 811 F.3d
99, 107 (3d Cir. 2016) (holding that the burden of proving a
fraudulent transfer is on the party seeking avoidance).

[53]   MSGI Liquidation Trust v. Modell (In re Modell's Sporting
Goods, Inc.), No. 20-14179 (VFP), Adv. Pro. No.: 22-1076 (VFP),
2023 WL 2961856, at *34 (Bankr. D.N.J. Apr. 14, 2023) (holding
that "the general rule that treats a preferential payment to an

presumption may be rebutted, however, if a plaintiff establishes that the payments were made in bad faith or were excessive given the defendant's employment responsibilities.[54]

IV.   DISCUSSION

    A.   Breach of Fiduciary Duty

The Trustee contends that Gloss breached his fiduciary duties by: (i) failing to address significant overruns in the Barnwell construction, (ii) failing to apprise himself of the process for building a new facility or to hire appropriate professionals to oversee the construction, (iii) failing to properly plan or adequately budget for maintenance of the QRT machine installed at the Barnwell plant, (iv) failing to keep abreast of raw material market prices, (v) failing to keep accurate books and records, and (vi) continuing to operate the Debtor after it became insolvent.[55]

---

insider of an insolvent corporation as a fraudulent transfer" does not apply to compensation, as it is considered a 'roughly contemporaneous exchange' and is deemed necessary to encourage people to work for distressed corporations" and that therefore "payments for salary are presumed to be made for fair consideration," rebuttable with an allegation that payments were excessive or made in bad faith) (citations omitted).

[54]   Sama v. Mullaney (In re Wonderwork, Inc.), 611 B.R. 169, 208 (Bankr. S.D.N.Y. 2020) (citing Pryor v. Tiffen (In re TC Liquidations LLC), 463 B.R. 257, 268 (Bankr. E.D.N.Y. 2011)).

[55]   Adv. D.I. 38 ¶ 167(c).

1.   <u>Barnwell Buildout</u>

In its Second Amended Complaint, the Trustee alleges that Gloss breached his fiduciary duties by consciously disregarding and failing to address significant cost and time overruns in the Barnwell buildout.[56]   The Trustee alleges that construction delays and costs for the Barnwell plant rapidly expanded beyond the budget during Gloss' tenure.[57]

Gloss concedes that the Barnwell project experienced delays and cost overruns.[58]  He argues, however, that the cost overruns alone are insufficient evidence that he breached any of his fiduciary duties.  Gloss argues that this same <u>ipso</u> <u>facto</u> argument has been rejected by the courts because an officer cannot be held to guarantee the success of the business.[59]

---

[56]   Adv. D.I. 38 ¶¶ 156, 167(c).

[57]   <u>Id.</u> at ¶ 68 ("By the beginning of December 2016, almost two years into the project . . . [the Barnwell project] was over two months behind schedule and $24 million over budget."), ¶ 74 ("By the time production at Barnwell began in June 2017 with its paper mill and two converting lines, the project was more than $30 million over budget and 10 weeks behind schedule.").

[58]   Adv. D.I. 158, App'x at A032 (Gloss Dep. at 47:22-48:4) ("Q. At the point that you left, was Barnwell tracking to finish on budget?  A.  No, there had been cost escalations.  For most of 2017, I was looking for 150 million final construction cost on the project.  And later, in 2017, I remember upping the estimate to 155 million.  And I think by the time I left, it was about 163 million.  So there was creep on the cost to finish it.").

[59]   <u>Space Case</u>, 2024 WL 1628440, at *8 (dismissing case because "[t]he mere fact of a business failure does not mean that a plaintiff can state claims against the directors, officers, and advisors" for breach of their fiduciary duties because they are not guarantors of a company's business success) (citation

The Court agrees that the mere fact that the Barnwell construction was over budget and delayed is insufficient to support a finding that Gloss breached his fiduciary duties as CFO of the Debtor.[60]  In the absence of evidence to the contrary, the business judgment rule presumes that an officer acts "on an informed basis, in good faith and in the honest belief" that his/her actions are in the company's best interests.[61]  "The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit" like the Barnwell project.[62]

However, the Court observes that the Trustee does not rely solely on the cost overruns but alleges that Gloss failed to properly supervise the Barnwell construction.[63]

Gloss argues initially that he had no supervisory role in the Barnwell project.  In support, he provides his declaration stating that others were responsible for planning and overseeing the Barnwell construction,[64] and that his only responsibility for

---

omitted).

[60]   Id.

[61]   McDonald's Corp., 291 A.3d at 685.

[62]   Trenwick Am., 906 A.2d at 193.

[63]   Adv. D.I. 38 at ¶¶ 57-64.

[64]   Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 8) ("I was not responsible for 'appris[ing] [my]self of the process for building a new manufacturing facility.' . . .  Others at [the Debtor] with the appropriate expertise and background, including the CEO

the project was to track the expenses and provide the Board of
Directors with reports of actual expenditures to budget reports,
which he asserts he did.[65]  Gloss states in his declaration that
he "monitored start-up related costs as they were incurred,
accurately reported the costs to the Board and CEO, and supported
the operations team in their efforts to contain costs."[66]

In its response, the Trustee contends that, despite what
Gloss asserts were his responsibilities in his self-serving
declaration,[67] Gloss was in fact given (and actually exercised)
oversight authority over the Barnwell project.  In support, the
Trustee presents evidence to show Gloss' significant role in the
Barnwell project, including: (i) deposition testimony of Jeffrey
Schoen[68] who stated that although Diring had ultimate
responsibility for the Barnwell project, Gloss did oversee

---

Schoen and VP of Operations Diring, selected qualified outside
firms (Jedson, Valmet, and M3) and worked with those firms to
plan for and oversee the buildout process.").

[65]   Id. at ¶ 6 ("My sole formal responsibilities with respect to
the Barnwell expansion were to account for its costs and
facilitate their payment.  I fulfilled those responsibilities: my
team and I tracked actual project expenses in real time, which I
reviewed on a monthly basis, and I insisted on quarterly (and at
times monthly) project forecasts.").

[66]   Id. at ¶ 20.

[67]   Paladino, 885 F.3d at 208 (holding that a conclusory, self-
serving affidavit was generally insufficient to overcome a motion
for summary judgment).

[68]   Schoen was a member of the Board from 2007 and the Debtor's
CEO from 2013 to the Petition Date.  Adv. D.I. 38 ¶ 11.

Diring's work;[69] (ii) emails among the Debtor's personnel and
Valmet showing Gloss' direct involvement in the Barnwell
project;[70] (iii) Gloss's own deposition testimony demonstrating
that he was actively involved with the Barnwell project;[71] and
(iv) draft minutes of Board meetings which demonstrate Gloss'
involvement in the financial planning and reporting on costs for
the Barnwell project.[72]

The Trustee argues that summary judgment is unwarranted
because of the genuine dispute which exists over the scope of
Gloss' responsibilities and his performance of them.[73]    The
Trustee contends that, even if there is no dispute of material

---

[69]    Adv. D.I. 158, App'x at A111-12 (Schoen Dep. at 262:20-
263:19) ("Q.  Can you give me some examples of what that would
include, what you would expect Eric [Diring] to be handling on
the Barnwell construction project?  A.  The Barnwell construction
project.  He had - he had oversight over the whole project.  He
was the - you know, there - it was really a three-part team with
Pierre, Michael and Eric, but Eric had ultimate responsibility
for the design engineering phase, the construction, the - making
sure everything fit together properly.  It's his project, you
know.  Q.  Who was overseeing Eric's work on that project?  A.
Me and the CFO. . . .  Q.  So did both Keith Schroeder and Rod
Gloss oversee the work that Eric was doing on the Barnwell
construction project?  A. Yes.") (emphasis added).

[70]    Adv. D.I. 158, App'x at A166-72; A105.

[71]    Id. at A041 (Gloss Dep. at 155:15-20) ("So I'm trying to
take action and trying to figure out what we can do to rein in
the changes and maybe second-guess Valmet and question whether we
are really designing what we need or versus some – some premier
product that we don't really need that is more nice to have.").

[72]    Id. at A145-65.

[73]    Adv. D.I. 158 at 7, 17.

fact, summary judgment in favor of Gloss is inappropriate because
the evidence demonstrates that he breached his fiduciary duties
in supervising the Barnwell project.  The Trustee asserts that
the evidence shows that Gloss knew of the financial problems
caused by the project (namely, the impact on the Debtor's cash
flow which caused it to delay payments to creditors and
ultimately file bankruptcy) and consciously ignored those red
flags, resulting in the project going $20 million over budget
during his tenure.[74]  The Trustee argues that those failures
establish that Gloss failed to act in good faith, thereby
breaching the duties of loyalty and care.[75]

In reply, Gloss argues that, while the Trustee's evidence
does show he was involved in the Barnwell project, it does not
show that he breached any of his fiduciary duties with respect to
that project.  Instead, he contends that the Trustee's evidence
shows quite the opposite: that he took action to reduce costs and
keep the project on target, all to the benefit of the Debtor.
That includes evidence that Gloss kept tabs on the person who was
ultimately responsible for the project;[76] pressed the contractors

---

[74]    See notes 69-72.

[75]    See, e.g., Kravitz, 2020 WL 3871340, at *8 (holding that the
board's sustained or systemic failure to exercise oversight
implicates the directors' duty of good faith and loyalty)
(citations omitted); McDonald's Corp., 292 A.3d at 679-80
(holding that an officer has an obligation to respond to known
risks to the corporation).

[76]    See note 69 (Schoen deposition testimony).

to keep the project on schedule and to minimize costs;[77] made recommendations to keep costs under control;[78] and routinely provided the Board with financial reports on the Barnwell project.[79]

Gloss, therefore, argues that the Trustee has failed to demonstrate any gross negligence, irrational decision-making, bad faith, or self-interested dealing on his part.[80]  Gloss accordingly submits that the Trustee has failed to demonstrate that he breached his fiduciary duties by failing to address overruns in the Barnwell buildout.

Viewing the facts in the light most favorable to the Trustee,[81] the Court concludes that Gloss has met his burden of establishing that his actions in connection with the Barnwell project did not breach his fiduciary duties.[82]

---

[77]   See notes 70-71 (emails and Gloss' deposition testimony).

[78]   See notes 71-72 (board minutes and Gloss' deposition testimony).

[79]   See note 72 (board minutes).

[80]   See, e.g., Opus E., 528 B.R. at 66; Zimmerman v. Crothall, No. CIV.A. 6001-VCP, 2012 WL 707238, at *5-6 (Del. Ch. Mar. 5, 2012), as revised (Mar. 27, 2012) (holding that recklessness or gross negligence can constitute a breach of the duty of care).

[81]   Diebold, 369 U.S. at 655; Saldana, 260 F.3d at 231-32.

[82]   Celotex Corp., 477 U.S. at 323 (holding that the party moving for summary judgment bears the initial burden of proving that it is entitled to relief and there is no genuine dispute of material fact).

First, while the Trustee asserts, correctly, that a self-serving affidavit is generally insufficient to meet a movant's burden of proof on a motion for summary judgment, such an affidavit is adequate when it is sufficiently specific to address the grounds asserted in the complaint.[83]  Gloss' declaration asserts specific actions he took with respect to the Barnwell project.[84]  Additionally, Gloss does not rely only on his declaration to meet his burden of proof but presents ample other evidence in support of his argument that he has not breached any fiduciary duty in connection with the Barnwell project.[85]  For example, Gloss presents deposition testimony of the Board members who consistently testified that he was competent and provided the Board with regular and accurate financial information regarding

---

[83]   <u>Kirleis</u>, 560 F.3d at 161 (holding that a conclusory, self-serving affidavit, while generally insufficient to overcome a motion for summary judgment, was sufficient in that case because it was specific and not rebutted by contrary evidence).

[84]   Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 6 ("my team and I tracked actual project expenses in real time, which I reviewed on a monthly basis, and I insisted on quarterly (and at times monthly) project forecasts."), ¶ 7 ("I (along with Jeffrey Schoen and Eric Diring) took an active role pressing M3 Construction and Valmet (which designed and manufactured the paper machine at Barnwell) to minimize costs and keep the project on schedule. For example, during the Spring of 2017, Schoen and I had a 'come to Jesus' meeting with Valmet to hold them accountable and demand that they pay for some of the overruns.  We also repeatedly pressed Valmet, M3, and [the Debtor's] operations team to achieve time and cost savings, intervened when necessary to keep the project on track, and sought and obtained discounts from Valmet and other vendors.").

[85]   Adv. D.I. 149, Ex.s A-N; Adv. D.I. 163, Ex.s 1, 2.

the Barnwell project.[86]  Gloss also relies on the deposition

testimony of Valmet's representative, Larsson, who confirmed the

meeting with the Debtor in which Gloss pressured Valmet to

mitigate costs and complete the project timely.[87]

Further, the Court finds that the evidence presented by the

Trustee does not refute Gloss' evidence and in most cases

confirms it.  For example, the deposition testimony cited by the

Trustee confirms that shortly after starting, Gloss alerted the

Board to the cost overruns at the Barnwell project and the need

to obtain financing to deal with them.[88]  The Board minutes also

---

[86]    Adv. D.I. 149, Ex. F (Hailey Dep. at 120:9-121:3); Ex. G
(Ravich Dep. at 99:21-25, 100:13-21, 102:18-25); Ex. H (Schoen
Dep. at 328:21-22).

[87]    Id. at Ex. J (Larrson Dep. at 123: 8-124:1); Ex. A (Gloss
Decl. at ¶ 7).

[88]    Adv. D.I. 158, App'x at A126 (Hailey Dep. at 230:4-11) ("Q.
When were you first aware that the project was over budget?  A.
I'm not sure when I was first aware.  I mean, the specific
meeting I remember Rod going over was December of '16 and prior
to our board meeting.  That's the one that just stands out to me
as here is a list of where we are.  I'm sure I heard about it
before then, but that's the one that stands out."); A028-31
(Gloss Dep. at 35:19-36:9, 37:14-38:19) ("When I joined the
company in September, the next board meeting, probably October,
maybe November of 2016, I surprised, I think, everybody, because
at the end of the board meeting they asked me what initial
observations I had as a new CFO, and I said, 'The only thing
that's bothering me about the company is that I think you need to
refinance the debt.  You don't have any contingency margin to
cover Barnwell if something goes wrong.  If everything goes
according to plan, you'll be fine, but you don't have a
contingency fund.  And the bank debt comes due right after
Barnwell is supposed to be completed, so,' I said, 'the timing
isn't good, so I'd suggest refinancing.'  And it caught them a
bit by surprise because no on had really put that bluntly, I
think, before. . . .  Q. . . . .  So you started off by saying

demonstrate, as Gloss stated in his Declaration[89] and the Trustee

admitted in his response,[90] that Gloss routinely reported to the

Board on financial issues related to the project.[91]  The emails

---

that you surprised the board at your first board meeting.  Do you
know approximately when that occurred?  A.  I'll say October of
2016.  Q.  And at this point, you had been working at [the
Debtor] for maybe a little over a month; is that right?  A.
Correct.  Q.  How did you come to the conclusion that - that the
debt needed to be refinanced?  A.  I was – remember that I've
worked for multiple companies that were developing plants and for
one company that had gone bankrupt.  Cash flow is king in most
situations like that.  I was trying to project the cash flows
going forward.  And I looked, okay, we've got so much money we
can borrow from the bank and it basically matches what is
expected to be spent on Barnwell, so there is no wiggle room . .
. .  So if something goes wrong, the business drops off or we end
up spending more in Barnwell, we don't have a reserve, we don't
have a backup plan.  So it was more of a contingency plan.  It
wasn't that things were going wrong.  It wasn't that we were
short on money, anything like that.  It was – in my mind and what
I was pitching was a contingency plan, that we didn't have any
contingency plan or contingency funds to cover anything that went
wrong.  So that's - to me, coming out of bad situations, I wanted
to make the board aware of that and give my opinion that it would
be better to take action early rather than later.")

[89]    Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 6).

[90]    Adv. D.I. 158 at 6-7.

[91]    See, e.g., Adv. D.I. 158, App'x at A-146 (Minutes of Board
Meeting on Dec. 1-2, 2016) ("Mr. Berlin next asked Messrs. Schoen
and Gloss to review the current and projected spending related to
the Barnwell plant expansion.  Management directed the Board to a
written summary of the project spend to date and estimated spend
through completion and proceeded to review the detail presented
in that summary."); A-157 (Minutes of Board Meeting on Apr. 30-
May 1, 2017) ("Mr. Berlin next requested that Management report
on the status of the Barnwell, SC plant expansion.  Messrs.
Schoen and Gloss proceeded to discuss status of the physical
plant construction, paper machine start-up curve, and cost
expenditures to date and projected through completion."); A-149
(Minutes of Board Meeting on Aug. 20-21, 2017) ("Mr. Berlin next
asked Messrs. Schoen and Gloss to review the current and
projected capital spend related to the Barnwell plant expansion.

cited by the Trustee show that Gloss made efforts to get the operations people who were in charge of the project to curtail excess costs and to get the construction done on time.[92]

Accepting as true the Trustee's evidence that Gloss did have some supervisory role in the Barnwell construction, the Court finds that all the evidence (even the Trustee's) shows that Gloss acted at all times in the Debtor's best interest[93] by urging those in charge of the construction to reduce costs and keep on target,[94] by reporting to the Board the true financial condition of the project, and by urging the Board to obtain financing for

---

Management directed the Board to a written summary of the project spend to date and estimated spend through completion and proceeded to review the detail presented in that summary.").

[92]   Id. at A170 (E-mail dated 2/25/17 from Gloss to Larsson) ("I will check with our bank about the impact of a LOC on our debt ratios and get back to you, however while the $2MM delayed payment is an appreciated and significant gesture, it also strikes me as being too little too late, but Jeff and Eric are the real decision makers."); A105 (email from Gloss dated 12/2/2016 to Schoen and Diring) ("I feel like we are perpetuating the problem of not having designed and planned Barnwell adequately on the front end. . . .  I would like to avoid any more creeps in scope but not sure how at this late juncture, other than [Diring] or someone else spending more time beating on Valmet and M3 . . . .") (emphasis in original).

[93]   The Trustee presented no evidence or argument suggesting that Gloss acted in his own self-interest rather than the Debtor's interest.  See Cede, 634 A.3d at 361 ("Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

[94]   See notes 70-71, 84, 92.

the projected overruns.[95]

As a result, the Court concludes that the Trustee has failed to present credible evidence that Gloss has breached any fiduciary duty.[96]  The Trustee's evidence of the cost overruns suffered over the course of the buildout is insufficient to demonstrate a breach of fiduciary duty.[97]  The Trustee has presented no evidence that Gloss was grossly negligent, performed in bad faith, was reckless, or acted outside the bounds of reason in connection with the actions he took related to the Barnwell construction project.  Therefore, the Court concludes that this allegation provides no basis for the Trustee's breach of fiduciary duties claim against Gloss.

## 2.  Failure to Hire Professionals

The Trustee also alleges that Gloss breached his fiduciary duties because he was not well-qualified to supervise the Barnwell construction project and failed to hire professionals to

---

[95]   See notes 72, 88, 91.

[96]   Sea-land, 642 A.2d at 779 (while reasonable factual inferences will be drawn against the moving party, "those inferences must be supported by evidence (as opposed to mere assertions or allegations) that supports each element of the claim.").

[97]   Space Case, 2024 WL 1628440, at *8-9 (holding that the courts do not equate "a bad outcome with bad faith" and dismissing the case because "[t]he mere fact of a business failure does not mean that a plaintiff can state claims against the directors, officers, and advisors" for breach of their fiduciary duties because they are not guarantors of a company's business success).

do that.

Gloss responds by submitting evidence that he did have experience in his prior jobs working on financing for construction projects,[98] that he did additional research into the Debtor's industry and its manufacturing processes,[99] that there was no need to hire professionals during his tenure because the Debtor had already hired competent professionals to oversee the Barnwell project,[100] and that hiring additional professionals was unnecessary and would only add additional costs.[101]

---

[98]    Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 8) ("I did have experience with major construction projects at my prior employers.  From those experiences, I was very familiar with the process and considerations associated with large-scale construction projects.").

[99]    Id. ("I also conducted extensive research into the tissue-making process and tissue industry when I initially joined [the Debtor] to supplement my prior experience with manufacturing and industrial businesses.")

[100]    Id. at ¶¶ 8-9 (stating that before Gloss was hired the Debtor had hired "qualified expert outside firms (Jedson, Valmet, and M3)" who worked on planning and overseeing the Barnwell project).  See also Adv. D.I. 149, Ex. K (Diring Dep. at 21:10-17, 22:9-18) ("Q.  Do you believe that M3 was qualified to handle the Barnwell construction?  A.  Yes.  Q.  Why did you feel that?  A.  He had worked in construction, had managed larger projects, and I - based on his resume from a previous employer and based on his track record, his project experience, we felt that he was adequate to do the job. . . .  Q.  And to your knowledge, did M3 perform all of the duties that they were hired to do?  A.  Yes.  Q.  Did M3 perform those duties timely?  A.  Yes.  Q.  Did M3 perform those duties accurately?  A.  Yes.  Q.  Was there ever a time that you became aware of any problems with the work performed by M3?  A.  No.").

[101]    Adv. D.I. 149, Ex. K (Diring Dep. at 139:6-25; 154:9-18) ("Q.  Did you ever have a conversation with Rod about hiring a project manager?  A.  Not that I recall.  Q.  Did you ever have

The Trustee does not directly respond to this issue.  The Trustee does attach deposition transcripts that tangentially touch on the issue, though, such as testimony from the Chairman of the Debtor's Board of Directors which it asserts establishes that Gloss was not well-qualified to perform his duties.[102]

Based on the evidence presented on this issue, and viewing the record in the light most favorable to the Trustee,[103] however, the Court must conclude that the Trustee has failed to prove that Gloss' failure to hire other professionals to oversee the

---

reason to form an opinion about whether a project manager would have been helpful on the Barnwell project? . . . A.  A project manager would not have changed anything. . . .   So project managers would have added costs to the project. . . .  Q.  Do you believe that the extra cost in time that occurred, which Jeff references in this e-mail, would have been mitigated if [the Debtor] had hired its own person to manage the Barnwell project from the beginning rather than relying on M3 and Valmet?  A.  No. Q.  Why not?  A. Because those same factors would have impacted the same project manager, whether he was with the project manager or M3 or Valmet.").

[102]    Adv. D.I. 158, App'x at A132-34 (Berlin Dep. at 163:18-24, 164:18-165:4) ("Rod did not have the total background in the financial accounting, auditing, inter-relationships with the auditors, the traditional kind of stuff that you think a chief accountant would have.  And to that end, I think he was not well qualified to handle that. . . .  Q.  Tell me about the times where - where Rob provided information that was not accurate.  A. I don't remember specifically what it was about, but we're going over a report, and the report made absolutely no sense to me. And I asked him that he needed to go back and get the thing looked at.  And when it came back, it was totally different than what it had been.  And he was providing that to me on a specific request that I had of him of some report, but I don't remember which one it was.  It wasn't a general board report.  It was just one I asked him as chairman.").

[103]    Diebold, 369 U.S. at 655.

Barnwell project was a breach of his fiduciary duties.  All the
evidence presented shows that competent professionals were
already in place managing the Barnwell construction and that
hiring more would have added to the project's costs and delays.[104]
Therefore, the Court concludes that this allegation provides no
basis for the Trustee's claim that Gloss breached his fiduciary
duties.

### 3.   QRT Maintenance Costs

In the Second Amended Complaint, the Trustee alleges that
Gloss breached his fiduciary duties by "[f]ailing to properly
plan for or budget adequate maintenance for the QRT machine and
failing to update the budget when costs vastly exceeded the
Debtor's expectations."[105]  Specifically, the Trustee alleges that
Gloss was partially responsible for the Debtor's decision to
perform maintenance on the QRT internally rather than purchase
the more attractively priced QRT maintenance program offered by
its manufacturer, Valmet.[106]  The Trustee asserts that Gloss
grossly miscalculated those internal maintenance costs and
alleges that as a result of that decision, the Debtor experienced
significantly higher actual maintenance costs and downtime than

---

[104]   See notes 100-01.

[105]   Adv. D.I. 38 ¶ 167(c)(iii).

[106]   Id. at ¶¶ 82-83.

it would have had it retained Valmet to do the maintenance.[107]

In his Motion for Summary Judgment, Gloss contends that he was not responsible for planning or budgeting the QRT maintenance and that it was instead the responsibility of the Debtor's operations team who had the requisite experience to do so as a result of operating the Debtor's other plant in Oklahoma.[108]  In support, Gross cites the deposition testimony of the operations manager, Diring, who confirmed that it was the prior CFO, Schroeder, who rejected Valmet's proposed maintenance program as too expensive.[109]  Diring testified that the QRT in-house maintenance program was cheaper than Valmet's, without considering start-up costs.[110]  Gloss also relies on the

---

[107]   Id. at ¶¶ 92, 94.

[108]   Adv. D.I. 149, Ex. A (Gloss Decl. at ¶¶ 11-12) ("I was not responsible for planning [the Debtor's] maintenance program, preparing maintenance budgets or projections, or updating maintenance budgets. . . . [but] I was aware of the decisions being made about QRT maintenance and I believe they were sound, reasonable, and appropriate, and I do not believe that [the Debtor] overpaid for its QRT maintenance.").

[109]   Adv. D.I. 149, Ex. K (Diring Dep. at 178:15-179:11) ("Q.  To your knowledge, did Jeff [Schoen] or Rod [Gloss] review these numbers proposed by Valmet for their program? . . . . A. Apparently, it was Keith [Schroeder], not Rod [Gloss].").

[110]   Id. at 176:4-22, 217:4-7 ("Q.  At this time, did you have any sense of how much maintenance of those two systems would cost [the Debtor] to do internally?  A.  Yes.  Because this is just labor.  This isn't - this isn't parts.  This isn't like stuff to buy the parts.  This is just supply their startup systems and then labor.  Basically, implementation team to implement these practices.  I would still be responsible for all the material and parts.  So $2 million [proposed by Valmet] was excessive for a team that was going to come in for six months.  Q.  Was the - so

deposition testimony of the Debtor's contact at Valmet, Jan
Larsson, who stated that few of Valmet's customers used its
maintenance program and that there was no reason that the Debtor
could not perform in-house maintenance on the QRT machine.[111]
Larsson further testified that the Debtor received startup
training and, in 2018, obtained further support and maintenance
from Valmet.[112]  Finally, Larsson testified that Gloss did raise

---

this proposal was only for a six-month period, not for a year?
A.  . . . .  So it was 1.5 million for the staffing to keep it
going; it was 2 million for a separate group to come in and
develop the computer systems, the software; and 822,000 in
equipment.  So year one, it would have cost 4.3 million. . . .
Q.  So the maintenance program that you helped plan was not meant
to include the startup troubleshooting; is that right?  A.
That's correct.").

[111]    Adv. D.I. 149, Ex. J (Larsson Dep. at 106:18-107:13, 145:16-
146:3) ("Q.  In your opinion, was [the Debtor] equipped to
maintain the QRT machine by itself? . . .  A.  Well, I - I can
say, then, that eventually they ended up having less maintenance
personnel than we are normally seeing for equipment maintenance .
. . .  Q.  Aside from not having enough maintenance personnel, in
your opinion, was there any other reason [the Debtor] may not
have been equipped to maintain the QRT by itself? . . .  A.  No,
not really.  I mean, they had the prior tissue mill.  I guess
they were using some experience and knowledge from that maybe,
you know, to bridge the gap. . . .  Q.  In your opinion, if
Valmet had been responsible for the maintenance at the Barnwell
facility and for the QRT machine, would the issues identified in
the report have occurred? . . .  A.  Well, it's not very common
that they actually are in charge of the maintenance, I mean, in
cases like this.  But it might have performed a little better,
yes.  But it is not very common that we have, you know, that kind
of maintenance outsourced to us, so to say.") (emphasis added).

[112]    Id. at 146:5-146:23 ("Q.  Did Valmet provide hands-on, on-
site training to mill personnel at Barnwell?  A.  Yeah.  I mean,
it was part of the - from the very beginning, when you do the
checkout and commissioning and startup, you have hands-on
training on the machine, together with the mill personnel, and
also classroom training.  And then later on, sometime I guess

concerns with Valmet about its cost overruns.[113]

Gloss contends that the Trustee has abandoned its QRT allegations because in its response to his summary judgment motion, the Trustee fails to present any evidence or argument on this point. Gloss also notes that the deposition testimony of the Trustee's own representative fails to identify any specific evidence that Gloss breached any duties related to the QRT maintenance[114] or that the Debtor suffered specific damages as a

---

during 2018, we did agree upon a support and maintenance support on site. So [the Debtor] did buy that sometime, I think, after this audit was done, I think. So we had people on site a certain amount of hours, you know, every month then to help them with the maintenance training, and support, and all of that. That was after startup. Q. And you said it was after that report? A. I think so. Maybe it is in some of the documents you have there. But it was during 2018, at least. They agreed upon that sometime during 2018.").

[113] Id. at 123:8-124:11; 145:16-146:3 ("Q. Who did you meet with from [the Debtor]? A. Eh. It was probably - I know Jeff and Eric, and it was probably also Rod. . . . Rod Gloss. Q. . . . . . What was discussed at that meeting? A. Well, I mean, they had concerns about the overruns. So, at this point in time, I guess, they told us, you know, how much their budget was overrun, et cetera. And how we could proceed here, you know, to make sure that they could really have a good startup. Q. So was the meeting specifically called to discuss the overruns specifically? A. I mean, I think the overall topic was to - was how can we make sure, you know, that we have a startup according to plan, or at least a revised plan, and to mitigate the costs in general.").

[114] Adv. D.I. 149, Ex. I (Buchwald Dep. at 59:7-20, 62:5-63:9) ("Q. Does the trust have any evidence that the company's maintenance program was inadequate? . . . A. The Trust relies on counsel for information regarding evidence. . . . Q. . . . . And has anyone told the Trust that the maintenance program was inadequate. . . . A. No. . . . Q. What is the basis for the Trust assertion that Gloss set the maintenance budget for the QRT? A. The Trust relied on investigations made by counsel to make that assertion. Q. Has anyone told the Trust that Mr.

result of doing the QRT maintenance internally.[115]  Instead, the

Trustee's representative simply relied on representations of its

counsel and refused to answer based on the attorney-client

privilege.[116]

Gloss argues that the fact that he may have had some role

with respect to the projections for on-going maintenance of the

QRT machine which turned out to be underestimated is not, alone,

---

Gloss set the maintenance budget? . . .  A.  No.  Q. . . . .  Is
the Trust relying on anyone's statements - other than statements
made by parties or witnesses during their depositions or
information received from counsel - for the proposition that
Gloss set the maintenance budget? . . .  A.  No.  Q. . . . .  And
has anyone provided the Trust with any documents - other than
documents the Trust has produced to the defendants during
discovery - indicating that Mr. Gloss set the maintenance budget
for the QRT? . . .  A.  No.").

[115]  Id. at 63:25-64:4 ("Q.  And what's the basis for the Trust
assertion that the debtor spent $5 million on maintenance?  A.
The Trust relied on investigations of counsel for that
information.").

[116]  Id. at 16:3-23 ("MS. QUICK:  Object to the extent that the
response would have required divulge - my client to divulge
attorney-client privileged information.  I would direct him not
to answer that, but to the extent you have other in - other
knowledge, you can.  THE WITNESS:  A.  I would not answer then.
MR. LAZAR:  . . . .  Dana, are you instructing him not to answer -
divulge facts known to him?  MS. QUICK:  I'm instructing him not
to divulge any substance of attorney-client privileged
communication.  MR. LAZAR:  Are you also directing him not to
divulge facts that were developed by counsel?  MS. QUICK:  To the
extent that Mr. Buchwald has knowledge about the facts that did
not come from privileged conversations, he is free to provide
that information to you.  MR. LAZAR:  Q. . . . .  As the Trust
representative, do you have any information other than what you
learned through - at depositions that didn't come from counsel?
A.  I don't have any information that didn't come from counsel  .
. . .  Q.  So, other than . . . depositions or - or documents
that you might have reviewed, all of your information comes from
facts developed by counsel?  A.  Correct.").

a basis for concluding that he breached his fiduciary duty.[117]
Gloss argues that opting for in-house QRT maintenance was a
decision protected by the business judgment rule and was
reasonable.[118]  As a result, Gloss argues that the Court must
conclude that Gloss did not breach any fiduciary duty that he
might have had with respect to maintenance of the QRT machine.
Nor, he asserts, can the Court conclude that the Debtor suffered
any damages as a result of the decision to perform maintenance of
the QRT machine internally because the Trustee has provided no
evidence of damages.[119]

 The Court concludes that Gloss has presented credible
evidence that he did not breach any fiduciary duty related to the
QRT maintenance.[120]  Gloss presented evidence that, contrary to
the Trustee's allegation, he was not responsible for the Debtor's
decision to do the maintenance in-house (rather than hiring

---

[117]   Segway, Inc. v. Cai, C.A. No. 2022-1110-LWW, 2023 WL
8643017, *5 (Del. Ch. Dec. 14, 2023) ("Oversight duties under
Delaware law are not . . . designed to subject [fiduciaries] to
personal liability for failure to predict the future and to
properly evaluate business risk.'") (quoting In re Citigroup Inc.
S'holder Derivative Litig., 964 A.2d 106, 131 (Del. Ch. 2009)).

[118]   See notes 110-11.

[119]   See note 115.

[120]   See Celotex, 477 U.S. at 323 (holding that the party moving
for summary judgment bears the initial burden of proving that it
is entitled to relief and there is no genuine dispute of material
fact).

Valmet),[121] that the decision to do the maintenance in-house was reasonable,[122] that he attempted to keep the costs down,[123] that he did not have any direct responsibility for preparing projections for the maintenance of the QRT machine,[124] and that he performed his duty to report the cost overruns for the Barnwell project to the Board.[125]  All of that evidence supports the conclusion that Gloss fulfilled his fiduciary duties with respect to the QRT maintenance.

The Trustee has failed to present any evidence to rebut Gloss' specific evidence.[126]  Nor has the Trustee presented any evidence to rebut the business judgment rule's presumption that Gloss "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[127]  Even if the decision to perform the QRT

---

[121]    See notes 108-09.

[122]    See notes 110-11.

[123]    Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 12).  See also note 113.

[124]    Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 11).

[125]    See Adv. D.I. 159, App'x A145-65.  See also note 88.

[126]    Matsushita, 475 U.S. at 574 (when the movant has met its burden of showing that the non-moving party's claim is implausible, the non-moving party must present more persuasive evidence to support its claim); Sea-Land Corp., 642 A.2d at 799 (holding that mere unsubstantiated assertions or allegations are insufficient to withstand a motion for summary judgment which has presented credible evidence in support).

[127]    McDonald's Corp., 291 A.3d at 685.

maintenance in-house might have cost more in hindsight (though the Trustee presents no evidence of this), the business judgment rule's presumption cannot be overcome simply by showing that the business decision was not successful.[128]

Thus, the Court cannot conclude that Gloss breached any fiduciary duty he had with respect to the QRT maintenance.

4.   Raw materials

In the Second Amended Complaint, the Trustee alleges that Gloss breached his fiduciary duties by failing to keep track of current market conditions for raw materials used by the Debtor to assure the Debtor was not overpaying.[129]  The Trustee asserts that the Debtor had a broker agreement under which it was charged market rate plus a premium.[130]  Notwithstanding the need to cut costs, the Trustee alleges that Gloss never compared the rate charged by the broker with the market price for raw materials or sought to terminate the agreement to get a better rate.[131]  The Trustee contends that this failure resulted in the Debtor paying a routine 20% premium for light print fiber and increased the Debtor's annual raw materials cost by $1 million.[132]

---

[128]   Trenwick Am., 906 A.2d at 193.

[129]   Adv. D.I. 38 ¶ 125.

[130]   Id. at ¶¶ 118-19.

[131]   Id. at ¶¶ 122-23.

[132]   Id. at ¶ 124.

In his Declaration, Gloss states that he fulfilled his
fiduciary duties with respect to the Debtor's raw material costs
by monitoring market prices and exploring alternative supply
arrangements.[133]  After doing so, Gloss states that he determined
that the Debtor's existing broker was the most appropriate
supplier.[134]

Gloss argues that the Trustee has failed to provide any
evidence to rebut Gloss' credible evidence that he did fulfill
his duty to monitor raw material prices.  Gloss notes again that
the deposition testimony of the Trustee's representative fails to
identify any evidence to support its allegations that Gloss was
not monitoring the cost of raw materials or that the Debtor was
being overcharged.[135]  While the Trustee's Answers to

---

[133]   Adv. D.I. 149, Ex. A (Gloss Decl. at ¶¶ 13-14) ("I closely
monitored the market prices for those materials, including by
reviewing the market price index reports periodically provided by
Dixie Pulp & Paper.  I do not believe that, at any time during my
tenure, Dixie was overcharging [the Debtor] as compared to other
suppliers.  In fact, Eric Diring and I explored potential
alternative fiber supply arrangements over the course of several
months in 2017 and determined that continuing the exclusive
supplier relationship with Dixie was the best option based on the
quotes we received from other potential suppliers.").

[134]   Id.

[135]   Id. at Ex. I (Buchwald Dep. at 64:22-66:17) ("Q. . . . .  What
evidence does the Trust have that Mr. Gloss failed to keep
himself apprised of current market conditions for raw materials
or avail itself of cost decreases in the market? . . .  A.  The
Trust relies on counsel for information in this paragraph based
on its investigations, and the Trust relies on counsel for
determinations of evidence. Q. . . . .  And has anyone told the
Trust that Mr. Gloss failed to keep himself apprised of current
market conditions for raw materials or avail himself - or avail

Interrogatories allege that Gloss' inability to find alternative suppliers harmed the Debtor, Gloss asserts that it provides no evidentiary support for that response.[136]

In its response to the summary judgment motion, the Trustee does not directly address its raw materials allegations.  The Trustee instead generally criticizes Gloss' declaration as an impermissible self-serving contradictory affidavit.  However, the Trustee does not identify any alleged inconsistencies in that Declaration nor present any evidence to contradict any of the statements in that Declaration with respect to the raw materials issue.

While the Trustee does not reference it in his response, the Trustee does attach deposition testimony of the Debtor's Chairman of the Board who testified that raw material costs increased in

---

the debtor of cost decreases? . . . A.  No.  Q. . . . .  And is the Trust relying on anyone's statements - either statements made by parties or witnesses during their deposition or information provided by counsel - for the proposition that Mr. Gloss failed to keep himself apprised of current market conditions and ensure the debtor was being availed of cost decreases? . . . .  A.  No. Q. . . .  Has anyone provided the Trust with any documents - other than documents the Trust has provided the defendants during discovery - indicating that Mr. Gloss failed to keep himself apprised of current market conditions or ensure the debtor was being availed of cost decreases the market? . . .  A.  No.").

[136]  Id. at Ex. B (Answers to Interrogatory No. 11) (". . . Plaintiff states that Gloss's failure to monitor market prices or negotiate with suppliers resulted in damages in the form of corporate waste; increased expenses, liabilities, and administrative costs; a decrease in value of the Debtor's assets; increased insolvency; and a substantial diminution in the Debtor's enterprise value.").

2017 and 2018 which lessened the Debtor's profitability.[137]    That

testimony does not, however, contend that any action or inaction

of Gloss caused those increased raw material costs, rather it

states that there was an industry-wide increase in the cost of

raw materials.[138]    Therefore, the Court finds that it provides no

support for the Trustee's allegations that Gloss breached his

fiduciary duties by failing to monitor and cut the cost of raw

materials used by the Debtor.

The Court concludes that Gloss has met his burden to present

sufficient evidence that he satisfied his fiduciary duties by

monitoring the Debtor's cost of raw materials.[139]    The Court

further finds that the Trustee has failed to rebut Gloss'

---

[137]    Adv. D.I. 158, App'x at A136 (Berlin Dep. at 255:4-18) ("Q.
And is there a reason why [[the Debtor] was not generating the
cash flow that it expected]?    A.    There were probably two or
three reasons at least.    One, the industry itself went into a
period of an extreme squeeze on margins.    So that the - the cost
of paper parent rolls and the pulp for the paper went up, and you
couldn't raise your prices nearly as fast.    Combined with the
idea that we were losing some customers because other companies
were coming in to our areas and stealing our customers.    Either
with economics or with misstatements about us.    And so we didn't
get the cash flows we were expecting from that.    And then we also
had the problems of not getting the cash flow starting and
spending more money on the Barnwell expansion.").

[138]    Id.

[139]    See Celotex, 477 U.S. at 323 (holding that the party moving
for summary judgment bears the initial burden of proving that it
is entitled to relief and there is no genuine dispute of material
fact).

specific evidence with any contrary evidence.[140]  Nor has the
Trustee presented any argument in support of its contention that
Gloss has breached his fiduciary duties or even that there are
genuine issues of material fact on this point.  Mere allegations
that the Debtor's business experienced increased costs is
insufficient to establish that Gloss breached a fiduciary duty.[141]
Nor does it rebut the business judgment rule's presumption that
Gloss "acted on an informed basis, in good faith and in the
honest belief" that his/her actions were in the company's best
interests.[142]  Thus, the Court cannot conclude that Gloss breached
any fiduciary duty he had with respect to the Debtor's cost of
raw materials.

     5.   <u>Books and records</u>

    In its Second Amended Complaint, the Trustee also alleges
that Gloss breached his fiduciary duties by failing to maintain

---

[140]   <u>Matsushita</u>, 475 U.S. at 574 (when the movant has met its
burden of showing that the non-moving party's claim is
implausible, the non-moving party must present more persuasive
evidence to support its claim); <u>Sea-Land Corp.</u>, 642 A.2d at 799
(holding that mere unsubstantiated assertions or allegations are
insufficient to withstand a motion for summary judgment which has
presented credible evidence in support).

[141]   <u>Space Case</u>, 2024 WL 1628440, at *8-9 (holding that the
courts do not equate "a bad outcome with bad faith" and
dismissing the case because "[t]he mere fact of a business
failure does not mean that a plaintiff can state claims against
the directors, officers, and advisors" for breach of their
fiduciary duties because they are not guarantors of a company's
business success).

[142]   <u>McDonald's Corp.</u>, 291 A.3d at 685.

accurate books and records for the Debtor.  The Trustee relies principally on a report of the Debtor's independent auditor, which identified several misstatements in the Debtor's records resulting from the Debtor's "lack of understanding of accounting system information" and "deficiencies in monitoring controls."[143] The Trustee also alleges that Gloss erroneously recorded the Barnwell plant costs as start-up costs even after operations at the plant began.[144]

In his Motion and attached Declaration, Gloss asserts that he did keep accurate books and records for the Debtor.[145]  Gloss contends that any inaccuracies identified by the auditor in the Debtor's books and records during his tenure as CFO were immaterial.  In support, Gloss relies on the Auditors' Letter itself which expressly states that the inaccuracies found by the auditor in the Debtor's books and records were immaterial.[146]

---

[143]    Adv. D.I. 38 ¶ 132.  <u>See</u> Adv. D.I. 149, Ex. N (Auditor's Interim Review and Report to Orchid's Audit Committee dated Aug. 7, 2017 (the "Auditor's Letter")) at App'x 1.

[144]    Adv. D.I. 38 at ¶ 138.

[145]    Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 17).

[146]    <u>Id.</u> at Ex. N (Auditors' Letter) at 1 ("Based on the interim review procedures we have completed thus far, we are <u>not aware of any material modifications that should be made</u> to the interim financial information for them to be in conformity with U.S. generally accepted accounting principles."), 3 ("During our review procedures, we <u>did not identify any significant accounting policies in controversial areas</u> or areas for which there is a lack of authoritative guidance or consensus, or diversity in practice."), 5 ("During the course of our review, we accumulated uncorrected misstatements that were determined by management to

40

Gloss further relies on deposition testimony from Jason Schultz, an accountant from the Debtor's audit company, who testified that there were no material misstatements in the Debtor's books and records.[147]

While the Auditor's Letter does identify some misstatements, Gloss notes that it states that they were immaterial and were the result of "certain deficiencies" in the Debtor's internal controls over financial reporting.[148]  Gloss further notes that both the Auditor's Letter and the testimony of the auditor, Shultz, confirm that the Debtor had acknowledged those deficiencies and put procedures in place to correct them.[149]

---

be immaterial, both individually and in the aggregate, to the financial position, results of operations, cash flows and related financial statement disclosures. . . .  We have discussed the <u>uncorrected misstatements</u> with management and after considering quantitative and qualitative factors, management determined and <u>we concur that these amounts are immaterial</u> to the interim financial information.") (emphasis added).

[147]   <u>Id.</u> at Ex. M (Shultz Dep. at 149:1-8) (Q. . . . .  Do you recall Hogan Taylor ever documenting a material misstatement in [the Debtor]'s publicly-recorded financials?  A.  Not to my knowledge.)

[148]   <u>Id.</u> at Ex. N (Auditors' Letter) at 5 ("During the course of our review, we accumulated uncorrected misstatements that were determined by management to be immaterial, both individually and in the aggregate, to the financial position, results of operations, cash flows and related financial statement disclosures. . . ."), at App'x A ("We identified certain deficiencies in internal control over financial reporting.")

[149]   <u>Id.</u> at Ex. N (Auditors' Letter) at App'x A ("Management has acknowledged the existence of these weaknesses in the financial reporting process, and has been working to improve the necessary controls so that errors are identified and adequately explained earlier in the financial close process going forward."); Ex. M

41

Gloss notes that in the Trustee's deposition, the Trustee
was unable to identify a single document, or witness, in support
of the Trustee's contention that there were material
misstatements in the Debtor's books and records during Gloss'

---

(Shultz Dep. at 28:8-24, 29:9-30:4, 148:3-24, 149:1-8) ("Q. . . .
Do you know what, if any, controls management was implementing?
A.  I recall a few.  Q.  Could you tell me what they are, please.
A.  So I believe they implemented a reconciliation process in
connection with the VAT.  I believe they hired a third party to
mitigate deficiencies around segregation of duties within
accounts payable.  I believe they were looking at the roles and
responsibilities of individuals who were executing controls, as
well as the timing of that.  And I believe that they made
modifications around the financial disclosure checklist that's
performed on a quarterly basis and in connection with the audit
to ensure that those were completed timely and reviewed.  Those
are the ones that I recall off the top of my head. . . .  Q.  Do
you know why significant misstatements went undetected as part of
[the Debtor]'s standard closing process? . . .  A.  No.  Q.
Would it have had something to do with a lack of internal
controls at [the Debtor]? . . .  A.  No.  Q.  And why not?  A.  I
believe they had sufficient internal controls.  I'm not recalling
saying that controls weren't accurate.  I think it was the
execution of the controls and/or the timing of how the controls
were fully completed and implemented. . . .  But the timing of
that something is where the closing process, we believe, needed
to be improved for that to happen earlier in the process. . . .
Q.  And, earlier, you were defining a material weakness, and you
defined it as reflecting a reasonable possibility of a material
misstatement, right?  A.  Correct.  Q.  So this letter does not
even identify a reasonable possibility of a material
misstatement, right? . . .  A.  This letter communicates a
significant deficiency.  Q. . . . .  So this letter does not
communicate a reasonable possibility of a material misstatement?
A.  It does not communicate a material weakness.  Q. . . . .  And
it does not reflect a judgment that [the Debtor]'s books and
records, overall, are inaccurate; is that right? . . .  A.  It
does not say that.  Q. . . . .  Do you recall Hogan Taylor ever
documenting a material misstatement in [the Debtor]'s publicly-
recorded financials?  A.  Not to my knowledge.  Q.  Do you recall
Hogan Taylor ever documenting a material weakness with respect to
[the Debtor]'s financial processes?  A.  Not to my knowledge.")
(emphasis added).

tenure.[150]  Gloss also notes that the Trustee admitted in its

discovery responses that the auditors found no material

misstatements in the Debtor's books and records.[151]

In its response, the Trustee does not directly address the

bookkeeping issue.  The Trustee instead generally criticizes

Gloss' declaration as an impermissible self-serving affidavit and

claims that Gloss' evidence is contradictory, without further

explanation.  The Trustee does, however, attach deposition

testimony from the Debtor's former CEO, Schoen (who testified

that the Barnwell plant was fully operational in the first half

of 2017)[152] which appears to support its contention that the costs

---

[150]   Id. at Ex. I (Buchwald Dep. at 67:4-68:10; 69:1-70:12) (Q. .
. . . How does the Trust allege the debtor's books and records
were inaccurate?  A.  These allegations were developed by the
Trust counsel.  Q.  Has anyone told the Trust that the debtor's
books and . . . records were inaccurate? . . . . A.  No.  Q. . .
. . Is the Trust relying on anyone's statements – other than any
statements made during depositions or information received from
counsel – to support the proposition that any of the debtor's
books and records were inaccurate? . . . . A.  No.  Q. . . . .
Has anyone provided the Trust with any documents – other than
documents produced by the Trust to the defendants during
discovery – indicating that any of the debtor's books and records
were inaccurate? . . .  A.  No.").

[151]   Id. at Ex. B (Trustee's Responses to Requests for Admissions
No. 3) ("Admit that [the Debtor]'s auditors never identified any
material misstatements in [the Debtor]'s annual or quarterly
financial statements during Gloss's tenure as [the Debtor]'s
chief financial officer.  RESPONSE: Admit.").

[152]   Adv. D.I. 158, App'x at A118-19 (Schoen Dep. at 461:7-462:6)
("Q.  And if we go into the report itself . . . it states that
the Barnwell facility was expected to be operational in the first
half of 2017.  And I'm curious to know what – what [the Debtor]'s
definition of operational would include.  A.  Operational means
making product.  Q.  Does that mean that all machines are

for the Barnwell plant should not have been recorded as startup costs.

Gloss replies that he has presented evidence (in addition to his declaration) sufficient to establish that his actions in recording costs for the Barnwell plant as start-up costs aligns with Generally Accepted Accounting Principles ("GAAP") and was justified given that the plant, though operational in 2017, was not running up to expectations.[153]  Gloss again argues that at his

---

operational? . . . A.  At Barnwell?  Q.  Yes. That is what's being discussed in this paragraph.  A.  Yeah.  You have one paper machine and two converting lines.  So yes.  Q.  And did Barnwell meet this expectation?  A.  We started up the machine in June, the paper machine.  Converting lines were started up in 2016.  Q. And so it was fully operational in the first half of 2017?  A. Yes.").

[153]     Adv. D.I. 149, Ex. A (Gloss Decl. at ¶¶ 19-20) ("Under U.S. Generally Accepted Accounting Principles, start-up costs include any labor, materials, advisory expenses and other costs incurred before a newly constructed manufacturing plant is operating at its intended standards.  The start-up phase continues even after the plant is capable of producing product for commercial sale. Barnwell was still in the process of ramping up to its intended operating standards when I left [the Debtor] in March 2018, so it was appropriate to continue reporting Barnwell-related expenses as start-up costs through my departure.  Throughout that period, I monitored start-up related costs as they were incurred, accurately reported the costs to the Board and CEO, and supported the operations team in their efforts to contain costs."); Ex. N (Auditors' Letter) at 1 ("Based on the interim review procedures we have completed thus far, we are not aware of any material modifications that should be made to the interim financial information for them to be in conformity with U.S. generally accepted accounting principles."); Adv. D.I. 163, Ex. 1 (Gloss Dep. at 374:3-11) ("Q.  To your knowledge, did [the Debtor] ever hit this defined completion date while you were with the company? A.  I believe so.  I have to look at the other amendments, but we were actually - you know, construction was done sometime mid 2017, and the equipment was operating mid - we may have – I think we had the equipment operating by September of '17.  It just

44

deposition, the Trustee's representative was unable to identify a single document, or witness, in support of the Trustee's contention that it was improper or inaccurate to record the Barnwell costs as a startup cost in 2017.[154]  As a result, Gloss asserts that the Trustee has failed to present competent evidence demonstrating that Gloss breached any fiduciary duty with respect to the Debtor's books and records.

While the Trustee asserts, correctly, that a self-serving affidavit is generally insufficient to meet a movant's burden of proof on a motion for summary judgment, as the Court concluded above, such an affidavit is adequate when it is sufficiently specific and is supported by other evidence.[155]  Here, Gloss' declaration specifically asserts that his accounting practices

---

wasn't operating at the productive levels we had anticipated.").

[154]  Id. at Ex. I (Buchwald Dep. at 69:1-70:12) (Q. "Does the Trust have any evidence that the costs being recorded as startup costs were not startup costs? . . . .  A.  The Trust relies on any information that the Trust counsel investigated, and the Trust relies on counsel for determinations of evidence.  Q. . . . .  Has anyone told the Trust that those costs were not startup costs? . . . .  A.  No.  Q. . . . .  And is the Trust relying on anyone - anyone's statements - other than statements made during depositions or information received from counsel - for the proposition that those costs were not start up costs? . . . .  A. No.").

[155]  Kirleis, 560 F.3d at 161 (holding that a conclusory, self-serving affidavit was generally insufficient to overcome a motion for summary judgment, but was sufficient given that it was sufficiently specific and uncontested due the lack of contradictory evidence submitted).

complied with GAAP and explains why.[156]   Additionally, Gloss does
not rely only on his declaration to meet his burden of proof.
Gloss' supporting evidence includes the auditors' report and
testimony demonstrating that there were no material
misrepresentations in the Debtor's books and records, that any
inaccuracy was immaterial, and that those records were prepared
in accordance with GAAP.[157]   Thus, the Court concludes that Gloss
has met his burden of demonstrating that he did not breach his
fiduciary duties with respect to maintenance of the Debtor's
books and records.[158]

Further, the Court finds that the Trustee has failed to
present any evidence that the Debtor's books and records were
materially inaccurate or that Gloss' practices were contrary to
GAAP.   The only evidence in support of its contention was the
Auditors' Letter identifying "weaknesses in the financial
reporting process" which resulted in "uncorrected misstatements"
in the Debtor's records.[159]   That same evidence though shows that
those deficiencies were immaterial, were acknowledged, and were

---

[156]   Adv. D.I. 149, Ex. A (Gloss Decl. at ¶¶ 16-20).

[157]   Adv. D.I. 149, Ex. N (Auditor's Letter); Ex. M (Shultz
Dep.).

[158]   See Celotex, 477 U.S. at 323 (holding that the party moving
for summary judgment bears the initial burden of proving that it
is entitled to relief and there is no genuine dispute of material
fact).

[159]   See note 148.

promptly corrected.[160]

    While the Trustee contends that there is a material issue in dispute regarding whether the Barnwell plant was operational in 2017, the Court finds that that factual issue is not in dispute or material to the allegations against Gloss.  Gloss has conceded that the plant became operational in 2017[161] but argues that it was still proper to charge the plant's costs as start-up costs under GAAP.  This argument is supported by Gloss' declaration and by the Auditors' testimony and report which state that the Debtor's accounting was in accordance with GAAP and not materially misleading.[162]  The Trustee presented no rebuttal evidence that presenting those costs as start-up costs was improper.

    Accepting the evidence in the light most favorable to the Trustee, that evidence shows only that there were immaterial misstatements in the Debtor's books and records as a result of deficiencies in the Debtor's financial reporting systems.  Those deficiencies were immediately acknowledged by the Debtor and

---

[160]   See note 149.

[161]   Adv. D.I. 163, Ex. 1 (Gloss Dep. at 374:3-11) ("Q.  To your knowledge, did [the Debtor] ever hit this defined completion date while you were with the company?  A.  I believe so.  I have to look at the other amendments, but we were actually - you know, construction was done sometime mid 2017, and the equipment was operating mid - we may have – I think we had the equipment operating by September of '17.  It just wasn't operating at the productive levels we had anticipated.").

[162]   See note 153.

corrective action was promptly taken.[163]

There is no evidence that those misstatements were deliberate nor do they show that Gloss was grossly negligent. Therefore, the Court concludes that the evidence is insufficient to support the Trustee's claim that Gloss breached his fiduciary duty of care.[164]  Those immaterial misstatements also provide no evidence that Gloss was on both sides of any transaction involving the Debtor and therefore no evidence that he breached his duty of loyalty.[165]  The fact that prompt steps were taken to correct the errors also negates any conclusion that Gloss breached his duty of loyalty by deliberate indifference and inaction with respect to his duties.[166]

Therefore, the Court concludes that the evidence regarding the maintenance of the Debtor's books and records is insufficient to support a finding that Gloss breached his fiduciary duties to the Debtor.

### 6. Operating after Becoming Insolvent

In the Second Amended Complaint, the Trustee asserts that Gloss breached his fiduciary duties to the Debtor by

---

[163]   See note 149.

[164]   Opus E., 528 B.R. at 66 (noting that a claim alleging breach of the fiduciary duty of care requires that the plaintiff demonstrate that the corporate officer acted with gross negligence).

[165]   Id.

[166]   Cf. Walt Disney Co., 907 A.2d at 755.

48

"[c]ontinuing to operate the Debtor once it was hopelessly insolvent, thereby greatly increasing amounts owed to creditors."[167]

In his Motion, Gloss asserts that the decision to continue to operate the Debtor was not his to make.  In his Declaration, he stated that the decision was made by the Debtor's CEO, Schoen, and its Board, not by him and that he had no authority to countermand that decision.[168]  Gloss further stated that he made a good faith effort to pursue the Board's chosen financing strategies by negotiating with the lenders to obtain extensions of the Debtor's financing.[169]  In support of his Motion for Summary Judgment, Gloss also notes that the Trustee's admits that Gloss had no authority to overrule such decisions by the Board or CEO.[170]

---

[167]    Adv. D.I. 38 at ¶ 167(c)(vi).

[168]    Adv. D.I. 149, Ex. A (Gloss Decl. at ¶¶ 22 & 24) ("The decisions to continue operating [the Debtor], amend its credit agreement, and conduct a refinancing process were made by [the Debtor's] board of directors and chief executive officer. . . . I had no authority to make a different decision or prevent [the Debtor] from pursuing the Board's chosen course of action.").

[169]    Id. at ¶¶ 23-24 ("During my tenure, at the Board's request, I worked diligently with SunTrust in an effort to refinance [the Debtor's] bank debt via new debt and/or equity issuances. . . . As noted, during my tenure, I worked diligently and in good faith to execute the strategy approved by the Board, including by attempting to achieve a successful refinancing of [the Debtor's] debt.").

[170]    Adv. D.I. 149, Ex. B (Response to Request for Admissions No. 4) (". . . . Plaintiff admits that the Debtor's Amended and Restated Bylaws provide that the position of 'Chief Financial

In response, the Trustee acknowledges that Gloss did not have sole discretion to determine whether the Debtor should continue to operate or agree to financial amendments with its lenders to allow it to continue to operate.[171]  However, the Trustee contends that Gloss should have opposed the amendments rather than participate in their negotiation and approval by the Board because those amendments only made the Debtor's financial condition worse.

In support, the Trustee presented evidence that Gloss knew that the Debtor required additional funds to cover anticipated cost overruns in the Barnwell construction,[172] was instrumental in arranging to pay for some of the cost overruns from cash flow resulting in the Debtor being unable to pay its debts as they came due,[173] played a key role in negotiating the credit

---

Officer' has certain powers and duties, none of which appear to include the ability to cancel, or veto the decisions of the Board of Directors or the Debtor's CEO.").

[171]    Adv. D.I. 158 at 11.

[172]    Adv. D.I. 158, App'x at A035 (Gloss Dep. at 106:21-25) (stating that the Debtor could not pay for the Barnwell project without refinancing the bank debt).

[173]    Id. at A035-36 (Gloss Dep. at 105:24-107:8) (stating that the company "made ends meet" by selling excess inventory and paying for the Barnwell cost overruns from cash flow); A135-36 (Berlin Dep. at 254:19-255:3) (testifying that the Debtor began to experience trouble with generating sufficient cashflow in late 2017 or early 2018); A142 (White Dep. at 27:10-13) (stating that inadequate cash flow drove the Debtor into bankruptcy); A166-67, A173-75 (emails to/from creditors regarding unpaid bills).

amendments,[174] and did not oppose the Board's approval of those amendments notwithstanding the fact that those amendments only made the Debtor's financial condition worse.[175]  The Trustee also

_____

[174]  Id. at A049 (Gloss Dep. at 342:5-10) ("I was in charge of negotiating the amendments and extensions to those agreements"); A-055 (Gloss Dep. at 348:20-23) (Q.  And did you negotiate this amendment, to your knowledge?  A.  Yes.  Others were involved, like Jeff Schoen, but I was principal contact and principal negotiator.").  See also, id. at A070 (Gloss Dep. at 363:17-18); A085 (Gloss Dep. at 378:20-21); A090 (Gloss Dep. at 383:17-18); A096 (Gloss Dep. at 390:20-22.  See also id. at A146 (Board Minutes dated December 1-2, 2016) ("Mr. Gloss first referred the Board to a written presentation of the Company's year-to-date Profit and Loss Statement through October, 2016 and actual sales of converted product, by customer, through November, 2016.  Mr. Gloss then discussed the Company's financial performance as it relates to the covenants coverage in its bank facility."); A149 (Board Minutes dated August 20-21, 2017) ("Mr. Gloss then discussed the Company's financial performance as it relates to the covenants coverage in its bank facility.  A discussion ensued at the conclusion of which, Management provided an update on various refinancing alternatives that were currently in process or being reviewed by Management and its advisors); A151 (Board Minutes dated February 14, 2017) ("Thereupon Messrs. Schoen and Gloss lead a detailed discussion of the Company's projected 2017 financial results with an emphasis on the first and second quarters, and how those results would affect the financial covenants in the Company's credit facility in each of those quarters."); A154 (Board Minutes dated April 30-May 1, 2017) ("Mr. Gloss also discussed the Company's projected quarter end cash and leverage ratios in the context of it bank covenants."); A159 (Board Minutes dated October 23, 2017) ("Mr. Berlin asked Management to present the most recent proposals regarding various avenues to refinance the Company's current indebtedness.  Messrs. Gloss and Schoen proceeded to discuss those proposals and the status of the process for the various alternatives.  A discussion ensued at the conclusion of which management was directed to continue discussions with specific interested lenders/investors.").

[175]  Id. at A161, A163-65.  See also id. at A173 (Email from Michael Steimle, M3, to Rodney D. Gloss, Chief Financial Officer of [the Debtor] dated Oct. 6, 2017, 9:41 CST) ("Rod, can you please advise when [the Debtor] will release payment to M3 on our invoices?  The payments are 2 months late at this point. . . .

relies on deposition testimony from Debra White, the Debtor's
former Chief Accounting Officer, who testified that the Debtor
was in compliance with the covenants for its long-term debt,[176]
but became insolvent because of inadequate cash flow, caused in
part by increasing interest and bank fees.[177]

Gloss contends that the Trustee's evidence does not support
its claim that his actions were a breach of his fiduciary duties.
He relies on evidence that a variety of factors led to [the
Debtor]'s weakened financial state,[178] and as a result, the Debtor

---

We've been told twice that payment would be released on the next
Friday but it has not happened and without explanation."); A174
(Email from Michael Steimle, M3, to Rodney D. Gloss, Chief
Financial Officer of [the Debtor] Paper dated Oct. 11, 2017,
10:47 CDT) ("Rod . . . the outstanding sum with us is pretty
large . . . if we need to have a conversation regarding splitting
up the balance into multiple payments, I'd be willing to talk to
you."); A175 (Email from Michael Steimle, M3, to Jeffrey S.
Schoen, Chief Executive Officer of [the Debtor] Paper dated Feb.
19, 2018, detailing outstanding payments due to M3 and Feb. 22,
2018, response from Schoen, asking to pay that debt over the next
5-6 months).

[176]   Id. at A142 (White Dep. at 27:4-9) ("Was [the Debtor] in
compliance with the covenants of its long-term debt?  A.  We
were.  Q.  Do you know the basis for that belief?  A.  We had to
provide a statement in the 10-K saying we're in compliance.").

[177]   Id. at A142 (White Dep. at 27:10-23) ("Q.  Based on your
experience at [the Debtor] between your hire date and the date of
bankruptcy, do you know what drove [the Debtor] into bankruptcy?
A.  Inadequate cash flow.  Q.  And what was the root of the
inadequate cash flow?  A.  I think there were a lot of
contributors to that.  Q.  Can you tell me what some of them
were, please?  A.  CapEx, the lower sales, reduced profit margin,
increasing interest and bank fees.  Q.  Do you recall - I'm
sorry.  Were there any others?  A.  That's all I can think of.").

[178]   Id.  See also Adv. D.I. 158 (Berlin Dep.) at A135-36,
254:19-255:18 ("Q.  Did the operations of [the Debtor] ever

had a poor bargaining position with the bank during the

negotiations regarding the credit agreement amendments.[179]  Gloss

---

produce enough cashflow to meet the debt obligation?  A.  You
asked 'ever,' so I have to say yes.  Q.  When did that occur?  A.
It happened all of the time until we got into this trouble with
not generating the cashflow that we expected to see.  Q.  And
when did that happen?  A.  Um, 2017, 2018.  So I don't remember
if it was late 2017 or early 2018.  Q.  And is there a reason why
that happened?  A.  There were probably two or three reasons at
least.  One, the industry itself went into a period of an extreme
squeeze on margins.  So that the -- the cost of paper parent
rolls and the pulp for the paper went up, and you couldn't raise
your prices nearly as fast.  Combined with the idea that we were
losing some customers because other companies were coming in to
our areas and stealing our customers.  Either with economics or
with misstatements about us.  And so we didn't get the cashflows
we were expecting from that.  And then we also had the problems
of not getting the cashflow starting and spending more money on
the Barnwell expansion.").

[179]    Adv. D.I. 163, Ex. 1 (Gloss Dep. at 379:18-380:7, 393:1-24)
("Q.  And is it your opinion that in that initial half a year
that [the Debtor] made progress towards meeting the requirements
of the bank? . . . .  A. Yeah, you'd have to be specific.
Answering the question generally, de facto, no.  I mean, we kept
forecasting that we were going to see improvements, but the
improvements we were forecasting generally did not materialize.
We didn't get the increased sales, we didn't get Barnwell up and
operating as intended, and our cost structure went up more than
anticipated. . . .  Q. . . . .  You mentioned that the forecast
for [the Debtor] had become negative during this period.  Can you
explain what that means, please.  A.  Yeah.  Again, we were
continuously updating our cash forecasts at least monthly and the
bank was getting them, at this point, monthly.  And the forecast
for operating results had become negative and were - we were - I
believe I was forecasting losses going forward.  In the three
critical factors, again, sales were adverse.  Dollar General was
down.  We - Walmart was in jeopardy, was not placing orders on
Barnwell that they had promised.  Barnwell's equipment was still
not operating at specified production levels.  So production was
hampered, costs were up, fiber costs were increasing.  For
example, electricity costs were increasing dramatically.  So our
costs of production were all increasing.  And so the - all the
operating metrics had turned negative.  And that hurt our story a

admits that he was involved in negotiating the credit agreements but contends that the terms of the credit agreement amendments were driven by the bank's superior negotiating position.[180]  Gloss argues that the amended credit agreements were less favorable to the Debtor as a natural consequence of the Debtor's continued declining financial condition.[181]

The Court finds that there is no dispute that Gloss was not responsible for the Debtor continuing to operate as its financial condition deteriorated; that was a Board decision.[182]  Further, there is no dispute that Gloss was responsible for negotiating

---

lot with the bank.  I mean, we had - my main pitch to the bank is bear with us until we get Barnwell up and operating.  And that was no longer the only issue.  We were having a bunch of operating issues at that point in time.").

[180]  Id. at 378:22-379:12 ("Q.  And just a second ago you called this 'the quarterly amendments.'  Can you explain for me what you meant by that, please.  A.  You're seeing a pattern here that the bank, we're entering into a new amendments every quarter.  And, basically, the bank was doing an update asking for updates on everything every quarter, official new forecasts of what we were expecting every quarter.  And as I stated earlier, in trying to negotiate these amendments, I always asked them to give us like another year to work out of things, but they kept coming back and saying, 'We want to stay in touch; we want to have you give us new information every quarter.'  And so, anyway, we ended up in a pattern of having to amend the loan every quarter based on whatever new information we had.").

[181]  Id. at 392:5-12 ("So the bank came back and was cracking down on - well, in a way, they were cracking down on everything.  They granted another extension and agreed to waive the default that had already occurred on the fixed charge coverage ratio.  But, you know they're - they're saying you've got to get everything in line and you've got to get back to these new ratios that they're giving.").

[182]  See notes 168-70; Adv. D.I. 158 at 11.

the credit agreements with the Debtor's lenders,[183] that the credit agreements were increasingly unfavorable to the Debtor because of its lessened bargaining position,[184] and that ultimately the Debtor filed for bankruptcy.[185]

The Court concludes, however, that those facts alone do not establish that Gloss breached his fiduciary duties. Under the business judgment rule Gloss is presumed to have "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[186] The Trustee has offered no evidence to rebut that presumption. The Trustee has presented no evidence that Gloss consciously disregarded his duties through deliberate indifference and inaction. On the contrary, the evidence shows that Gloss was actively involved in the negotiation of the credit agreements in an effort to relieve the Debtor's liquidity problems caused, in part, by the Barnwell cost overruns.[187] Nor has the Trustee presented any evidence that Gloss breached his duty of loyalty by being on both sides of the credit agreement negotiations. Further, the Trustee offers no evidence that Gloss breached his

---

[183]   See note 174.

[184]   See notes 179-81.

[185]   D.I. 1.

[186]   McDonald's Corp., 291 A.3d at 685.

[187]   See notes 174, 179-81.

duty of care by acting with gross negligence, in bad faith, recklessly, or unreasonably in the credit agreement negotiations.

Thus, the Court concludes that Gloss has presented sufficient competent evidence, unrebutted by the Trustee's evidence, that Gloss did not breach his fiduciary duties by negotiating the credit agreement amendments. Even if the Trustee is correct in its assertion that the credit agreement amendments contributed to the Debtor's weakened financial condition and led to its need to file bankruptcy, there is no evidence that the decision of the Debtor to refinance its bank debt was irrational. That action was taken to allow the completion of the Barnwell construction in the hope that the plant could begin to generate additional cashflow. It is not a breach of an officer's fiduciary duty to attempt to prevent the Debtor's insolvency by taking affirmative action, even if that action is ultimately unsuccessful.[188] "The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit."[189]

---

[188]  _Space Case_, 2024 WL 1628440, at *8 (Bankr. D. Del. Apr. 15, 2024) ("Even when a company is insolvent, its directors and officers may 'take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red.' The fact that a firm is insolvent does not mean that the company's officers and directors 'cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery.") (quoting _Fedders N. Am._, 405 B.R. at 541).

[189]  _Trenwick Am._, 906 A.2d at 193.

Accordingly, the Court concludes that the Trustee has failed to present sufficient evidence to establish that Gloss' actions with respect to the credit agreement negotiations were a breach of Gloss' fiduciary duties.

Because the Court has concluded that Gloss has presented competent evidence that he fulfilled all of his fiduciary duties to the Debtor which the Trustee has not rebutted by contrary evidence, the Court will grant Gloss' Motion for Summary Judgment on Count I of the Second Amended Complaint.

B.    <u>Avoidance of Fraudulent Transfers</u>

In Count IV of the Second Amended Complaint, the Trustee seeks to avoid, as fraudulent transfers under sections 544, 548, and 550 of the Bankruptcy Code, all payments made to Gloss within two years of the Petition Date.[190]  The Trustee alleges that the payments made to Gloss for his compensation and benefits from April 1, 2017, to March 16, 2018, totaling $209,037.53,[191] are avoidable fraudulent transfers.  The Trustee contends that, because Gloss breached his fiduciary duties, the Debtor received less than reasonably equivalent value for the payments made to him.[192]

---

[190]    Adv. D.I. 38 ¶ 187.

[191]    <u>Id.</u> at ¶ 187(b) & Ex. B.

[192]    <u>Id.</u> at ¶¶ 188, 190.

Gloss argues that the premise of the Trustee's allegations is faulty. He asserts that he did not breach any of his fiduciary duties for the reasons stated above. Gloss further contends that, even if he had breached a fiduciary duty, that alone does not warrant a claw back of his compensation.[193]

Gloss asserts an additional ground for granting judgment in his favor on the fraudulent transfer claim. He contends that the allegedly avoidable transfers were Gloss' normal salary payments and that there is a presumption that he provided reasonably equivalent value for those payments by the services he rendered.[194] He argues that Delaware courts have held that even when a company fails, it does not mean that the corporate officers did not provide valuable services for which they should be paid.[195]

---

[193] Citron v. Merritt-Chapman & Scott Corp., 409 A.2d 607, 611 (Del. Ch. 1977) ("While numerous decisions hold that corporation compensation is properly recoverable in a situation where the disloyalty of the officer or director constitutes the usurpation of a corporate opportunity . . . no authority is offered for the proposition that every illegal act or breach of fiduciary duty committed by a corporate officer warrants a forfeiture of his compensation.").

[194] See Modell's Sporting Goods, 2023 WL 2961856, at *34 ("As a general rule, 'payments for salary are presumed to be made for fair consideration.'") (quoting TC Liquidations, 463 B.R. at 268).

[195] See, e.g., SRC Liquidation, 581 B.R. at 98 (holding that even when corporate fiduciaries are "ultimately unsuccessful in saving the [c]ompany," it "does not detract from the work undertaken . . . for which they were compensated" in affirming the bankruptcy court's dismissal of fraudulent transfer claims because bonuses were approved by the board for work performed

Gloss notes that in the Second Amended Complaint the Trustee characterizes the payments to him as compensation and benefits.[196] In further support, Gloss presented evidence that the payments were for his compensation at the rate stated in the Debtor's offer of employment (which he accepted without further negotiation).[197]  Gloss also presented the deposition testimony of the Board members who stated that he was qualified for his role as CFO and that they were satisfied with his services.[198]

---

pursuing acquisition, even though the acquisition was ultimately unsuccessful); Official Committee of Unsecured Creditors v. Nat'l Amusements Inc. (In re Midway Games Inc.), 428 B.R. 303, 323 (Bankr. D. Del. 2010) (dismissing claim for avoidance of fees paid to directors in the ordinary course of business because the plaintiff failed to state a claim for breach of fiduciary duties and there was no allegation that the fees were extraordinary or excessive).

[196]    Adv. D.I. 38 at ¶ 187(b).

[197]    Adv. D.I. 149, Ex. A (Gloss Decl. at ¶ 3) ("During my tenure, I received routine compensation in exchange for my services as CFO."); Adv. D.I. 163, Ex. 2 (Gloss Dep. at 33:16-18) ("Q.  Did you negotiate this offer at all?  A.  No.  I found it acceptable and I was interested.").

[198]    See Adv. D.I. 149, Ex. C (Berlin Dep. at 163:11-13) ("Q. . . . Was - was Rod well qualified to be CFO in your opinion?  A.  I think Rod was qualified to be CFO."); Ex. D (Guttilla Dep. at 117:3-9) ("Q.  Did you ever have any criticisms of Mr. Gloss's performance of his duties as the CFO of [the Debtor]?  A.  No. Q.  Did you ever identify any weaknesses of Mr. Gloss in his performance as the CFO of [the Debtor]?  A.  No, he's a very detailed individual, very thorough in his analysis."); Ex. E (MacDonald Dep. at 107:21-24) ("Q.  And since you were involved in hiring him, I assume that you believe [Gloss] was qualified to be the CFO of [the Debtor].  A.  Yes."); Ex. F (Hailey Dep. at 120:9-19) ("Q.  How about Rod Gloss, do you believe Rod was . . . well qualified to be CFO of [the Debtor]?  A. . . . . You know, he was hired by the audit committee, I remember them running him by me.  They went through a big process and talked to a lot of

In response, the Trustee argues that recovery of an officer's compensation is justified when it was paid in bad faith or is excessive.[199]  The Trustee asserts that Gloss breached his fiduciary duties and acted in bad faith and that his compensation is excessive because he neglected to fulfill his employment responsibilities and ignored numerous red flags.[200]  In support of these assertions, the Trustee relies on the evidence and arguments presented in support of its arguments that Gloss breached his fiduciary duties.  In addition, the Trustee cites the deposition testimony of the Chairman of the Debtor's Board who stated Gloss was not well-qualified because he produced an unintelligible report in response to a request by the Chairman for information, suggesting that his services were not reasonably

---

people and, you know, settled on Rod.  He seemed very qualified on paper.  I don't really remember, you know, the specifics. But, yeah, I think he was definitely qualified."); Ex. G (Ravich Dep. at 99:19-23) ("Q.  So the next CFO was Mr. Gloss, correct? A. Yes.   Q.  Do you believe that Mr. Gloss was well qualified to by a CFO of [the Debtor]?  A.  Yeah."); Ex. H (Schoen Dep. at 328:21-22) ("Q.  Did you consider Rod to be a good CFO?  A. Yes.").

[199]    See, e.g., Modell's Sporting Goods, 2023 WL 2961856, at *34 (holding that to sufficiently state an avoidance claim with respect to salary, the plaintiff must allege that "the salary payments were in bad faith or that the payments were excessive in light of the Defendants' employment responsibilities.") (citing TC Liquidation, 463 B.R. at 268)).

[200]    OHC Liquidation Trust v. Discover RE (In re Oakwood Homes Corp.), 342 B.R. 59, 70 (Bankr. D. Del. 2006) (defining bad faith in general as neglecting or refusing to fulfill some duty or some contractual obligation based upon an interested or sinister motive) (citations omitted).

equivalent to his salary.[201]  The Trustee argues that the
determination of bad faith is a factual issue and that there is a
genuine dispute of material fact on this point warranting denial
of Gloss' summary judgment motion.[202]  The Trustee contends that
this case is distinguishable from the ones on which Gloss relies
because there was no credible contention in those cases that the
officers or directors acted in bad faith or had not competently
performed the work for which they were paid.[203]

---

[201]   Adv. D.I. 158, App'x at A132-34 (Berlin Dep. at 163:11-24,
164:18-165:4) (Q. . . . .  What about Rod Gloss?  Was - was Rod
Gloss well qualified to be CFO in your opinion?  A.  I think Rod
was qualified to be CFO.  Q.  Okay.  But not well qualified?  A.
Correct.  Q.  Tell me why that is.  A.  . . . . Rod did not have
the total background in the financial accounting, auditing,
inter-relationships with the auditors, the traditional kind of
stuff that you think a chief accountant would have.  And to that
end, I think he was not well qualified to handle that. . . .  Q.
Tell me about the times where - where Rob provided information
that was not accurate.  A.  I don't remember specifically what it
was about, but we're going over a report, and the report made
absolutely no sense to me.  And I asked him that he needed to go
back and get the thing looked at.  And when it came back, it was
totally different than what it had been.  And he was providing
that to me on a specific request that I had of him of some
report, but I don't remember which one it was.  It wasn't a
general board report.  It was just one I asked him as
chairman.").

[202]   Oakwood Homes, 342 B.R. at 70.

[203]   See Modell's Sporting Goods, 2023 WL 2961856, at *34
(dismissing case on the pleadings for failure to allege bad faith
or that the salary was excessive); SRC Liquidation, 581 B.R. at
98 (dismissing breach of fiduciary duty claims); Midway, 428 B.R.
at 323 (dismissing fraudulent transfer claim because, inter alia,
court found that plaintiff had failed to state a claim for breach
of fiduciary duty).

Gloss argues that the Trustee's mere assertion that there is a genuine dispute regarding Gloss' bad faith or the excessiveness of his salary is not sufficient to conclude that there is one. Gloss contends that the Trustee has presented no evidence that Gloss acted in bad faith or that his salary was excessive or not reasonably equivalent to his services. Gloss further argues that the evidence presented by the Trustee regarding Gloss' "poor" performance related to a single isolated incident and is refuted by the testimony of all of the Board members (including the Chairman of the Board on whom the Trustee relies) who stated that they were satisfied with his work and that he was qualified.[204]

After considering all the evidence in the light most favorable to the Trustee,[205] the Court concludes that Gloss has met his burden of establishing that his compensation and benefits are not avoidable under sections 544, 548, and 550 of the Bankruptcy Code.[206]

Because the Court has concluded above that Gloss has met his burden of showing that he did not commit any breach of fiduciary duty, the Court agrees that this is not a basis for avoidance of his salary and benefits payments. Further, even if Gloss had

---

[204]   See notes 198, 201.

[205]   Saldana, 260 F.3d at 231-32.

[206]   See Celotex, 477 U.S. at 323 (holding that the party moving for summary judgment bears the initial burden of proving that it is entitled to relief and there is no genuine dispute of material fact).

breached a fiduciary duty, that alone is insufficient to sustain an action for avoidance of his compensation as a fraudulent transfer.[207]  Instead, the Trustee would have to prove that Gloss acted in bad faith, was disloyal, or profited from a conflict of interest.[208]  As the Court concluded above in connection with the breach of fiduciary duty claims, the Trustee has presented no evidence that Gloss acted in bad faith.[209]  Mere unsubstantiated assertions or allegations are insufficient to withstand a motion for summary judgment which has presented credible evidence in support.[210]

Furthermore, routine salary payments are presumed to be an exchange of reasonably equivalent value for an employee's services.[211]  Gloss has presented credible evidence that the compensation paid to him was the salary that the Debtor offered for the position when he applied.[212]  Thus, there is a presumption that it was reasonably equivalent to the services he rendered.

---

[207]  <u>Citron</u>, 409 A.2d at 611 (holding that not every illegal act or breach of fiduciary duty warrants a forfeiture of an officer's compensation).

[208]  <u>Id.</u>

[209]  <u>See</u> text at notes 97, 127, 142, 165.

[210]  <u>Sea-Land Corp.</u>, 642 A.2d at 799.

[211]  <u>Modell's Sporting Goods</u>, 2023 WL 2961856, at *34 (holding that salary payments are presumptively reasonably equivalent value, rebuttable with an allegation that payments were excessive or made in bad faith).

[212]  <u>See</u> note 197.

That presumption may be rebutted only by evidence that the payments were made in bad faith (which as noted, the Trustee has not established) or were excessive.[213]   While the Trustee presented testimony by one of the Board members that Gloss underperformed, that testimony was based on an isolated incident and is refuted by the testimony of that same Board member (and the rest of the Board) that Gloss was qualified to serve as the Debtor's CFO.[214]   Therefore, the Court concludes that the isolated incident alone is insufficient to support a finding that Gloss' salary was excessive.   Thus, the Court finds that the Trustee has failed to present sufficient evidence to rebut the presumption that the routine salary payments made to Gloss were made for reasonably equivalent value.[215]

Consequently, the Court will grant summary judgment in favor of Gloss on Count IV of the Trustee's complaint.

V.   CONCLUSION

For the foregoing reasons, the Court will grant Gloss' Motion for Summary Judgment on Counts I and IV of the Trustee's

---

[213]   Modell's Sporting Goods, 2023 WL 2961856, at *34; Wonderwork, 611 B.R. at 208;   TC Liquidation, 463 B.R. at 268.

[214]   See notes 198, 201.

[215]   See Modell's Sporting Goods, 2023 WL 2961856, at *34 ("As a general rule, 'payments for salary are presumed to be made for fair consideration.'") (quoting TC Liquidations, 463 B.R. at 268).

64

Second Amended Complaint.

    An appropriate Order is attached.


Dated: February 14, 2025        BY THE COURT:


Mary F. Walrath
United States Bankruptcy Judge